UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ──────────────────── x | | |
| ALASKA LABORERS EMPLOYERS RETIREMENT FUND, Individually and On Behalf of All Others Similarly Situated, | : : : : | Civil Action No. 07-CIV-07402-GBD <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | : : | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS |
| vs. | : : | OF FEDERAL SECURITIES LAWS |
| SCHOLASTIC CORP., et al., | : : | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | : : | |
| ──────────────────── x | | |

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Scholastic Corp. ("Scholastic" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, the allegations and consent decree in the matter styled *United States of America v. Scholastic Inc., Grolier Incorporated, and Scholastic At Home, Inc.*, Civ. No. 05-1216, press releases and other public statements issued by the Company, media reports about the Company and interviews with former employees of Scholastic, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of Scholastic between March 18, 2005 and March 23, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Alaska Laborers Employers Retirement Fund, as set forth in its previously filed certification, incorporated by reference herein, purchased the securities of Scholastic at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Scholastic and its subsidiaries engage in publishing and distributing children's books worldwide.  The Company is headquartered in New York City.

8.     (a)     Defendant Richard Robinson ("Robinson") served as Scholastic's Chairman, Chief Executive Officer ("CEO") and President during the Class Period.

(b)     Defendant Mary Winston ("Winston") served as Scholastic's Chief Financial Officer ("CFO") during the Class Period.

(c)     Defendants Robinson and Winston are collectively referred to herein as the "Individual Defendants."

9.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's

public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of Scholastic, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly, with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Scholastic, each of the Individual Defendants had access to the adverse undisclosed information about Scholastic's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Scholastic and its business issued or adopted by the Company materially false and misleading.

13.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Scholastic common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Scholastic's business, operations, management and the intrinsic value of Scholastic common stock; (ii) enabled Defendant Robinson and other Scholastic insiders to sell more than $22 million of their personally-held Scholastic common stock to the unsuspecting public; and (iii) caused plaintiff and other members of the Class to purchase Scholastic common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the common stock of Scholastic during the Class Period, inclusive and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Scholastic common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Scholastic or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Scholastic; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## CONFIDENTIAL SOURCES

21.     The allegations made herein are made on information and belief and are supported by the first-hand knowledge of nine confidential informants ("CI").  These informants are former Scholastic employees and provided facts from various departments of the Company.  As detailed below, the CIs each served in positions at Scholastic, which provided them with access to the information they are alleged to possess.

22.     CI 1 worked at Scholastic from 2002 to 2007 and served in the roles of Scholastic's Vice President of Internal Audit and Vice President Of Finance for the At Home Division (as detailed herein).

23.     CI 2 worked at Scholastic from 2001 to April 2006 and served in the role of Marketing Director at the At Home Division.

24.    CI 3 worked at Scholastic from 1994 to 2005 and served in the role of a manager of Distribution Operations.

25.    CI 4 worked at Scholastic from 1995 to 2005 and served in various roles.  Starting in 2004 until the time of departure, CI 4 was tasked with overseeing and rectifying the issues of the At Home Division.

26.    CI 5 worked at Scholastic from August 2004 to November 2005 and served as business manager of the Games Division.

27.    CI 6 worked at Scholastic from October 2002 to May/June 2005 and served as a financial analyst at the Company's Distribution Center in Jefferson City, Missouri.

28.    CI 7 worked at Scholastic from May 2003 to August 2006 and served as director of Wholesale Sales.

29.    CI 8 worked at Scholastic from November 2005 to August 2006 and served as executive director of sales for the Company's Trade Publishing Division.

30.    CI 9 worked at Scholastic as a financial analyst and left the Company in 2004.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

31.    Defendant Scholastic and its subsidiaries engage in publishing and distributing children's books worldwide.  The Company operates through four segments: Children's Book Publishing and Distribution; Educational Publishing; Media, Licensing, and Advertising; and International.

32.    Scholastic describes itself as a leading operator of school-based book clubs and book fairs and continuity programs in the United States.

### During the Class Period, Scholastic's Business Was Being
### Negatively Impacted by a Host of Undisclosed Adverse Factors

33.    Throughout the Class Period, Scholastic's business was being negatively impacted by a host of adverse undisclosed negative factors which were causing its revenues to decline, expenses to rise and earnings to be negatively impacted.  In addition, throughout the Class Period, Scholastic was reporting financial results which were artificially inflated due to certain improper accounting practices, as detailed herein.

34.    **Problems at the At Home Division**: During the Class Period, Scholastic was experiencing significant problems with its Scholastic-at-Home division (the "At Home Division"). The At Home Division serves families with children from birth to 12 years of age with book programs for home reading and learning and is primarily the old book club business of Grolier Incorporated ("Grolier").  Scholastic acquired Grolier in 2000.

35.    During the Class Period, the At Home Division was struggling to comply with the requirements of a Federal Trade Commission ("FTC") consent decree concerning its sales and consumer practices.  As Defendants were aware at the time Scholastic acquired Grolier, Grolier was operating subject to a FTC consent decree (the "Grolier FTC Consent Decree") relating to its sales and consumer practices as it related to Grolier's Pre-Notification Negative Option Plan.[1]  The FTC alleged that Grolier was sending merchandise to consumers without their prior express consent and was seeking to obtain payment for merchandise shipped without the express consent of the recipient

---

[1]    A Pre Notification Negative Option Plan is a marketing plan under which consumers periodically receive announcements which identify books or other merchandise and the consumers thereafter receive and are billed for the merchandise identified in each such announcement, unless they instruct the Company not to send the identified merchandise.

in violation of federal law.  Under the Grolier FTC Consent Decree, Grolier was enjoined from sending merchandise to consumers without their prior express consent, among other things.

36.    Following its acquisition of Grolier, Scholastic continued to operate the At Home Division in violation of the Grolier FTC Consent Decree.  The Company continued to ship unordered merchandise to consumers and to send communications seeking to obtain payment for those goods and made many of the same misleading disclosures and omissions that the FTC had told Grolier it could not make.

37.    Eventually, the FTC was moved to action.  On June 21, 2005, several months after the start of the Class Period, Scholastic agreed to yet another FTC consent decree (the "Scholastic FTC Consent Decree").  The FTC alleged that Scholastic had continued Grolier's improper practices and shipped unordered merchandise to customers and failed to make numerous important disclosures, among other things.  Under the Scholastic FTC Consent Decree, the Company was required to pay a civil fine of $710,000 and agreed to stop shipping and seeking payment for unordered merchandise.  The Company was also forced to make various disclosures to customers.

38.    As a result of the Scholastic FTC Consent Decree, the operations of the At Home Division were dramatically impacted.  Stripped of the practices that had brought the problems with the FTC, the At Home Division's results began to dramatically suffer.  According to CI 1, who served as vice president of the At Home Division at times during the Class Period, complying with the Scholastic FTC Consent Decree caused the At Home Division to experience declining financial results.  In particular, according to CI 1, prior to the entry of the Scholastic Consent Decree, the Company had deliberately not included an (800) number for customer service inquiries and generally made it extremely difficult to contact customer service regarding returns.  According to CI 1,

following the entry of the Scholastic FTC Consent Decree, the Company rectified this situation but it led to more returns and less sales.

39.    Moreover, the cessation of the improper conduct forced the At Home Division to substantially increase its promotional activity, which caused expenses to rise in excess of internal expectations. According to CI 2, who served as the At Home Division's marketing director during the Class Period, the Company was increasing the frequency and amount of mailings as it attempted to broaden its customer base. The increase in the timing and scope of mailings, however, had a negative consequence. (Source: CI 2.) The increased scope of the mailings meant that the Company was forced to look to potential customers that presented heightened credit risk and risk of non-payment (Source: CI 2) and this caused the At Home Division's level of bad debts to rise. CI 1 confirmed that the At Home Division's level of bad debt rose throughout the Class Period.

40.    Finally, according to CI 1, the At Home Division was negatively impacted by: (i) Federal "anti-call" legislation, which limited the ability of the division's telecommunication activities; and (ii) the requirements of the Scholastic FTC Consent Decree.

41.    **Improper Accounting Practices**: As detailed below in ¶¶43-91, throughout the Class Period, Scholastic reported artificially inflated financial results, which were not indicative of the Company's true operating performance. As a result of these improper accounting practices, the Company's Class Period financial statements were not presented in conformity with Generally Accepted Accounting Principles ("GAAP") and therefore were materially false and misleading when issued.

42.    **Decline of U.K. Operations**: Throughout the Class Period, Scholastic was experiencing significant problems with its U.K. operations. According to CI 1, throughout the Class

Period, the Company was unable to address the problems with its U.K. operations and it was continuing to experience problems with that division.

### Scholastic's False and Misleading
### Financial Statements and Disclosures

43.    At all relevant times during the Class Period, Scholastic represented in filings made with the SEC that its financial results were reported in accordance with GAAP:[2]

Form 10-K for the year ended May 31, 2005

The Company's discussion and analysis of its financial condition and results of operations is based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States.

Forms 10-Q for the quarters ended August 31, 2005, November 30, 2005 and February 28, 2006

The Company's condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States.

44.    These representations were materially false and misleading when made because Scholastic's financial statements during the Class Period violated numerous provisions of GAAP and materially inflated Scholastic's operating results by improperly recognizing revenue and by materially understating the amount of accounting reserves.

45.    Indeed, the Company has now entered into a consent decree with the FTC wherein Scholastic has stipulated that it shipped unordered merchandise to consumers. Nonetheless, Scholastic has improperly failed to restate its misstated Class Period financial statements or

---

[2]    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practices at a particular time. Generally Accepted Auditing Standard ("GAAS") §AU 411.02. Regulation S-X [17 C.F.R. §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate. Additionally, Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. 210.01-01.

commence an internal investigation into its false and misleading financial reporting during the Class Period, evidencing Defendants' proclivity to mislead investors about the Company's true historical financial performance during the Class Period.

46.    Defendants caused or allowed Scholastic to issue statements during the Class Period that failed to disclose or misstated facts that: (i) the Company's financial statements violated GAAP in numerous respects; (ii) the disclosed policies of accounting in the Company's interim and annual reports filed with the SEC were materially false and misleading; and (iii) despite representations to the contrary in its interim and annual reports filed with the SEC, the Company's internal controls and procedures were grossly deficient.

## Scholastic's Violations of GAAP

47.    Defendants had the responsibility to present the Company's business activities in accordance with Section 13 of the Exchange Act, which provides:

> Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall - -
>
>> A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and
>>
>> B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that - -
>>
>>> i.    transactions are executed in accordance with management's general or specific authorization;
>>>
>>> ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

48.    As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, a fundamental objective of financial reporting is to provide useful information about an entity's financial performance. In addition, FASB Concepts Statement No. 2 provides that financial reporting should be reliable in that it represents what it purports to represent, with reliable financial information being a notion that is central to GAAP. As detailed below, Scholastic's financial reporting violated these and numerous other provisions of GAAP, which materially inflated its true financial results during the Class Period.

### Scholastic's Improper Overstatement of Revenue During the Class Period

49.    GAAP provides that revenue should not be recognized until it is realized or realizable and earned. FASB Concepts Statement No. 5, ¶83. The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. Generally, revenue should not be recognized until an exchange has occurred and the earnings process is complete. A transfer of risk has to occur in order to affect an "exchange" for the purposes of revenue recognition. SEC Staff Accounting Bulletin ("SAB") No. 104; FASB Concepts Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting Research Bulletin No. 43; Accounting

Principles Board Opinion No. 10; and American Institute of Certified Public Accountants Statement of Position 97-2.

50.     During the Class Period, Scholastic falsely represented that it complied with these accounting rules.  In its financial statements for the year ended May 31, 2005, filed with the SEC on Form 10-K, the Company disclosed the following with respect to its policy of accounting for the recognition of revenue:[3]

**Revenue recognition**

The Company's revenue recognition policies for its principal businesses are as follows:

*School-Based Book Clubs* – Revenue from school-based book clubs is recognized upon shipment of the products.

*School-Based Book Fairs* – Revenue from school-based book fairs is recognized ratably as each book fair occurs.

*Continuity Programs* – The Company operates continuity programs whereby customers generally place a single order and receive multiple shipments of books and other products over a period of time. Revenue from continuity programs is recognized *at the time of shipment* or, in applicable cases, upon customer acceptance. Reserves for estimated returns are established at that time and recorded as a reduction to revenue.  Actual returns are charged to the reserve as received.  The calculation of the reserve for estimated returns is based on historical return rates and sales patterns.

*Trade* – Revenue from the sale of children's books for distribution in the retail channel primarily is recognized *at the time of shipment*, which generally is when title transfers to the customer or when the product is on sale and available to the public. A reserve for estimated returns is established at that time and recorded as a reduction to revenue.  Actual returns are charged to the reserve as received.  The calculation of the reserve for estimated returns is based on historical return rates and sales patterns.

*Educational Publishing* – For shipments to schools, revenue is recognized on passage of title, which generally occurs upon receipt by the customer. Shipments to depositories are on consignment.  Revenue is recognized based on actual shipments

---

[3]     Scholastic made similar false representations concerning its revenue recognition policy in its Forms 10-Q filed with the SEC during the Class Period.

from the depositories to the schools. For certain software-based products, the Company offers new customers installation and training. In such cases, revenue is recognized when installation and training are complete.

*Toy Catalog* – Revenue from the sale of children's toys to the home through catalogs is recognized at the time of shipment, which is generally when title transfers to the customer. A reserve for estimated returns is established at the time of sale and recorded as a reduction to revenue. Actual returns are charged to the reserve as received. The calculation of the reserve for estimated returns is based on historical return rates and sales patterns.

*Film Production and Licensing* – Revenue from the sale of film rights, principally for the home video and domestic and foreign television markets, is recognized when the film has been delivered and is available for showing or exploitation. Licensing revenue is recorded in accordance with royalty agreements at the time the licensed materials are available to the licensee and collections are reasonably assured.

*Magazines* – Revenue is deferred and recognized ratably over the subscription period, as the magazines are delivered.

*Magazine Advertising* – Revenue is recognized when the magazine is on sale and available to the subscribers.

*Scholastic In-School Marketing* – Revenue is recognized when the Company has satisfied its obligations under the program and the customer has acknowledged acceptance of the product or service. [Emphasis added.]

51.     In violation of GAAP and the above-stated accounting policy, Scholastic's financial statements in its periodic reports filed with the SEC and the press releases issued by the Company during the Class Period materially overstated the Company's operating results by recognizing millions of dollars in revenue on unwanted product so that it could meet earnings targets previously announced to investors.

52.     As Defendants knew or recklessly ignored, the above representations concerning Scholastic's policy of recognizing school-based book club revenue, continuity program and trade revenue was materially false and misleading. Indeed, numerous former Company employees stated

that improper sales practices existed at Scholastic, especially in its At Home Division.[4]  In fact, CI 4 stated that former members of Grolier's management who remained with the Company after it was acquired by Scholastic were among "the most unethical I have ever met" and CI 5 characterized Scholastic as absolutely the "worst place" he has ever worked at in his professional career.

53.     CI 4, a former Senior Vice President of Marketing Services and Global Operations, stated that the At Home Division experienced "tremendous" customer service issues because of its common practice to ship unwanted product to customers.  In fact, CI 4 stated the At Home Division employees would refuse to terminate the memberships of customers who had clearly indicated they wished to do so.

54.     Other former employees made similar representations.  For example, CI 6, a former Company Financial Analyst, stated that the Company's Grolier subsidiary engaged in a practice of "ship first and ask questions later."  CI 7, a former Director of Wholesale Sales, stated it was "like games were being played" because there were times when it appeared there was no way that quarterly goals were going to be met.  Then, "as if by magic," in the final days of the quarter some deal would be made that would enable the Company to meet its goals.  CI 7 represented these end-of-quarter deals would inevitably be followed by "big returns" in ensuing months.

55.     CI 2, a former Marketing Director in the Company's At Home Division during the Class Period, explained that unrealistic revenue targets foisted upon them by Scholastic caused the division's employees to pursue prospective book club customers that were not likely to pay Scholastic.

---

[4]     Former Company employees stated that Scholastic's At Home Division was basically the successor to Grolier Enterprises, which was acquired by Scholastic.  The Company lists Scholastic At Home Inc. (formerly Grolier Enterprises Inc.) as a subsidiary to its Grolier Incorporated subsidiary.

56.    CI 5 confirmed the existence of unreasonably high sales forecasts as a factor that contributed to the Company's improper revenue recognition practices.  CI 5 stated that it was not uncommon to see customer sales forecasts established at an amount that was twice what the prior sales history reflected, even when the customer's recent sales history was declining.  CI 5 stated it was obvious that "there was no way" such a forecast could be achieved.

57.    CI 3 explained that the At Home Division maintained "a huge database" of customer information that was used as a marketing tool.  CI 3 said that a fundamental question that was asked by At Home Division salespeople was "how deep do we ship into the list," because prior payment histories of many customers indicated that they were not "acceptable" club members.  Nonetheless, near the end of each quarter, CI 3 said it was the routine practice to "ship deeper into the list to generate revenue."

58.    Faced with the pressure of unrealistic sales targets, CI 5 stated that sales employees would offer distributors end-of-quarter promotions such as "we'll give you product at sixty cents on the dollar," even though it was fully known that as much as 75% of whatever was shipped to the distributor would be returned in the following month.  CI 5 stated that Scholastic was "notorious for sales spikes" at the ends of quarters, which inevitably resulted in returns of the items "the next day." CI 5 said that Scholastic's motive was to book revenue upon shipping the products, but worry later about the returns or inability to actually collect on the revenues in the future.

59.    Consistent with these representations, CI 7 said one sales goal was the "sell-in" of books to distributors and the "sell-through" of these books by the distributors to end-user customers. CI 7 explained that Scholastic had engaged in "a numbers game" because sell-in sales goals were set at a level that essentially disregarded the actual amount of books that would be sold-through, which

resulted in "too much product in the channel" that inevitably led to large returns by the Company's distributors.

60.    For example, CI 3 explained that the Company's Little Rock facility typically recorded 300,000 – 400,000 shipments in a given week. However, the practice of going "deeper into the list" usually resulted in a 20% increase in the number near the end of a quarter.

61.    CI 3 stated that as a result of Scholastic's shipment of product to "unacceptable" customers, the Company would experience "heavy returns" after the quarter's end. CI 3 said that Scholastic's improper sales practices were so aggressive that customers frequently attached letters with the returned product, demanding that Scholastic stop shipping them unwanted products.

62.    CI 8, a former Company Executive Director of Sales during the Class Period, stated that he observed excessive shipments of books to the Company's distributors. In fact, CI 8 stated that "side-letter" arrangements existed with Company distributors, which altered the terms in the formal documentation associated with a particular transaction. CI 8 stated that the existence of such "side-letter" arrangements was most detectible when it came time to collect from a customer, who owed less than what Scholastic's documentation reflected. CI 8 mentioned SPS Distribution as a customer that had entered into "side-letter" arrangements with Scholastic.

63.    The representations associated with the Company's improper recognition practices by the CIs have, in part, been confirmed by a June 2005 consent decree entered into by Scholastic. The consent degree, which settled charges brought by the FTC, asserted, among other things, that Scholastic and its Grollier Incorporated and Scholastic At Home, Inc. subsidiaries "shipped unordered merchandise to consumers and sent them communications seeking payment for the merchandise when they had actual knowledge that the FTC had previously determined that such practices were unfair and deceptive."

64.    Scholastic's recognition of revenue on shipments of unwanted merchandise violated GAAP because persuasive evidence of an arrangement did not exist, the seller's sales price was not fixed or determinable and the collectibility of the sales price was reasonably assured at the time revenue was recognized.

65.    In addition, Scholastic's policy of recognizing revenue was materially false and misleading because during the Class Period, Scholastic recognized millions of dollars in revenue on product without the ability to reasonably estimate product returns.

66.    GAAP, in SAB No. 104 and FASB's SFAS No. 48, mandates that when customers are granted a right to return product, the amount of future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of the product return rights.  SFAS No. 48 identifies the "relatively long period in which a particular product may be returned" as a factor that may impair the ability to make a reasonable estimate of product returns.  In addition, SAB No. 104, identifies: (1) a significant increase in, or excess levels of, inventory in a distribution channel (sometimes referred to as "channel stuffing"); and (2) a lack of "visibility" into or an inability to determine or observe the levels of inventory in distribution as factors being among those affecting or precluding an entity from making reasonable and reliable estimates of product returns.

67.    Former Company employees stated that Scholastic granted customers an unlimited amount of time to return product and that product returns were not timely recorded in the Company's accounting records.  In addition, former Company employees stated that the Company's improper revenue recognition practices noted above contributed to significant increases in and excessive levels of the Company's product in its distribution channel and that the amounts of product in the Company's distribution channel were difficult to monitor.

68.    These factors, as Defendants knew or recklessly ignored, rendered Scholastic's policy of recognizing revenue upon shipment of product improper, as the Company's estimates of product returns during the Class Period were inherently unreliable.  As a result, GAAP required that Scholastic defer the recognition of revenue until such time as the product return provisions expired.

69.    For example, CI 7 explained that large retail customers were agreeable about accepting excessive quantities of Scholastic's products because it granted customers "unlimited" rights to return unsold product and because accepting significantly large amounts of product assured the customers that they would receive popular titles, such as *Harry Potter*, from Scholastic when they were made available for release.[5]  In fact, CI 7 stated that given the unpredictable amount of books that might eventually be returned to the Company, sales personnel did not receive commissions on the "sales" they reported during a particular quarter.

70.    Further evidencing Scholastic's inability to estimate product returns, CI 8 stated that returns from distributors were not formally processed or timely accounted for.  Moreover, CI 5 represented product would get "lost" in the distribution channel.

71.    Indeed, SAB No. 104 provides that financial statement "preparers and auditors should be skeptical of estimates of product returns when little history with a particular product line exists, when there is inadequate verifiable evidence of historical experience, or when there are inadequate internal controls that ensure the reliability and timeliness of the reporting of the appropriate historical information."

72.    CI 8 attended meetings in very early 2006 to discuss the large volumes of returns from distributors, including Levy Home Entertainment, of paperback *Harry Potter* books, which had

---

[5]    CI 7 stated that the unlimited return rights granted to the large retail stores were not extended to small, independent bookstores that bought books from Scholastic in much smaller quantities.

been received by Scholastic but had not been timely processed or recorded in the Company's accounting systems. CI 8 said that the original shipments of these books, which occurred in the second half of 2005, were returned because there was too much inventory in the distribution channel resulting from a "deliberate" attempt by Scholastic to realize a large amount of revenue and "overly-optimistic" expectations of what could be sold-through. CI 8 said that the *Harry Potter* books were not the only returned books which had not been timely processed and accounted for.

73.    As a result of its inability to reasonably estimate future product returns, Scholastic was precluded from recognizing revenue at the time it shipped products to its customers during the Class Period, thereby rendering the Company's policy of recording revenue upon shipment of product in violation of GAAP because, as noted in GAAP, "[i]f a reasonable estimate of future returns cannot be made, revenue can not be recognized until the return period lapses."

74.    This improper practice had the intended effect of materially inflating Scholastic's reported sales and earnings during the Class Period. In furtherance of Defendants' deceptive financial reporting, Scholastic has failed to correct its improper recognition of revenue by restating its previously issued false and misleading financial statements, as specifically required by GAAP in SFAS No. 154.

### Scholastic's Improper Manipulation of Accounting Reserves During the Class Period

75.    GAAP requires that financial statements account for existing uncertainties as to probable losses. Such loss contingencies should be recognized and reported as a charge to income when: (1) information existing at the date of the financial statements indicates that it is probable (*e.g.*, a likely chance) that an asset has been impaired or a liability has been incurred; and (2) the amount of such loss can be reasonably estimated. SFAS No. ¶¶5, 8.

76.    During the Class Period, Scholastic falsely represented that it complied with these accounting rules and its publicly disclosed policy of accounting for it accounts receivable. Scholastic's financial statements for the year ended May 31, 2005, filed with the SEC on Form 10-K, disclosed its policy of accounting for its accounts receivable:[6]

> Accounts receivable are recorded net of allowances for doubtful accounts and reserves for returns. In the normal course of business, the Company extends credit to customers that satisfy predefined credit criteria. The Company is required to estimate the collectability of its receivables. Reserves for returns are based on historical return rates and sales patterns. Allowances for doubtful accounts are established through the evaluation of accounts receivable agings and prior collection experience to estimate the ultimate collectability of these receivables in the period such determination is made.

77.    In violation of GAAP and the above-stated accounting policy, Scholastic's financial statements in its periodic reports filed with the SEC and the press releases issued by the Company during the Class Period that included its financial statements, materially understated its sales returns and accounting reserves for its uncollectible receivables. In so doing, Scholastic also materially overstated its reported accounts receivable and operating results during the Class Period.

78.    CI 2 asserted that "heading into 2006," Scholastic was aware that there had been a definite "upswing in bad debt and no-pays" in Scholastic's book club business in the last eight to ten months of 2005. These representations were confirmed by CI 3, who stated that Scholastic "absolutely had problems" collecting from customers who had received books as part of participating in the clubs and attributed the collection difficulties to the improper selling practices noted above. As a result of the foregoing, CI 2 stated Scholastic's "bad debt assumptions" needed to be modified because the existing bad debt reserves were insufficient.

---

[6]    Scholastic made similar false representations concerning its accounts receivable policy in its Forms 10-Q filed with the SEC during the Class Period.

79.    CI 9 was told by various members of the Company's finance and accounting staff that "they [Scholastic management] don't like write-offs . . ." and "we [Scholastic] don't write off anything."  CI 9 stated that Scholastic had "huge receivables" of accounts that were more than two years past-due and which Scholastic "never wrote off."

80.    As noted in the chart below, during the Class Period, Scholastic reduced its accounts receivable reserves to an artificially low level:[7]



81.    As a result of the wrongful accounting practices alleged herein, Defendants disseminated financial statements of Scholastic that were materially false and misleading.  In addition to the accounting improprieties stated above, Scholastic presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

---

[7]    Scholastic's accounts receivable reserves include those for sales returns and uncollectible receivables.  Prior to, during and after the Class Period, Scholastic disclosed its reserves for sales returns and uncollectible receivables only in its Forms 10-K.  Accordingly, such information is not available at the end of interim quarters.  CI 4 stated the Company's accounts receivable reserves were set by Defendant Winston.

(a)    The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" (APB No. 28, ¶10);

(b)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶34);

(c)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶40);

(d)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶50);

(e)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶42);

(f)    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶58-59);

(g)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶79); and

(h)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶95, 97).

82.     The foregoing accounting improprieties caused Scholastic to issue financial statements which violated numerous provisions of GAAP and the SEC's accounting rules and regulations.

83.     In failing to file financial statements with the SEC which conformed to the requirements of GAAP, Scholastic repeatedly disseminated financial statements that were presumptively misleading and inaccurate.  Indeed, the numerous accounting machinations detailed herein evidence Defendants' intent to deceive investors during the Class Period and misrepresent the truth about the Company and its business, operations and financial performance to the detriment of those who relied on them.

84.     In addition, Defendants knew or recklessly ignored numerous red flags associated with the financial reporting improprieties alleged herein.  For example, the American Institute of Certified Public Accountants has issued statements identifying the following as fraudulent financial reporting risk factors:

(a)     Significant sales or volume of sales that are recorded at or near the end of the reporting period;

(b)     Unusual volume of sales to distributors/resellers (*i.e.*, "channel stuffing");

      (c)     The existence of "side-agreements;"

      (d)     Sales not being based on actual (firm) orders to buy;

      (e)     Pressure from senior management to increase revenues and earnings;

      (f)     High turnover rates or employment of ineffective accounting, internal audit, or information technology staff;

      (g)     Ineffective accounting and information systems, including situations involving reportable conditions;

      (h)     Known history of violations of securities laws or other laws and regulations, or claims against the entity, its senior management, or board members alleging fraud or violations of laws and regulations; and

      (i)     Ineffective communication, implementation, support, or enforcement of the entity's values or ethical standards by management or the communication of inappropriate values or ethical standards.

85.     During the Class Period, Defendants were on notice of the Grolier Consent Decree and knew or recklessly ignored each of the above-noted red flags at Scholastic.  In fact, CIs noted:

      (a)     Grolier's management was the "most unethical I ever met" (Source: CI 4);

      (b)     Grolier's accounting and bookkeeping, especially pertaining to book inventory, were "the most convoluted" he/she ever witnessed (Source: CI 4);

      (c)     During 2005, Scholastic had been experiencing "a tremendous amount of turnover" in key finance positions (Source: CI 4);

      (d)     Scholastic entered into "side-agreements" with distributors (Source: CI 8);

      (e)     Scholastic's different divisions did not coordinate with one another (Source: CI 5);

(f)    Scholastic was "notorious for sales spikes" at the end of quarters (Source: CI 5);

(g)    Product "was lost" in the distribution channel, "all over the place" and not very well accounted for (Source: CI 5); and

(h)    Sales forecasts were unrealistically high (Source: CI 5).

86.    In addition to the accounting improprieties noted above, the Company's Class Period Forms 10-K and 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### Scholastic's False and Misleading Reporting and Certifications of Disclosure and Internal Controls

87.    As a result of the rash of recent corporate accounting scandals, Congress enacted the Sarbanes-Oxley Act in 2002, in part, to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies. The SEC revised Item 307 and added Item 308 of Regulation S-K [17. C.F.R. 229.307 and 308] to require companies to disclose the conclusions of its principal executive and principal financial officer on the effectiveness of a company's disclosure controls and procedures and disclose a report by management on its internal control over its financial reporting.

88.    Concerning the Company's internal and disclosure controls, Defendants Robinson and Winston signed the following report, which was included in Scholastic's May 31, 2005 Form 10-K:

> The Chief Executive Officer and Chief Financial Officer of the Corporation, after conducting an evaluation, together with other members of the Company's management, of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures as of May 31, 2005, have concluded that the

- 27 -

Corporation's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Corporation in its reports filed or submitted under the Securities Exchange Act of 1934 (the "Exchange Act") is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and accumulated and communicated to members of the Company's management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

The management of the Company is responsible for establishing and maintaining adequate internal control over financial reporting for the Corporation. A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. The Corporation's Chief Executive Officer and Chief Financial Officer, after conducting an evaluation, together with other members of Scholastic management, of the effectiveness of the Corporation's internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission, concluded that the Corporation's internal control over financial reporting was effective as of May 31, 2005.

In coming to the conclusion that Scholastic's internal control over financial reporting was effective as of May 31, 2005, the Company's management considered, among other things, the control deficiency related to the periodic review of the application of generally accepted accounting principles to certain leasing transactions, which resulted in the need to restate its previously issued financial statements, as disclosed in Note 1 of Notes to Consolidated Financial Statements in Item 8, "Consolidated Financial Statements and Supplementary Data." The Company took steps to remediate the deficiency by implementing new internal controls relating to leasing transactions, which were put into place and were operating effectively prior to May 31, 2005. Based on this review and analysis, management concluded that the control deficiency that resulted in the restatement of the prior period financial statements was not in itself a material weakness and, when aggregated with other deficiencies, did not constitute a material weakness.

Ernst & Young LLP, an independent registered public accounting firm, has issued an attestation report on this assessment of the effectiveness of the Corporation's internal control over financial reporting as of May 31, 2005, which is included herein. There was no change in the Corporation's internal control over financial reporting that occurred during the quarter ended May 31, 2005 that materially affected, or is reasonably likely to materially affect, the Corporation's internal control over financial reporting.

89.    Similarly, Defendants Robinson and Winston signed Scholastic's Forms 10-Q during the Class Period, which included, in all material respects, the following report on the Company's internal and disclosure controls:

> The Chief Executive Officer and the Chief Financial Officer of Scholastic Corporation, after conducting an evaluation, together with other members of the Company's management, of the effectiveness of the design and operation of the Corporation's disclosure controls and procedures as of  [each quarter end], have concluded that the Corporation's disclosure controls and procedures were effective to ensure that information required to be disclosed by the Corporation in its reports filed or submitted under the Securities Exchange Act of 1934 is recorded, processed, summarized, and reported within the time periods specified in the rules and forms of the SEC and accumulated and communicated to members of the Company's management, including the Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.  There was no change in the Corporation's internal control over financial reporting that occurred during the quarter . . . that has materially affected, or is reasonably likely to materially affect, the Corporation's internal control over financial reporting.

90.    These representations, which were materially false and misleading for the reasons alleged herein, were then wrongfully certified by Defendants Robinson and Winston and included as part of Scholastic's Forms 10-K and 10-Q filed with the SEC:

> I, . . . the . . . officer of Scholastic Corporation, certify that:
>
> 1.    I have reviewed this . . . Report on Form . . . of Scholastic Corporation;
>
> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

91.      The certifications above were materially false and misleading when made for the reasons alleged herein.

**Materially False and Misleading
Statements Issued During the Class Period**

92.    The Class Period commences on March 18, 2005.  On March 17, 2005, after the close of trading, Scholastic issued a press release announcing its financial results for its third quarter of 2005, the period ending February 28, 2005.  For the quarter, the Company reported revenues of $480.8 million and operating profit of $5.8 million.  Defendant Robinson, commented on the results, stating in pertinent part, as follows:

> With continued focus on margins, we achieved higher profitability in all operating segments last quarter. . . Improved results in Trade drove growth in the Children's Book Publishing and Distribution segment, while profits also rose in International and in Educational Publishing.

> With Internet orders up nearly 20% this fiscal year and now representing more than 10% of Scholastic's revenues, I'm also very excited by the recent appointment of Seth Radwell as president of e-Scholastic.  Seth's experience building new print and electronic businesses, most recently at Bookspan and Doubleday Interactive, will help us accelerate this momentum.

The press release provided the Company's earnings expectations, stating in pertinent part, as follows:

> For fiscal 2005, the Company continues to expect earnings of between $1.50 and $1.70 per diluted share, excluding severance charges, on revenues of approximately $2.1 billion, and is on plan to generate free cash flow of $40 to $50 million.

93.    The statement referenced above in ¶92 that "With continued focus on margins, we achieved higher profitability in all operating segments last quarter" positively described the trends in the Company's business, thereby creating a duty to disclose the adverse factors then impacting the Company's business, as detailed herein.  Specifically, Defendants were required to disclose that: (i) the Company's At Home Division was operating in violation of the Grolier FTC Consent Decree; and (ii) the Company's U.K. operations were in significant decline and the Company's efforts to correct the problems in the U.K. were not successful.  In addition, the Company's reported financial results were not a true and accurate representation of the Company's financial performance as the

Company was engaged in a host of improper accounting practices which artificially inflated its financial performance, as detailed herein in ¶¶43-91.

94.    On March 18, 2005, Scholastic held a conference call with analysts and investors to discuss its third quarter earnings and its business operations. During the conference call, Defendant Winston acknowledged that the Company's third quarter financial performance had been positively impacted by a reduction in the Company's bad debt reserve. The following exchange took place:

> William Bird - Smith Barney – Analyst:
>
> Thank you. It looks like about 40 percent of your operating income in the quarter came from a 50 basis point reduction in reserve for bad debt. I was just wondering if you could talk a little bit about what went into that decision and whether or not that change is sustainable. Also you mentioned that you experienced lower returns in the quarter. I was wondering if you could give us the reserve for returns in the quarter this year versus last. Thanks.
>
> Mary Winston  - Scholastic Corporation – CFO:
>
> This is Mary. I will start with the bad debt question. **The improvement in bad debt is largely driven by the strategies that we've put in place in our direct to home and our continuities business. And as you know we put in place much more rigorous credit policies. We are tracking that much more closely, being much more conscious of the type of customer that we sell to to begin with. So consequently we are starting to see bad debt improvements**. Now from an accounting perspective clearly we do have a model that takes into consideration the long-term history. So if we look at our shorter term improvement on pay rates and the fundamentals in the business we would even see more improvement than what we are seeing in the bad debt on the P&L.
>
> So we are definitely comfortable with where our bad debt reserves are and what's behind that is the same calculations and accounting methodologies that have always been in place for looking at bad debt over a historical period of time. In terms of your question around returns reserve, we don't have the details of that available right away but I will get that and I will get back to you. But we did have lower returns in both our continuity business as well as our trade business. [Emphasis added.]

95.    The statements above in ¶94 concerning the reasons for the improvements in the Company's bad debt reserve were materially false and misleading because the Company was improperly manipulating its bad debt reserve as set forth herein at ¶¶75-86.

96.    In response to the positive earnings announcement and the positive statements made during the earnings conference call, the price of Scholastic stock rose from $36.20 per share to $38.62 per share, on heavy trading volume.

97.    On June 21, 2005, the FTC issued a press release announcing that Scholastic and two of its subsidiaries, the At Home Division and Grolier, had agreed to settle allegations that they violated laws enforced by the FTC in marketing their negative option book clubs.  The FTC further announced that Scholastic had agreed to pay a civil penalty of $710,000 and had agreed to an injunction against future violations.

98.    On July 20, 2005, Scholastic issued a press release announcing its financial results for the fourth fiscal quarter of 2005 and the full fiscal year, the period ending May 31, 2005.  For the quarter, the Company reported that net income increased to $42.8 million, or $1.04 per share. Defendant Robinson commented on the results, stating in pertinent part, as follows:

> We achieved our goals for profits and improved margins in fiscal 2005, while exceeding our target for Free Cash Flow.  Impressive gains in Educational Publishing, improved results in International, a strengthening of our children's book businesses and disciplined financial management all contributed to these results. . . We're confident that the significant progress made in fiscal 2005, coupled with a strengthened management team, creates a solid foundation to expand margins and grow revenues in fiscal 2006 and beyond.

> Fiscal 2006 is off to a tremendous start with last weekend's phenomenally successful release of Harry Potter & the Half-Blood Prince.  After selling a record breaking 6.9 million copies in the U.S. in the first 24 hours, our retailers continue to report very strong sales during the first week.  We are extremely proud of Scholastic's role in helping make J.K. Rowling's brilliant book the largest book release in history.

With respect to the "Fiscal 2006 Outlook" the Company stated, in pertinent part, as follows:

> The Company expects total revenues of approximately $2.3 - $2.4 billion and earnings of $2.30 - $2.50 per diluted share based on the following outlook:

> 1.    Revenue and profit growth in Children's Book Publishing and Distribution, reflecting significant sales of Harry Potter and the Half-Blood Prince primarily in the first quarter, as well as modest growth throughout the rest of the segment.

2.    Growth across Educational Publishing, led by educational technology, which should continue to benefit margins.

3.    Continued improvements in International and Media, Licensing and Advertising.

4.    A focus on margin improvements and operating efficiencies, with continued attention to Free Cash Flow, which is targeted at $85 - $95 million.

99.    The statements above in ¶98 were materially false and misleading for the reasons set forth above in ¶¶51-74.  In addition, Defendants lacked a reasonable basis for their statements concerning "Fiscal 2006 Outlook" because Defendants were aware or recklessly disregarded that the Company was: (i) experiencing problems with the At Home Division; (ii) engaging in improper accounting, which was artificially inflating its financial results; and (iii) experiencing significant problems with its U.K. Operations.  Accordingly, Defendants knew or recklessly disregarded that Scholastic could not meet its stated outlook.

100.    On July 21, 2005, Scholastic held a conference call with analysts and investors to discuss its fourth quarter earnings and its business operations.  During the conference call, Defendant Robinson positively described the Company's 2005 financial performance, stating in pertinent part, as follows:

> In fiscal 2005, we hit our targets for higher earnings per share and operating margins, and -- and those of you who were here last rear will remember that that was the Number 1 focus for the -- for the year, improving our operating margin.  And that was despite lower revenues compared to 2004, when we released Harry Potter 5, and this year we -- this 205 year we also exceeded our targets for free cash flow.  We strengthened our core children's book business, we produced strong gains in education which had a -- a marvelous year, great year.  We stabilized our direct-to-the-home business and improved results in international and successfully launched a new media property, Maya & Miguel.  We also continued to strengthen our management team with key appointments in children's books and e-Scholastic

Defendant Robinson also represented that the At Home Division had implemented a "revised strategy of focusing on our most productive customers" stating, in pertinent part, as follows:

- 34 -

Last year, Scholastic at Home primary direct channel to families of young children imple -- implemented a revised strategy of focusing on our most productive customers. We've talked about this before. And but we -- we did it. It worked. Improved targeting, better service and a shift toward lifetime customer value will all continue in fiscal 2006 as this business has become stabilized and we're now putting it back on a path for growth.

During the conference call, Defendant Winston again directly addressed the Company's bad

debt reserve. The following exchange took place:

Dick Robinson - Scholastic - Chairman, CEO, President:

Mary do you want to deal with the first part of that, in terms of bad debt, and Judy say a word or two about what you're doing to grow the business?

Mary Winston - Scholastic – CFO:

Okay. Yes, okay. As it relates to bad debt in the continuities business, one of the things that we have done this year is really focus on that. So there's no change in accounting methodology that's driving that, it truly is as a result of strategies in that business and a better management of the credit risk of the customers and better targeting of credit-worthy customers to begin with. So we are seeing true improvement.

From an accounting perspective we're still using the same methodology which means that we look at the historical performance of our base of receivables, and that's on a program-by-program basis and it could be anywhere from over a 12-month period to a 30-month period. So on a -- on average it's a couple of years. So the improvement that you've been seeing is actually not as impressive as what we're seeing in the underlying statistics. So we're seeing pay rates up substantially and we're just seeing overall credit performance in the files much better. I think the way we're treating it from it a accounting perspective is somewhat conservative, although appropriate, when you've made this degree of strategic change in any business. And so I think from a financial perspective we'll start to see continued improvement as we go into next year as well as we continue to get, say, the old credit history customers out of the file and more population of the new credit. And I'll let Judy talk about some of the metrics in the business.

Finally, Judy Newman, President, Clubs and Homes, spoke positively about the Company's

At Home Division stating, in pertinent part, as follows:

Right. As we've been saying all along, this year has been about stabilizing the business and reducing promotion expense to just focus on better quality customers, customers who want to be engaged with us, focusing on good customer service, our 800 number, and customers can get to us on -- on the web, so we have really good

customer experience.  So now we have a good base of customers who are happy to be engaged with us and we're seeing those bad debt rates and return rates go down which are these metric that is you're experiencing.  And so now we are building.  This year we've been testing new products.  Scholastic Phonics out in -- on telemarketing and in direct mail, and we're -- and Scholastic Classics and we have a Vegitales program, a new book of knowledge, and we're starting to put a lot of these Scholastic branded products out to these good quality customers and building a really great experience for Scholastic at Home.  So we're seeing really good responsible, solid growth in our future here.

101.    The statements above in ¶100 were materially false and misleading for the reasons set forth in ¶99.

102.    On September 22, 2005, Scholastic issued a press release announcing its financial results for the first fiscal quarter of 2006, the period ending August 31, 2005, and "reaffirmed its outlook for fiscal 2006."   For the quarter, the Company reported revenues of $498.4 million. Defendant Robinson commented on the results, stating in pertinent part, as follows:

> Record-breaking sales of Harry Potter and the Half-Blood Prince drove significantly higher results in Children's Book Publishing and Distribution and for the Company overall.  Scholastic Education's strongest quarter ever also contributed to last quarter's improved results, with sales of educational technology demonstrating the continued success of our reading solutions strategy.  These achievements reinforce Scholastic's leading position as a partner with families and teachers, helping develop children's reading skills and love of books.

The Company also reaffirmed its "fiscal 2006 outlook for revenues of $2.3 billion to $2.4 billion, earnings per diluted share of $2.30 to $2.50, and free cash flow of $85 to $95 million."

103.    The statements above in ¶102 were materially false and misleading for the reasons set forth in ¶99.

104.    Then, on December 16, 2005, Scholastic issued a press release announcing its financial results for the fiscal second quarter of 2006, the period ending November 30, 2005.  For the quarter, the Company reported net income of $66.9 million.  Defendant Robinson commented on the results, stating in pertinent part, as follows:

The impact of hurricanes on the Company, challenges in School Book Clubs and Continuities, and investments to restructure our business in the United Kingdom were all factors contributing to lower profits in the second quarter. . . Our business also showed many strengths, especially in School Book Fairs, Trade and educational technology sales. Significant free cash flow in the quarter also strengthened our balance sheet.

Responding to the challenges we faced in the second quarter, Scholastic's management team is now implementing plans to improve performance in the second half of the year, particularly in the important fourth quarter. We are accelerating the U.K. turn-around efforts, streamlining Club promotions, booking new fairs, introducing new Continuity programs, trimming marketing costs and reducing overhead. Notwithstanding the challenges, we believe we will attain our financial goals for the year, based on these actions and strong first quarter performance. We expect to achieve revenues for the year of $2.3 to $2.4 billion, free cash flow of $85 to $95 million and earnings at the bottom end of the previously announced range of $2.30 to $2.50 per diluted share.

105.    In response to the disappointing earnings announcement, the price of Scholastic common stock declined from $33.10 per share to $29.30 per share on heavy trading volume. Defendants, however, continued to conceal the scope of the problems at the Company and maintained earnings guidance that they knew could not be met.

106.    On March 23, 2006, Scholastic issued a press release announcing its financial results for the third quarter of 2006, the period ending February 28, 2006. The Company reported a net loss of $15.5 million, or ($0.37) per share. Defendant Robinson commented on the disappointing earnings release, stating in pertinent part, as follows:

Our third quarter was disappointing, and based on our review of these results and their impact on the fourth quarter, we are reducing our outlook for the fiscal year. . . Promotion expenses in School Book Clubs continued to be higher due to the volume of direct mailings required as more customers than anticipated migrated to the core clubs in response to promotions. In School Book Fairs, staffing expenses increased during the quarter, in anticipation of fourth quarter fair bookings. Lastly, results in Educational Publishing were affected by lower educational technology revenues, reflecting greater seasonality in that business and a large district sale in the prior-year period.

Next year, based on customer reaction to thorough market tests conducted in School Book Clubs, we will focus exclusively on Scholastic branded clubs and discontinue Troll(R) and Trumpet(R), two smaller, less efficient clubs. We believe this focus on

core clubs will substantially reduce overhead, promotion and fulfillment expense and increase profits. We also remain confident about growth opportunities for Scholastic Education, and for educational technology, where sales are up 18% this year and we have a strong pipeline of future sales prospects.

The Company also cut its "Outlook" stating, in pertinent part, as follows:

Given lower third quarter results and a revised outlook for the fourth quarter, Scholastic now expects full year earnings between $1.70 and $1.80 per diluted share, including approximately $0.15 per diluted share of expected severance expense, on revenues of approximately $2.3 billion. Free cash flow for the fiscal year is now expected to be between $70 and $80 million.

107.    In response to the Company's announcement, the price of Scholastic common stock declined from $29.42 per share to $26.04 per share, on heavy trading volume.

108.    On July 20, 2006, Scholastic issued a press release announcing its financial results for its fourth fiscal quarter of 2006 and fiscal year 2006, the period ending May 31, 2006. For the fourth quarter, the Company reported revenue of $601 million and net income of $0.91 per share. For the fiscal year, the Company reported net income of $1.66 per share. The Company disclosed that its financial results were negatively impacted by "costs associated with the write-down of certain print reference set assets and with the bankruptcy of a customer, incurred in the Educational Publishing segment, totaling $0.07 and $0.09 per diluted share in the fourth quarter and full year, respectively."

109.    The market for Scholastic's common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Scholastic's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Scholastic common stock relying upon the integrity of the market price of Scholastic's common stock and market information relating to Scholastic, and have been damaged thereby.

110.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Scholastic's common stock, by publicly issuing false and misleading statements

and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

111.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Scholastic's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Scholastic and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein when the true facts were revealed to the public and the price of Scholastic stock declined.

### Loss Causation/Economic Loss

112.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Scholastic's stock price and operated as a fraud or deceit on Class Period purchasers of Scholastic stock by misrepresenting the Company's past and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by making misrepresentations about the Company's business and financial results. As detailed above, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Scholastic's stock fell precipitously as

the prior artificial inflation came out of Scholastic's stock price. As a result of their purchases of Scholastic stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

113.    By improperly concealing their conduct, Defendants presented a misleading picture of Scholastic's business and prospects. Thus, instead of truthfully disclosing the risks and uncertainties facing Scholastic, Defendants caused Scholastic to conceal the adverse problems detailed herein. During the Class Period, Defendants repeatedly emphasized Scholastic's positive financial performance. These representations caused and maintained the artificial inflation in the stock price of Scholastic throughout the Class Period and until the truth was revealed to the market.

114.    Defendants' false and misleading statements had the intended effect and caused Scholastic stock to trade at artificially inflated levels throughout the Class Period.

115.    Starting on December 16, 2005, Defendants were forced to publicly disclose that Scholastic would report disappointing financial results and that the Company's poor results were directly the result of problems in numerous divisions of the Company. Then, on March 23, 2006, Scholastic reported disappointing fiscal third quarter financial results and slashed its outlook for fiscal 2006. As a direct result of Defendants' admissions and the public revelations about Scholastic's business, the price of Scholastic stock declined from $33.10 per share to $29.30 per share in December 2005 and declined in March 2006 from $29.42 per share to $26.04 per share. These drops removed the inflation from Scholastic's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

116.    The decline in Scholastic's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Scholastic's stock price declines negate any inference that the

loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Scholastic's stock price and the subsequent significant decline in the value of Scholastic's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

### Additional Scienter Allegations

117.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Scholastic, their control over, and/or receipt and/or modification of Scholastic's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Scholastic, participated in the fraudulent scheme alleged herein.

118.    Defendants' scienter is further evidenced by the insider selling of Defendant Robinson and other high-level Scholastic insiders, as follows:

| Last Name | First Name | Date | Shares | Price | Proceeds | % of Holdings Sold |
|-----------|-----------|------|--------|-------|----------|--------------------|
| DEULL | CHARLES | 10/3/2005 | 21,400 | $37.45 | $801,430 | |
| | | 10/3/2005 | 3,600 | $37.50 | $135,000 | |
| | | 10/21/2005 | 5,000 | $32.66 | $163,300 | |
| | | 10/24/2005 | 22,238 | $32.49 | $722,513 | |
| | | 10/24/2005 | 15,203 | $32.53 | $494,554 | |
| | | 10/24/2005 | 12,497 | $32.56 | $406,902 | |
| | | | 79,938 | | $2,723,699 | 84.05% |

- 41 -

| Last Name | First Name | Date | Shares | Price | Proceeds | % of Holdings Sold |
|---|---|---|---|---|---|---|
| FORD | BETH | 9/28/2005 | 5,690 | $37.28 | $212,123 | |
| | | 10/3/2005 | 9,310 | $37.31 | $347,356 | |
| | | | 15,000 | | $559,479 | 83.31% |
| | | | | | | |
| FORTE | DEBORAH | 3/22/2005 | 3,000 | $38.00 | $114,000 | |
| | | 3/23/2005 | 5,000 | $37.15 | $185,750 | |
| | | 3/29/2005 | 5,000 | $37.01 | $185,050 | |
| | | 4/6/2005 | 3,082 | $37.00 | $114,034 | |
| | | 4/7/2005 | 7,300 | $37.00 | $270,100 | |
| | | 4/8/2005 | 2,400 | $37.01 | $88,824 | |
| | | 4/15/2005 | 6,300 | $35.05 | $220,815 | |
| | | 5/2/2005 | 22,000 | $35.01 | $770,220 | |
| | | 5/2/2005 | 16,500 | $35.01 | $577,665 | |
| | | 5/2/2005 | 8,818 | $35.00 | $308,630 | |
| | | | 79,400 | | $2,835,088 | 76.68% |
| | | | | | | |
| HARRIS | CHARLES | 7/29/2005 | 15,000 | $37.04 | $555,600 | |
| | | 7/29/2005 | 10,000 | $37.45 | $374,500 | |
| | | 8/1/2005 | 5,000 | $37.25 | $186,250 | |
| | | | 30,000 | | $1,116,350 | 86.25% |
| | | | | | | |
| HOLLAND | LARRY | 3/22/2005 | 5,000 | $37.64 | $188,200 | |
| | | 3/23/2005 | 6,000 | $37.42 | $224,520 | |
| | | 3/23/2005 | 5,000 | $37.61 | $188,050 | |
| | | 3/23/2005 | 3,000 | $37.30 | $111,900 | |
| | | 3/23/2005 | 2,900 | $37.23 | $107,967 | |
| | | 3/23/2005 | 2,100 | $37.35 | $78,435 | |
| | | 3/23/2005 | 2,000 | $37.30 | $74,600 | |
| | | 3/23/2005 | 1,000 | $37.21 | $37,210 | |
| | | 3/24/2005 | 1,973 | $37.75 | $74,481 | |
| | | 3/29/2005 | 10,000 | $37.04 | $370,400 | |
| | | 3/29/2005 | 5,000 | $37.05 | $185,250 | |
| | | 3/29/2005 | 2,000 | $37.28 | $74,560 | |
| | | 3/29/2005 | 2,000 | $37.26 | $74,520 | |
| | | 3/29/2005 | 2,000 | $37.16 | $74,320 | |
| | | 3/29/2005 | 1,200 | $37.23 | $44,676 | |
| | | 3/29/2005 | 1,000 | $37.22 | $37,220 | |
| | | 3/29/2005 | 1,000 | $37.25 | $37,250 | |
| | | 3/29/2005 | 1,000 | $37.24 | $37,240 | |
| | | 3/29/2005 | 1,000 | $37.23 | $37,230 | |
| | | 3/29/2005 | 1,000 | $37.13 | $37,130 | |
| | | 3/29/2005 | 408 | $37.12 | $15,145 | |
| | | 3/29/2005 | 387 | $31.57 | $12,218 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | % of Holdings Sold |
|-----------|------------|------|--------|-------|----------|--------------------|
| | | 3/29/2005 | 300 | $37.26 | $11,178 | |
| | | 3/30/2005 | 5,000 | $37.35 | $186,750 | |
| | | 3/30/2005 | 4,000 | $37.15 | $148,600 | |
| | | 3/30/2005 | 3,000 | $37.27 | $111,810 | |
| | | 3/30/2005 | 3,000 | $36.80 | $110,400 | |
| | | 3/30/2005 | 2,000 | $37.34 | $74,680 | |
| | | 3/30/2005 | 2,000 | $37.35 | $74,700 | |
| | | 3/30/2005 | 2,000 | $37.34 | $74,680 | |
| | | 3/30/2005 | 2,000 | $37.20 | $74,400 | |
| | | 3/30/2005 | 2,000 | $37.28 | $74,560 | |
| | | 3/30/2005 | 2,000 | $37.20 | $74,400 | |
| | | 3/30/2005 | 2,000 | $37.15 | $74,300 | |
| | | 3/30/2005 | 2,000 | $37.52 | $75,040 | |
| | | 3/30/2005 | 1,000 | $37.19 | $37,190 | |
| | | 3/30/2005 | 1,000 | $37.26 | $37,260 | |
| | | 3/30/2005 | 1,000 | $37.18 | $37,180 | |
| | | 3/30/2005 | 1,000 | $36.85 | $36,850 | |
| | | 3/30/2005 | 1,000 | $36.75 | $36,750 | |
| | | 3/31/2005 | 6,000 | $37.00 | $222,000 | |
| | | 3/31/2005 | 95 | $37.50 | $3,563 | |
| | | 4/4/2005 | 10,000 | $36.19 | $361,900 | |
| | | 4/4/2005 | 10,000 | $36.59 | $365,900 | |
| | | 4/4/2005 | 10,000 | $36.68 | $366,800 | |
| | | 4/4/2005 | 10,000 | $36.64 | $366,400 | |
| | | 4/4/2005 | 6,797 | $37.35 | $253,868 | |
| | | 4/4/2005 | 5,700 | $36.25 | $206,625 | |
| | | 4/4/2005 | 1,000 | $36.42 | $36,420 | |
| | | 4/4/2005 | 1,000 | $36.43 | $36,430 | |
| | | 4/4/2005 | 1,000 | $36.40 | $36,400 | |
| | | 4/4/2005 | 1,000 | $36.35 | $36,350 | |
| | | 4/4/2005 | 1,000 | $36.40 | $36,400 | |
| | | 4/4/2005 | 1,000 | $36.42 | $36,420 | |
| | | 4/4/2005 | 1,000 | $36.53 | $36,530 | |
| | | 4/4/2005 | 803 | $36.35 | $29,189 | |
| | | 4/6/2005 | 10,000 | $36.92 | $369,200 | |
| | | 4/6/2005 | 5,920 | $36.97 | $218,862 | |
| | | 4/6/2005 | 4,080 | $36.81 | $150,185 | |
| | | 4/7/2005 | 10,000 | $36.35 | $363,500 | |
| | | 4/7/2005 | 5,000 | $37.00 | $185,000 | |
| | | 4/8/2005 | 3,000 | $37.00 | $111,000 | |
| | | 4/11/2005 | 1,100 | $37.00 | $40,700 | |
| | | 4/12/2005 | 10,000 | $36.91 | $369,100 | |
| | | 4/12/2005 | 2,000 | $36.75 | $73,500 | |
| | | 4/12/2005 | 2,000 | $36.45 | $72,900 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | % of Holdings Sold |
|-----------|-----------|------|--------|-------|----------|--------------------|
| | | 4/12/2005 | 2,000 | $36.40 | $72,800 | |
| | | 4/12/2005 | 2,000 | $36.36 | $72,720 | |
| | | 4/13/2005 | 2,000 | $35.63 | $71,260 | |
| | | 4/13/2005 | 2,000 | $35.75 | $71,500 | |
| | | 4/13/2005 | 2,000 | $35.76 | $71,520 | |
| | | 4/13/2005 | 1,000 | $35.61 | $35,610 | |
| | | 4/13/2005 | 1,000 | $35.52 | $35,520 | |
| | | 4/13/2005 | 97 | $35.76 | $3,469 | |
| | | 4/19/2005 | 2,173 | $35.71 | $77,598 | |
| | | | 227,033 | | $8,370,388 | 97.34% |
| | | | | | | |
| JEMISON | MAE | 4/19/2005 | 2,000 | $34.73 | $69,460 | |
| | | | 2,000 | | $69,460 | 66.58% |
| | | | | | | |
| MALONEY | KAREN | 3/28/2005 | 4,000 | $37.50 | $150,000 | |
| | | | 4,000 | | $150,000 | 56.30% |
| | | | | | | |
| MARCUS | BARBARA | 3/22/2005 | 3,000 | $37.99 | $113,970 | |
| | | 3/29/2005 | 5,000 | $37.05 | $185,250 | |
| | | 3/30/2005 | 2,000 | $37.27 | $74,540 | |
| | | 3/30/2005 | 2,000 | $37.25 | $74,500 | |
| | | 3/30/2005 | 1,000 | $37.27 | $37,270 | |
| | | 4/6/2005 | 5,000 | $37.00 | $185,000 | |
| | | 4/12/2005 | 544 | $37.00 | $20,128 | |
| | | 4/15/2005 | 6,456 | $34.49 | $222,667 | |
| | | | 25,000 | | $913,325 | 48.81% |
| | | | | | | |
| ROBINSON | RICHARD | 4/13/2005 | 6,290 | $36.10 | $227,069 | |
| | | 4/13/2005 | 5,100 | $36.33 | $185,283 | |
| | | 4/13/2005 | 3,020 | $36.34 | $109,747 | |
| | | 4/13/2005 | 2,280 | $35.87 | $81,784 | |
| | | 4/13/2005 | 2,200 | $35.56 | $78,232 | |
| | | 4/13/2005 | 1,843 | $35.92 | $66,201 | |
| | | 4/13/2005 | 1,800 | $36.25 | $65,250 | |
| | | 4/13/2005 | 1,660 | $36.00 | $59,760 | |
| | | 4/13/2005 | 1,300 | $36.29 | $47,177 | |
| | | 4/13/2005 | 1,300 | $35.85 | $46,605 | |
| | | 4/13/2005 | 1,300 | $35.61 | $46,293 | |
| | | 4/13/2005 | 1,200 | $35.69 | $42,828 | |
| | | 4/13/2005 | 1,100 | $36.27 | $39,897 | |
| | | 4/13/2005 | 1,000 | $36.15 | $36,150 | |
| | | 4/13/2005 | 900 | $36.36 | $32,724 | |
| | | 4/13/2005 | 900 | $35.91 | $32,319 | |
| | | 4/13/2005 | 818 | $35.88 | $29,350 | |

| Last Name | First Name | Date | Shares | Price | Proceeds | % of Holdings Sold |
|---|---|---|---|---|---|---|
| | | 4/13/2005 | 800 | $36.26 | $29,008 | |
| | | 4/13/2005 | 800 | $35.80 | $28,640 | |
| | | 4/13/2005 | 800 | $35.54 | $28,432 | |
| | | 4/13/2005 | 795 | $36.35 | $28,898 | |
| | | 4/13/2005 | 700 | $35.66 | $24,962 | |
| | | 4/13/2005 | 700 | $35.55 | $24,885 | |
| | | 4/13/2005 | 600 | $35.93 | $21,558 | |
| | | 4/13/2005 | 600 | $35.90 | $21,540 | |
| | | 4/13/2005 | 600 | $35.78 | $21,468 | |
| | | 4/13/2005 | 600 | $35.50 | $21,300 | |
| | | 4/13/2005 | 500 | $35.94 | $17,970 | |
| | | 4/13/2005 | 400 | $35.51 | $14,204 | |
| | | 4/13/2005 | 310 | $36.13 | $11,200 | |
| | | 4/13/2005 | 300 | $35.89 | $10,767 | |
| | | 4/13/2005 | 300 | $35.68 | $10,704 | |
| | | 4/13/2005 | 300 | $35.57 | $10,671 | |
| | | 4/13/2005 | 300 | $35.52 | $10,656 | |
| | | 4/13/2005 | 260 | $35.86 | $9,324 | |
| | | 4/13/2005 | 200 | $36.38 | $7,276 | |
| | | 4/13/2005 | 200 | $36.14 | $7,228 | |
| | | 4/13/2005 | 200 | $36.11 | $7,222 | |
| | | 4/13/2005 | 200 | $35.76 | $7,152 | |
| | | 4/13/2005 | 200 | $35.73 | $7,146 | |
| | | 4/13/2005 | 200 | $35.65 | $7,130 | |
| | | 4/13/2005 | 200 | $35.56 | $7,112 | |
| | | 4/13/2005 | 190 | $35.72 | $6,787 | |
| | | 4/13/2005 | 100 | $36.41 | $3,641 | |
| | | 4/13/2005 | 100 | $36.37 | $3,637 | |
| | | 4/13/2005 | 100 | $36.03 | $3,603 | |
| | | 4/13/2005 | 100 | $36.01 | $3,601 | |
| | | 4/13/2005 | 39 | $35.59 | $1,388 | |
| | | 4/13/2005 | 10 | $35.79 | $358 | |
| | | 4/14/2005 | 4,300 | $35.75 | $153,725 | |
| | | 7/27/2005 | 15,200 | $36.81 | $559,512 | |
| | | 7/27/2005 | 15,000 | $36.76 | $551,400 | |
| | | 7/27/2005 | 15,000 | $36.91 | $553,650 | |
| | | 7/27/2005 | 15,000 | $36.86 | $552,900 | |
| | | 8/2/2005 | 15,000 | $37.00 | $555,000 | |
| | | 8/2/2005 | 15,000 | $37.18 | $557,700 | |
| | | 8/10/2005 | 10,000 | $36.25 | $362,500 | |
| | | 8/11/2005 | 20,000 | $36.37 | $727,400 | |
| | | | 170,215 | | $6,219,923 | 3.21% |
| | | **Total:** | **632,586** | | **$22,957,711** | |

- 45 -

119.    The insider trading was unusual and suspicious for at least the following reasons:

(a)    the insider sellers sold significant portions of their personal holdings; and

(b)    the insider selling during the Class Period greatly exceeded pre-Class Period insider selling.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

120.    At all relevant times, the market for Scholastic's common stock was an efficient market for the following reasons, among others:

(a)    Scholastic stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Scholastic filed periodic public reports with the SEC and the NASDAQ;

(c)    Scholastic regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Scholastic was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

121.    As a result of the foregoing, the market for Scholastic's common stock promptly digested current information regarding Scholastic from all publicly available sources and reflected such information in Scholastic's stock price.   Under these circumstances, all purchasers of

Scholastic's common stock during the Class Period suffered similar injury through their purchase of Scholastic's common stock at artificially inflated prices and a presumption of reliance applies.

### No Safe Harbor

122.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Scholastic who knew that those statements were false when made.

### COUNT I

### Violation of Section 10(b) of the Exchange Act
### Against and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

123.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

125.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

126.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Scholastic common stock. Plaintiff and the Class would not have purchased Scholastic common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

127.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Scholastic common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

128.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

129.    The Individual Defendants acted as controlling persons of Scholastic within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Scholastic, and their ownership of Scholastic stock, the Individual Defendants had the power and authority to cause Scholastic to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  January 11, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD


                                                  */s/ Samuel H. Rudman*
                                            SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            *Attorneys for Plaintiff and Lead Counsel*
                                            *for the Class*

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that on January 11, 2008, I caused a true and

correct copy of the attached:

Consolidated Amended Class Action Complaint for Violations of Federal
Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to

all counsel on the attached service list.

*/s/ Samuel H. Rudman*
Samuel H. Rudman

SCHOLASTIC 07

Service List - 10/19/2007   (07-0182)

Page 1 of  1

### Counsel For Defendant(s)

Michael J. Chepiga
David  Elbaum
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY  10017-3954
   212/455-2000
   212/455-2502 (Fax)

### Counsel For Plaintiff(s)

Evan J. Smith
Brodsky & Smith, LLC
240 Mineola Blvd., 1st Floor
Mineola, NY  11501
   516/741-4977
   516/741-0626 (Fax)

Samuel H. Rudman
David A. Rosenfeld
Mario  Alba, Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747
   631/367-7100
   631/367-1173 (Fax)

Richard A. Maniskas
Schiffrin Barroway Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA  19087
   610/667-7706
   610/667-7056 (Fax)