# EXHIBIT 8



# SCHOLASTIC CORP (SCHL)

555 BROADWAY
NEW YORK, NY 10012
212. 343.6100
http://www.scholastic.com/

# 10-K

**Filed on 08/08/2005 – Period: 05/31/2005**
File Number 000-19860



LIVEDGAR Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

United States
## Securities and Exchange Commission

Washington, D.C. 20549

## Form 10-K

### Annual Report pursuant to section 13 or 15(d) of
### the Securities Exchange Act of 1934

For the fiscal year ended May 31, 2005  ¦  Commission File No. 000–19860

# Scholastic Corporation

(Exact name of Registrant as specified in its charter)

| **Delaware** | **13–3385513** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **557 Broadway, New York, New York** | **10012** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (212) 343–6100
Securities Registered Pursuant to Section 12(b) of the Act:
NONE
Securities Registered Pursuant to Section 12(g) of the Act:

| Title of class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $0.01 par value | The NASDAQ Stock Market |

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☐

Indicate by check mark whether the Registrant is an accelerated filer (as defined in Exchange Act Rule 12b–2). Yes ☒ No ☐

The aggregate market value of the Common Stock, par value $0.01, held by non–affiliates as November 30, 2004, was approximately $1,001,610,000. As of such date, non–affiliates held no shares of the Class A Stock, $0.01 par value. There is no active market for the Class A Stock.

The number of shares outstanding of each class of the Registrant's voting stock as of July 22, 2005 was as follows: 39,194,645 shares of Common Stock and 1,656,200 shares of Class A Stock.

### Documents Incorporated By Reference

Part III incorporates certain information by reference from the Registrant's definitive proxy statement for the Annual Meeting of Stockholders to be held September 21, 2005.

Critical Accounting Policies and Estimates

In connection with a comprehensive review of its lease accounting practices, the Company determined that certain leases previously classified as operating leases should have been classified as capital leases and that the calculation of rent expense from certain other operating leases did not properly reflect future payment escalation clauses. As a result, the Company has revised its accounting for these leasing transactions and restated its previously issued annual and interim consolidated financial statements. Note 1 of Notes to Consolidated Financial Statements in Item 8, "Consolidated Financial Statements and Supplementary Data," provides a comprehensive description of the adjustments recorded in connection with the restatement.

**General:**
The Company's discussion and analysis of its financial condition and results of operations is based upon the Company's consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States. The preparation of these financial statements involves the use of estimates and assumptions by management, which affect the amounts reported in the consolidated financial statements and accompanying notes. The Company bases its estimates on historical experience, current business factors, and various other assumptions believed to be reasonable under the circumstances, all of which are necessary in order to form a basis for determining the carrying values of assets and liabilities. Actual results may differ from those estimates and assumptions. On an ongoing basis, the Company evaluates the adequacy of its reserves and the estimates used in calculations, including, but not limited to: collectability of accounts receivable and installment receivables; sales returns; amortization periods; pension obligations; and recoverability of inventories, deferred promotion costs, deferred income taxes and tax reserves, prepublication costs, royalty advances, goodwill and other intangibles.

The following policies and account descriptions include all those identified by the Company as critical to its business operations and the understanding of its results of operations:

**Revenue recognition:**
The Company's revenue recognition policies for its principal businesses are as follows:

**School – Based Book Clubs –** Revenue from school–based book clubs is recognized upon shipment of the products.

**School – Based Book Fairs –** Revenue from school–based book fairs is recognized ratably as each book fair occurs.

**Continuity Programs –** The Company operates continuity programs whereby customers generally place a single order and receive multiple shipments of books and other products over a period of time. Revenue from continuity programs is recognized at the time of shipment or, in applicable cases, upon customer acceptance. Reserves for estimated returns are established as a reduction to revenue. Actual returns are charged to the reserve as received. The calculation of the reserve for estimated returns is based on historical return rates and sales patterns. Actual returns could differ from the Company's estimate. A one percentage point change in the estimated reserve for returns rate by product and media would result in an increase or decrease in operating income of approximately $0.3 million.

**Trade –** Revenue from the sale of children's books for distribution in the retail channel primarily is recognized at the time of shipment, which generally is when title transfers to the customer or when the product is on sale and available to the public. A reserve for estimated returns is established at that time and recorded as a reduction to revenue. Actual returns are charged to the reserve as received. The calculation of the reserve for estimated returns is based on historical return rates and sales patterns.



16

Actual returns could differ from the Company's estimate. A one percentage point change in the estimated reserve for returns rate would result in an increase or decrease in operating income of approximately $1.0 million.

**Educational Publishing** – For shipments to schools, revenue is recognized on passage of title, which generally occurs upon receipt by the customer. Shipments to depositories are on consignment. Revenue is recognized based on actual shipments from the depositories to the schools. For certain software–based products, the Company offers new customers installation and training. In such cases, revenue is recognized when installation and training are complete.

**Toy Catalog** – Revenue from the sale of children's toys to the home through catalogs is recognized at the time of shipment, which is generally when title transfers to the customer. A reserve for estimated returns is established at the time of sale and recorded as a reduction to revenue. Actual returns are charged to the reserve as received. The calculation of the reserve for estimated returns is based on historical return rates and sales patterns.

**Film Production and Licensing** – Revenue from the sale of film rights, principally for the home video and domestic and foreign television markets, is recognized when the film has been delivered and is available for showing or exploitation. Licensing revenue is recorded in accordance with royalty agreements at the time the licensed materials are available to the licensee and collections are reasonably assured.

**Magazines** – Revenue is deferred and recognized ratably over the subscription period, as the magazines are delivered.

**Magazine Advertising** – Revenue is recognized when the magazine is on sale and available to the subscribers.

**Scholastic In–School Marketing** – Revenue is recognized when the Company has satisfied its obligations under the program and the customer has acknowledged acceptance of the product or service.

For the fiscal years ended May 31, 2005, 2004 and 2003, no significant changes have been made to the underlying assumptions related to the revenue recognition policy or the methodology applied.

**Accounts receivable:**
Accounts receivable are recorded net of allowances for doubtful accounts and reserves for returns. In the normal course of business, the Company extends credit to customers that satisfy predefined credit criteria. The Company is required to estimate the collectability of its receivables. Reserves for returns are based on historical return rates and sales patterns.
Allowances for doubtful accounts are established through the evaluation of accounts receivable agings and prior collection experience to estimate the ultimate collectability of these receivables. A one percentage point change in the estimated bad debt reserve rates, which are applied to the accounts receivable agings, would result in an increase or decrease in operating income of approximately $0.7 million.

**Inventories:**
Inventories, consisting principally of books, are stated at the lower of cost, using the first–in, first–out method, or market. The Company records a reserve for excess and obsolete inventory based upon a calculation using the historical usage rates and sales patterns of its products.

**Deferred promotion costs:**
Deferred promotion costs represent direct mail and telemarketing promotion costs incurred to acquire customers in the Company's continuity and magazine businesses. Promotional costs are deferred when incurred and amortized in the proportion that current revenues bear to estimated total revenues. The Company regularly evaluates the operating performance of the promotions over their life cycle based on historical and forecasted demand and adjusts the carrying value accordingly. Except as discussed above, all other advertising costs are expensed as incurred. A one



17

## NEW ACCOUNTING PRONOUNCEMENTS

In December 2004, the Financial Accounting Standards Board (the "FASB") issued SFAS No. 123 (revised 2004), "Share–Based Payment" ("SFAS No. 123R"), which requires companies to measure compensation cost for all share–based payments (including employee stock options) at fair value, as currently permitted but not required under SFAS No. 123. As a result, the pro forma disclosures previously permitted under SFAS No. 123, as disclosed in Note 1 of Notes to Consolidated Financial Statements in Item 8, "Consolidated Financial Statements and Supplementary Data," will no longer be an alternative to financial statement recognition, effective for the Company commencing June 1, 2006. Retroactive application of the fair value recognition provisions of SFAS No. 123R to all prior years for which SFAS No. 123 was effective is permitted, but not required. Alternatively, a company may use the modified–prospective transition method for application of SFAS No. 123R. Under this method, compensation cost is recognized for all share–based payments granted, modified or settled after the date of adoption based on their grant–date fair value. For awards granted prior to the adoption date, the compensation cost of any unvested portion is recognized over the remaining service period, based on the grant–date fair value utilized in the SFAS 123 disclosure. The Company is currently evaluating the impact that the adoption of SFAS No. 123R will have on its financial position, results of operations and cash flows.

In December 2004, the FASB issued FASB Staff Position No.109–2, "Accounting and Disclosure Guidance for the Foreign Earnings Repatriation Provision within the American Jobs Creation Act of 2004" ("FSP No. 109–2"). FSP No.109–2 provides guidance on recording and disclosing the impact on income tax expense and deferred tax liabilities of the optional foreign earnings repatriation provision of the American Jobs Creation Act of 2004. The Company has elected not to repatriate foreign earnings pursuant to these provisions, and therefore the adoption of FSP No. 109–2 has had no impact on the Company's financial position, results of operation or cash flows.

In March 2005, the FASB issued Interpretation No. 47, "Accounting for Conditional Asset Retirement Obligations – an interpretation of FASB Statement No. 143" ("FIN 47"). FIN 47 clarifies that an entity is required to recognize a liability for the fair value of a conditional asset retirement obligation when incurred, if the liability's fair value can be reasonably estimated. The Company is required to adopt FIN 47 no later than May 31, 2006 and is currently evaluating the impact that the adoption of FIN 47 will have on its financial position, results of operations and cash flows.

In May 2005, the FASB issued SFAS No. 154, "Accounting Changes and Error Corrections – a replacement of APB Opinion No. 20 and FASB Statement No. 3" ("SFAS No.154"). Under the previous guidance, most voluntary changes in accounting principle were required to be recognized as the cumulative effect of a change in accounting principle within the net income of the periods in which the change is made. SFAS No. 154 requires retrospective application to prior period financial statements of a voluntary change in accounting principle, unless it is impracticable to do so. SFAS No. 154 is effective for accounting changes and corrections of errors made in fiscal years beginning after December 15, 2005. The Company has elected to adopt SFAS No.154 effective June 1, 2006.

## FACTORS THAT MAY AFFECT FUTURE RESULTS AND FINANCIAL CONDITION

This Annual Report on Form 10–K contains forward–looking statements. Additional written and oral forward–looking statements may be made by the Company from time to time in SEC filings and otherwise. The Company cautions readers that results or expectations expressed by forward–looking statements, including, without limitation, those relating to the Company's future business prospects, revenues, operating margins, working capital, liquidity, capital needs, interest costs and income, are subject to certain risks and uncertainties that could cause actual results to differ materially from those indicated in the forward–looking statements, due to factors including the following and other risks and factors identified from time to time in the Company's filings with the SEC:



- The Company's ability to continue to produce successful educational, trade, entertainment and software products;
- The ability of the Company's school–based book clubs and book fairs to successfully meet market needs;
- The ability of the Company to successfully execute its plan with regard to its continuity business;
- The Company's ability to maintain relationships with its creative talent;
- Changes in purchasing patterns in and the strength of educational, trade, entertainment and software markets;
- Competition from other educational and trade publishers and media, entertainment and internet companies;
- Significant changes in the publishing industry, especially relating to the distribution and sale of books;
- The effect on the Company of volatility in the price of paper and periodic increases in postage rates through traditional and emerging channels;
- The Company's ability to effectively use the Internet to support its existing businesses and to launch successful new Internet initiatives;
- The impact of governmental initiatives, including the expansion of restrictions on communications with actual and potential customers;
- The general risks attendant to the conduct of business in foreign countries;
- The general risks inherent in the market impact of rising interest rates with regard to its variable–rate debt facilities.

The foregoing list of factors should not be construed as exhaustive or as any admission regarding the adequacy of disclosures made by the Company prior to the date hereof. The Company disclaims any intention or obligation to update or revise forward–looking statements, whether as a result of new information, future events or otherwise.

## Item 7A |    Quantitative and Qualitative Disclosures about Market Risk

The Company has operations in various foreign countries. In the normal course of business, these operations are exposed to fluctuations in currency values. Management believes that the impact of currency fluctuations does not represent a significant risk in the context of the Company's current international operations. In the normal course of business, the Company's operations outside the United States periodically enter into short–term forward contracts (generally not exceeding $20.0 million) to match selected purchases not denominated in their respective local currencies.

Market risks relating to the Company's operations result primarily from changes in interest rates, which are managed through the mix of variable–rate versus fixed–rate borrowings. Additionally, financial instruments, including swap agreements, have been used to manage interest rate exposures. Approximately 5% of the Company's debt at May 31, 2005 bore interest at a variable rate and was sensitive to changes in interest rates, compared to approximately 7% at May 31, 2004. The Company is subject to the risk that market interest rates will increase and thereby increase the interest charged under its variable–rate debt. Additional information relating to the Company's outstanding financial instruments is included in Item 7, "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The following table sets forth information about the Company's debt instruments as of May 31, 2005 (see Note 3 of Notes to Consolidated Financial Statements in Item 8, "Consolidated Financial Statements and Supplementary Data"):

($ amounts in millions)

| | Fiscal Year Maturity | | | | | | | Fair Value as of May 31, 2005 |
|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009(1) | 2010 | Thereafter | Total | |
| **Debt Obligations** | | | | | | | | |
| Lines of credit | $ 24.7 | $ — | $ — | $ — | $ — | $ — | $ 24.7 | $ 24.7 |
| Average interest rate | 5.36% | | | | | | | |
| Long–term debt including current portion: | | | | | | | | |
| Fixed–rate debt | $ 0.2 | $ 300.0 | $ — | $ — | $ — | $ 175.0 | $ 475.2 | $ 480.3 |
| Average interest rate | 13.0% | 5.75% | | | | 5.0% | | |

(1)    The Credit Agreement and Revolver, with credit lines totalling $230.0, expire in fiscal 2009.



29

**Consolidated Statements of Income**

(Amounts in millions, except per share data)
Years ended May 31,

| | 2005 | 2004 | 2003 |
|---|---|---|---|
| | | Restated | Restated |
| Revenues | $ 2,079.9 | $ 2,233.8 | $ 1,958.3 |
| Operating costs and expenses: | | | |
|   Cost of goods sold (exclusive of depreciation) | 970.5 | 1,080.0 | 882.1 |
|   Cost of goods sold – Continuity charges | — | 6.8 | — |
| Selling, general and administrative expenses | 845.4 | 854.9 | 813.1 |
| Selling, general and administrative expenses – Continuity charges | 3.8 | 15.2 | — |
| Bad debt expense | 62.2 | 88.3 | 72.3 |
| Bad debt expense – Continuity charges | — | 2.0 | — |
| Other operating costs: | | | |
|   Depreciation and amortization | 63.1 | 62.1 | 52.1 |
|   Special severance charges | — | 3.3 | 10.9 |
|   Litigation and other charges | — | — | 1.9 |
| Total operating costs and expenses | 1,945.0 | 2,112.6 | 1,832.4 |
| | | | |
| Operating income | 134.9 | 121.2 | 125.9 |
| Other income | — | 8.0 | 2.9 |
| Interest income | 1.0 | 0.4 | 0.3 |
| Interest expense | 36.2 | 40.0 | 38.6 |
| | | | |
| Earnings before income taxes | 99.7 | 89.6 | 90.5 |
| Provision for income taxes | 35.4 | 31.8 | 31.7 |
| Net income | $ 64.3 | $ 57.8 | $ 58.8 |
| | | | |
| **Earnings per Share of Class A and Common Stock:** | | | |
| Net income: | | | |
|   Basic | $ 1.61 | $ 1.47 | $ 1.50 |
|   Diluted | $ 1.58 | $ 1.44 | $ 1.46 |

See accompanying notes



SCHOLASTIC

31

# Schedule II

## Valuation and Qualifying Accounts and Reserves

(Amounts in millions)
Years Ended May 31.

| | Balance at Beginning of Year | Expensed | Write–Offs and Other | Balance at End of Year |
|---|---|---|---|---|
| **2005** | | | | |
| Allowance for doubtful accounts | $ 68.3 | $ 62.2 | $ 83.2 | $ 47.3 |
| Reserve for returns | 52.6 | 130.8 | 141.4(1) | 42.0 |
| Reserve for obsolescence | 59.2 | 38.7 | 39.4 | 58.5 |
| Reserve for royalty advances | 49.8 | 3.0 | 0.7 | 52.1 |
| **2004** | | | | |
| Allowance for doubtful accounts | $ 60.5 | $ 90.3 | $ 82.5 | $ 68.3 |
| Reserve for returns | 58.2 | 193.5 | 199.1(1) | 52.6 |
| Reserve for obsolescence | 54.4 | 29.9 | 25.1 | 59.2 |
| Reserve for royalty advances | 45.8 | 4.3 | 0.3 | 49.8 |
| **2003** | | | | |
| Allowance for doubtful accounts | $ 62.6 | $ 72.3 | $ 74.4 | $ 60.5 |
| Reserve for returns | 61.3 | 164.1 | 167.2(1) | 58.2 |
| Reserve for obsolescence | 55.1 | 26.7 | 27.4 | 54.4 |
| Reserve for royalty advances | 44.6 | 5.0 | 3.8 | 45.8 |

(1)    Represents actual returns charged to the reserve.



S–2

**Report of Independent Registered Public Accounting Firm**

**THE BOARD OF DIRECTORS AND STOCKHOLDERS
OF SCHOLASTIC CORPORATION**

We have audited the accompanying consolidated balance sheets of Scholastic Corporation as of May 31, 2006 and 2005, and the related consolidated statements of income, changes in stockholders' equity and comprehensive income and cash flows for each of the three years in the period ended May 31, 2006. Our audits also included the financial statement schedule included in the Index at Item 15(a). These financial statements and schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Scholastic Corporation at May 31, 2006 and 2005, and the consolidated results of its operations and its cash flows for each of the three years in the period ended May 31, 2006, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statements schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of Scholastic Corporation's internal control over financial reporting as of May 31, 2006, based on criteria established in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated August 4, 2006 expressed an unqualified opinion thereon.

*Ernst & Young LLP*

Ernst & Young LLP

New York, New York
August 4, 2006



60

**Report of Independent Registered Public Accounting Firm**

**THE BOARD OF DIRECTORS AND STOCKHOLDERS
OF SCHOLASTIC CORPORATION**

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Scholastic Corporation maintained effective internal control over financial reporting as of May 31, 2006 based on criteria established in Internal Control–Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Scholastic Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that the Scholastic Corporation maintained effective internal control over financial reporting as of May 31, 2006 is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, Scholastic Corporation maintained, in all material respects, effective internal control over financial reporting as of May 31, 2006 based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Scholastic Corporation as of May 31, 2006 and 2005 and the related consolidated statements of income, changes in stockholders' equity and comprehensive income, and cash flows for each of the three years in the period ended May 31, 2006 and our report dated August 4, 2006 expressed an unqualified opinion thereon.

*Ernst + Young LLP*

Ernst & Young LLP

New York, New York
August 4, 2006

**◼SCHOLASTIC**

61

# EXHIBIT 9



# SCHOLASTIC CORP (SCHL)

555 BROADWAY
NEW YORK, NY 10012
212.343.6100
http://www.scholastic.com/

# EX-99.1

**EXHIBIT 99.1**
**8-K Filed on 09/22/2005 - Period: 09/22/2005**
File Number 000-19860



LIVEDGAR information provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

Exhibit 99.1

Scholastic Reports First Quarter Results for Fiscal 2006;
Strong Growth Driven by Successful Launch of Harry Potter
and the Half-Blood Prince;
Record Sales of Educational Technology

NEW YORK--(BUSINESS WIRE)--Sept. 22, 2005--Scholastic Corporation
(NASDAQ:SCHL) today reported its results for the fiscal 2006 first
quarter ended August 31, 2005, and affirmed its outlook for fiscal
2006.

Revenues in the first quarter were $498.4 million versus $323.7
million in the prior year period. Net loss for the quarter was $21.2
million, or $0.52 per share. This compares to a net loss of $50.5
million, or $1.28 per share, in the prior year period, which included
a pre-tax charge of $3.6 million, or $0.06 per share, in severance
costs relating to the reorganization of the Continuities business.
Scholastic typically records a seasonal loss in its first quarter of
the fiscal year, as most schools are not in session resulting in
minimal revenues from school-based Book Fairs and Book Clubs.

Richard Robinson, Chairman, President and CEO of Scholastic,
commented: "Record-breaking sales of Harry Potter and the Half-Blood
Prince drove significantly higher results in Children's Book
Publishing and Distribution and for the Company overall. Scholastic
Education's strongest quarter ever also contributed to last quarter's
improved results, with sales of educational technology demonstrating
the continued success of our reading solutions strategy. These
achievements reinforce Scholastic's leading position as a partner with
families and teachers, helping develop children's reading skills and
love of books."

The Company also affirmed its fiscal 2006 outlook for revenues of
$2.3 to $2.4 billion, earnings per diluted share of $2.30 to $2.50,
and free cash flow of $85 to $95 million.

First Quarter Segment Analysis

Children's Book Publishing and Distribution. Segment revenues in
the quarter were $275.3 million, compared to $121.8 million in the
prior year period. Harry Potter revenue increased to approximately
$185 million from about $10 million in last year's first quarter,
reflecting the successful launch of Harry Potter and the Half-Blood
Prince, as well as higher sales of Harry Potter backlist titles.
Partially offsetting this increase was a decline in Continuities
revenue resulting from the Company's strategy to focus on its most
productive customers. The resulting operating loss for the segment was
$19.7 million, compared to an operating loss of $64.0 million in the
prior year period.

Educational Publishing. In the first quarter, segment revenues
increased 9% to $128.3 million from $118.2 million in the prior year
period. Operating profits rose 23% to $27.5 million relative to the
prior year period. Higher revenues and profits primarily reflected a
32% increase in sales of educational technology over the prior year,
benefiting from the launch of the Enterprise Edition of the READ
180(R) reading intervention program.

International. Segment revenues in the first quarter rose 7% (3%
in local currencies) to $76.7 million from $71.8 million in the prior
year period, primarily as a result of growth in the Company's export
business and in the Australia market. The operating loss in the
segment was $5.5 million in the first quarter, as compared to a loss
of $3.0 million in the year ago period, primarily due to lower results

in the United Kingdom, where Scholastic is rebuilding its Trade and
Continuities businesses. The first quarter is also typically the
smallest for the International segment, with schools out of session in
the United Kingdom and Canada, two of our largest operations,
resulting in a loss.

Media, Licensing and Advertising. Segment revenues rose 52% to
$18.1 million in the first quarter, compared to the prior year period,
primarily due to increased production revenue for Maya & Miguel(TM)
and Time Warp Trio(TM). Operating loss improved to $5.7 million for
the quarter compared with $6.2 million in the year ago period.

Conference Call

Scholastic will hold a conference call today (September 22, 2005)
at 8:00 a.m. EDT. To listen by telephone, dial 888-338-6461 or
973-935-8510. To listen and view accompanying slides on the Internet,
go to the Investor Relations section of www.scholastic.com, and follow
links there. Following the call, the slides will be available in the
Investor Relations section of www.scholastic.com and an audio replay
will be available at 877-519-4471; PIN number: 6459681.

About Scholastic

Scholastic Corporation (NASDAQ:SCHL) is the world's largest
publisher and distributor of children's books and a leader in
educational technology. Scholastic creates quality educational and
entertaining materials and products for use in school and at home,
including children's books, magazines, technology-based products,
teacher materials, television programming, film, videos and toys. The
Company distributes its products and services through a variety of
channels, including proprietary school-based book clubs, school-based
book fairs, and school-based and direct-to-home continuity programs;
retail stores, schools, libraries and television networks; and the
Company's Internet site, www.scholastic.com.

Forward-Looking Statements

This news release contains certain forward-looking statements.
Such forward-looking statements are subject to various risks and
uncertainties, including the conditions of the children's book and
educational materials markets and acceptance of the Company's products
within those markets, and other risks and factors identified from time
to time in the Company's filings with the Securities and Exchange
Commission. Actual results could differ materially from those
currently anticipated.

```
                       SCHOLASTIC CORPORATION
                 CONSOLIDATED STATEMENTS OF OPERATIONS
                              (UNAUDITED)
                 (Amounts in millions except per share data)
```

|  | THREE MONTHS ENDED | | |
|---|---|---|---|
|  | 8/31/05 | 8/31/04 Restated(1) | Favorable/(Unfavorable) |
| Revenues | $498.4 | $323.7 | $174.7 | 54% |

# EXHIBIT 10

 # SCHOLASTIC CORP (SCHL)

555 BROADWAY
NEW YORK, NY 10012
212. 343.6100
http://www.scholastic.com/

# EX−99.1

**EXHIBIT 99.1 − PRESS RELEASE**
**8−K Filed on 12/16/2005 − Period: 12/16/2005**
File Number 000−19860



www.gsionline.com

Exhibit 99.1

Scholastic Announces Fiscal 2006 Second Quarter Results

NEW YORK--(BUSINESS WIRE)--Dec. 16, 2005--Scholastic Corporation
(NASDAQ:SCHL) today announced its fiscal 2006 second quarter results.

For the quarter ended November 30, 2005, the Company reported
revenues of $696.7 million, up 2% from $683.3 million in the prior
year period. Net income was $66.9 million, down 8% from $72.5 million,
and earnings per diluted share were $1.59 versus $1.80 a year ago.

Higher revenue in the second quarter was driven by growth in the
Educational Publishing and Media, Licensing and Advertising segments,
as well as favorable foreign exchange effects. Lower profits in the
quarter reflected a decline in International results and modestly
lower profits in Children's Book Publishing and Distribution, partly
offset by lower overhead costs.

Free cash flow in the second quarter was $286.2 million compared
to $70.7 million in the prior year period, driven by strong cash
receipts and working capital management. For the first half of the
year, free cash flow was $107.9 million, compared to cash use of $37.5
million in the same period last year. These improvements were
principally due to the impact of this year's higher Harry Potter
sales.

"The impact of hurricanes on the Company, challenges in School
Book Clubs and Continuities, and investments to restructure our
business in the United Kingdom were all factors contributing to lower
profits in the second quarter," commented Richard Robinson, Chairman,
CEO and President of Scholastic. "Our business also showed many
strengths, especially in School Book Fairs, Trade and educational
technology sales. Significant free cash flow in the quarter also
strengthened our balance sheet."

Mr. Robinson added, "Responding to the challenges we faced in the
second quarter, Scholastic's management team is now implementing plans
to improve performance in the second half of the year, particularly in
the important fourth quarter. We are accelerating the U.K. turn-around
efforts, streamlining Club promotions, booking new fairs, introducing
new Continuity programs, trimming marketing costs and reducing
overhead. Notwithstanding the challenges, we believe we will attain
our financial goals for the year, based on these actions and strong
first quarter performance. We expect to achieve revenues for the year
of $2.3 to $2.4 billion, free cash flow of $85 to $95 million and
earnings at the bottom end of the previously announced range of $2.30
to $2.50 per diluted share."

Second Quarter Results

Children's Book Publishing and Distribution. Segment revenues in
the second quarter of fiscal 2006 were $424.2 million, down slightly
from $425.0 million in the prior year period. Trade revenue rose 11%,
driven by strong sales of Harry Potter backlist titles. School Book
Fair revenue rose 7% on higher revenue per fair. School Book Club
revenue was down 3% from fewer orders, partially offset by higher
revenue per order. Continuities revenue decreased 19%, as a result of
the Company's continued strategy of focusing on its most productive
customers. Profit in the segment declined 3% to $88.6 million from

$90.9 million, reflecting the negative impact across the Company of hurricane-related school disruptions and higher fuel prices, as well as lower revenue and profit in the Clubs and Continuities businesses.

Educational Publishing. Segment revenue rose 5% to $99.2 million compared to $94.5 million in the prior year period, driven by a more than 25% increase in revenues from educational technology sales, partially offset by a decline in classroom magazine revenue from last year's election-related increases. Profit in the segment rose slightly to $21.6 million from $21.5 million a year ago, with higher technology sales more than offsetting lower library and classroom magazine results.

International. Revenue in the segment rose 4% to $121.4 million from $116.2 million in the prior year period, primarily reflecting foreign exchange benefits of $4.2 million. Profit in the segment declined $6.4 million to $12.8 million from $19.2 million, due in part to lower results in the United Kingdom.

Media, Licensing and Advertising. Revenue in the segment was up 9% to $51.9 million from $47.6 million in the prior year period, primarily due to growth in Back to Basics Toys(R). Sales of Scholastic-produced titles such as I Spy(TM) and Math Missions(TM) for Leapfrog's Leapster and Where the Wild Things Are for Fisher-Price's Read with Me DVD learning products were also strong. Profit in the quarter fell slightly to $7.7 million from $8.5 million in the prior period.

Other Financial Results. Overhead decreased 15% to $15.4 million from $18.2 million, reflecting lower salary-related expenses and expenses related to Sarbanes-Oxley compliance. The Company's estimated effective tax rate in the second quarter rose to 37.0% from 35.5% in the prior year, primarily due to higher effective tax rates on foreign earnings and a higher state tax provision.

First Half Results

Net income for the first half of fiscal 2006 was $45.7 million or $1.10 per diluted share, up from $22.0 million or $0.55 per diluted share in the first half of fiscal 2005, which included $3.6 million or $0.06 per diluted share in severance charges related to a reorganization of the Continuities business. Revenues in the period rose 19% to $1,195.1 million from $1,007.0 million in the first half of fiscal 2005. The year over year difference in revenue and profitability primarily reflects higher Harry Potter revenues and educational technology sales, partially offset by declines in Clubs and International results.

Conference Call

The Company will hold a conference call to discuss its results at 8:00 am ET today, December 16, 2005. Scholastic's Chairman, President and CEO, Richard Robinson, and Executive Vice President and CFO, Mary Winston, will moderate the call.

The conference call and accompanying slides will be webcast and accessible through the Investor Relations section of Scholastic's website, scholastic.com. Participation by telephone will be available by dialing 888-338-6461 from within the U.S. or +1-973-935-8510 internationally.

Following the call, an audio replay of the call will be available from approximately 10:00 am ET, December 16, 2005 through December 23, 2005 by dialing 877-519-4471 and entering participant code 6737108. Slides from the conference call will also be posted in the Investor Relations section of scholastic.com.

Investor Conference

The Company is currently scheduled to make a presentation to investors at the Citigroup Salomon Smith Barney Entertainment, Media and Telecom Conference on January 10, 2006 in Phoenix, Arizona. Mary Winston, the Company's CFO, is expected to speak. Further details, including information about a webcast, will be posted in the Investor Relations section of scholastic.com when available.

About Scholastic

Scholastic Corporation (NASDAQ:SCHL) is the world's largest publisher and distributor of children's books and a leader in educational technology. Scholastic creates quality educational and entertaining materials and products for use in school and at home, including children's books, magazines, technology-based products, teacher materials, television programming, film, videos and toys. The Company distributes its products and services through a variety of channels, including proprietary school-based book clubs, school-based book fairs, and school-based and direct-to-home continuity programs; retail stores, schools, libraries and television networks; and the Company's Internet site, scholastic.com.

Forward-Looking Statements

This news release contains certain forward-looking statements. Such forward-looking statements are subject to various risks and uncertainties, including the conditions of the children's book and educational materials markets and acceptance of the Company's products within those markets, and other risks and factors identified from time to time in the Company's filings with the Securities and Exchange Commission. Actual results could differ materially from those currently anticipated.

SCHOLASTIC CORPORATION
CONSOLIDATED STATEMENTS OF OPERATIONS
(UNAUDITED)
(Amounts in millions except per share data)

|  | THREE MONTHS ENDED | | |
|  | 11/30/05 | 11/30/04 | Favorable/ (Unfavorable) |
|  |  | Restated (1) |  |
| Revenues | $696.7 | $683.3 | $13.4 | 2% |
| Operating costs and expenses: |  |  |  |  |
| Cost of goods sold | 298.3 | 301.1 | 2.8 | 1% |

# EXHIBIT 11

 **SCHOLASTIC CORP** (SCHL)

555 BROADWAY
NEW YORK, NY 10012
212. 343.6100
http://www.scholastic.com/

# EX−99.1

**EXHIBIT 99.1**
**8−K Filed on 03/23/2006 − Period: 03/23/2006**
File Number 000−19860



www.gsionline.com

Exhibit 99.1

Scholastic Announces Fiscal 2006 Third Quarter Results

NEW YORK--(BUSINESS WIRE)--March 23, 2006--Scholastic Corporation
(NASDAQ: SCHL) today announced its fiscal 2006 third quarter results.
    For the quarter ended February 28, 2006, the Company reported
revenues of $487.7 million, up 1% from $480.8 million, and a seasonal
net loss of $15.5 million, compared to $0.8 million in the prior year
period. Net loss per diluted share was $0.37 versus $0.02 a year ago.
The fiscal third quarter is typically Scholastic's second smallest
revenue quarter.
    "Our third quarter was disappointing, and based on our review of
these results and their impact on the fourth quarter, we are reducing
our outlook for the fiscal year," commented Richard Robinson,
Chairman, CEO and President of Scholastic. "Promotion expenses in
School Book Clubs continued to be higher due to the volume of direct
mailings required as more customers than anticipated migrated to the
core clubs in response to promotions. In School Book Fairs, staffing
expenses increased during the quarter, in anticipation of fourth
quarter fair bookings. Lastly, results in Educational Publishing were
affected by lower educational technology revenues, reflecting greater
seasonality in that business and a large district sale in the
prior-year period."
    Mr. Robinson continued, "Next year, based on customer reaction to
thorough market tests conducted in School Book Clubs, we will focus
exclusively on Scholastic branded clubs and discontinue Troll(R) and
Trumpet(R), two smaller, less efficient clubs. We believe this focus
on core clubs will substantially reduce overhead, promotion and
fulfillment expense and increase profits. We also remain confident
about growth opportunities for Scholastic Education, and for
educational technology, where sales are up 18% this year and we have a
strong pipeline of future sales prospects."
    Scholastic has accelerated its company-wide plans to reduce
overhead, and it has already identified more than $40 million in
annualized savings from streamlining centralized functions and
pursuing outsourcing opportunities, which it expects to realize fully
over the next two years, with a significant amount achieved in fiscal
2007. Additionally, the Company has outsourced all remaining outbound
telemarketing in Continuities, closing a call center and eliminating
75 staff positions.

    Outlook

    Given lower third quarter results and a revised outlook for the
fourth quarter, Scholastic now expects full year earnings between
$1.70 and $1.80 per diluted share, including approximately $0.15 per
diluted share of expected severance expense, on revenues of
approximately $2.3 billion. Free cash flow for the fiscal year is now
expected to be between $70 and $80 million.

    Third Quarter Results

    Children's Book Publishing and Distribution. Segment revenues in
the third quarter of fiscal 2006 were $270.9 million, down slightly
from $272.3 million in the prior year period. Trade revenue rose 6%,
from sales of best-selling and award-winning front-list titles, as
well as continuing strong sales of back-list titles. Continuities
revenue increased 3%, with growth in revenues from new sales channels

and products offsetting declines in the traditional business. In School Book Fair, revenues declined 2% in a small quarter from lower fair count, partially offset by higher revenue per fair. School Book Club revenue was down 4% on lower revenues in the non-core clubs. Segment operating results declined to a loss of $3.2 million from a profit of $14.7 million a year ago, primarily due to higher expenses in School Book Clubs and in Fairs.

Educational Publishing. Segment revenue declined 7% to $73.5 million compared to $79.3 million in the prior year period, primarily from lower education technology sales, reflecting greater seasonality and a strong prior year period in that business, as well as soft library sales. Segment operating results declined to a loss of $3.5 million from a profit of $4.9 million a year ago, reflecting lower technology sales and increased investment in sales and support staff to support a larger customer base for READ 180(R).

International. Revenue in the segment rose 5% to $96.9 million from $92.0 million in the prior year period, primarily reflecting growth in Canada and Australia, partially offset by lower revenues in the United Kingdom. Operating profit in the segment declined slightly to $2.3 million from $3.0 million a year ago, due in part to lower results in the United Kingdom, where the Company is investing in a turn-around plan, partially offset by foreign exchange benefits.

Media, Licensing and Advertising. Revenue in the segment was up 25% to $46.4 million from $37.2 million in the prior year period, due to growth in all business lines, including software and multimedia sales, Back to Basics Toys(R) and consumer magazines. Operating profit in the quarter rose to $6.3 million from $4.4 million in the prior period.

Other Financial Results. Free cash use was $12.7 million, compared to free cash flow of $39.8 million in the prior year period, as a result of higher tax payments, higher net loss in the quarter and earlier product purchasing in School Book Fairs.

Fiscal Year-to-Date Results

Net income for the first nine months of fiscal 2006 was $30.2 million or $0.73 per diluted share, up from $21.2 million or $0.52 per diluted share in the first nine months of fiscal 2005, which included $3.6 million or $0.06 per diluted share in severance charges related to a reorganization of the Continuities business. Revenues in the period rose 13% to $1,682.8 million from $1,487.8 million in the year ago period. The year over year improvement in revenue and profitability primarily reflects higher Harry Potter revenues, partially offset by profitability declines in Clubs, International, and Continuities.
Free cash flow for the first nine months of this year was $95.2 million, compared to $2.3 million in the prior year, reflecting an increase in accrued royalties and higher net income in the period, partially offset by higher tax payments.

Conference Call

The Company will hold a conference call to discuss its results at 8:00 am ET today, March 23, 2006. Scholastic's Chairman, President and CEO, Richard Robinson, and Executive Vice President and CFO, Mary Winston, will moderate the call.

The conference call and accompanying slides will be webcast and accessible through the Investor Relations section of Scholastic's website, scholastic.com. Participation by telephone will be available by dialing 888-338-6461 from within the U.S. or +1-973-935-8510 internationally.

Following the call, an audio replay of the call will be available from approximately 10:00 am ET, March 23, 2006 through March 30, 2006 by dialing 877-519-4471 from within the U.S. or +1-973-341-3080 internationally, and entering participant code 7087347. Slides from the conference call will also be posted in the Investor Relations section of scholastic.com.

About Scholastic

Scholastic Corporation (NASDAQ: SCHL) is the world's largest publisher and distributor of children's books and a leader in educational technology. Scholastic creates quality educational and entertaining materials and products for use in school and at home, including children's books, magazines, technology-based products, teacher materials, television programming, film, videos and toys. The Company distributes its products and services through a variety of channels, including proprietary school-based book clubs, school-based book fairs, and school-based and direct-to-home continuity programs; retail stores, schools, libraries and television networks; and the Company's Internet site, scholastic.com.

Forward-Looking Statements

This news release contains certain forward-looking statements. Such forward-looking statements are subject to various risks and uncertainties, including the conditions of the children's book and educational materials markets and acceptance of the Company's products within those markets, and other risks and factors identified from time to time in the Company's filings with the Securities and Exchange Commission. Actual results could differ materially from those currently anticipated.

SCHOLASTIC CORPORATION
CONSOLIDATED STATEMENTS OF OPERATIONS
(UNAUDITED)
(Amounts in millions except per share data)

| | THREE MONTHS ENDED | | |
| --- | --- | --- | --- |
| | 02/28/06 | 02/28/05 | Favorable/(Unfavorable) |
| | | Restated(1) | |
| Revenues | $487.7 | $480.8 | $6.9 | 1% |
| Operating costs and expenses: | | | |
| Cost of goods sold | 242.2 | 233.9 | (8.3) | (4%) |
| Selling, general and administrative expenses (2) | 230.9 | 208.4 | (22.5) | (11%) |
| Bad debt expense | 15.7 | 14.9 | (0.8) | (5%) |
| Depreciation and | | | |

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *U.S. ATTORNEY 555 4TH ST. N.W. W.D.C. 20001* Plaintiff, <br><br> v. <br><br> SCHOLASTIC INC., <br> GROLIER INCORPORATED, <br> and SCHOLASTIC AT HOME, INC., <br><br> Defendants. | CIVIL ACTION NO: <br><br> COMPLAINT FOR CIVIL PENALTIES AND PERMANENT INJUNCTION <br><br> CASE NUMBER 1:05CV01216 <br><br> JUDGE: Richard W. Roberts <br><br> DECK TYPE: General Civil <br><br> DATE STAMP: 06/21/2005 |

Plaintiff, the United States of America, acting upon notification and authorization to the

Attorney General by the Federal Trade Commission ("FTC" or "Commission"), for its complaint,

alleges that:

1.    Plaintiff brings this action under Sections 5(a), 13(b), and 16(a) and 19 of the

Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), and 56(a), and 57b; the

Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C.

§ 6101, et seq.; and the Unordered Merchandise Statute, 39 U.S.C. § 3009, to secure a permanent

injunction and other equitable relief from Defendants for engaging in acts or practices violating

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a); the FTC's Trade Regulation Rule entitled "Use

of Prenotification Negative Option Plans" ("Prenotification Negative Option Rule"), 16 C.F.R.

Part 425; the FTC's Rule entitled "Telemarketing Sales Rule" ("Telemarketing Sales Rule"), 16

C.F.R. Part 310; and the Unordered Merchandise Statute, and to recover monetary civil penalties

pursuant to Section 5(m)(l)(A) and (B) of the FTC Act, 15 U.S.C. § 45(m)(1)(A) and (B), from

Defendants for engaging in acts or practices previously determined by the Commission to be

unfair and deceptive and unlawful under Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and for

engaging in acts or practices violating the Prenotification Negative Option Rule and the

Telemarketing Sales Rule.

### JURISDICTION AND VENUE

2.     This Court has jurisdiction over this matter pursuant to 15 U.S.C. §§ 45(a),

45(m)(1)(A) and (B), 53(b), 56(a), 57b, and 6105(b), and 28 U.S.C. §§ 1331, 1337(a), 1339,

1345, and 1355.

3.     Venue in this district is proper under 28 U.S.C. §§ 1391(b) and (c), and 1395(a),

and 15 U.S.C. § 53(b).

### DEFENDANTS

4.     Defendant Scholastic Inc., ("Scholastic"), a New York corporation with its

principal place of business located at 557 Broadway, New York, New York, 10012, transacts or

has transacted business in this district.  Scholastic is the corporate parent of Defendant Grolier

Incorporated, which Scholastic acquired in June 2000.

5.     Defendant Grolier Incorporated ("Grolier") is a wholly-owned subsidiary of

Scholastic.  Grolier is a Delaware corporation with its principal place of business located at 90

Sherman Turnpike, Danbury, Connecticut, 06816.  Grolier transacts or has transacted business in

this district.

6.      Defendant Scholastic at Home, Inc., ("SAH"), is a wholly-owned subsidiary of Grolier. SAH is a Delaware corporation with its principal place of business located at 90 Sherman Turnpike, Danbury, Connecticut, 06816. SAH transacts or has transacted business in this district.

7.      Scholastic, Grolier, and SAH, ("Defendants"), operated a common business enterprise while engaging in the acts and practices alleged below and are therefore jointly and severally liable for said acts and practices.

## COMMERCE

8.      At all times relevant to this Complaint, Defendants' course of business, including the acts and practices alleged herein, has been and is in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## COURSE OF CONDUCT

9.      Scholastic describes itself as the largest publisher and distributor of children's books in the world. Scholastic, through Grolier, operates direct-to-home book clubs, primarily serving children, as one of its principal distribution channels.

10.     Scholastic's subsidiary Grolier is a children's book publisher. Prior to its acquisition by Scholastic, Grolier independently operated various book clubs. Currently, Grolier operates these and other book clubs together with Scholastic. Among other things, Grolier's subsidiary SAH invoices consumers, attempts to collect unpaid balances, and handles consumer inquiries and complaints. SAH also creates, prepares, and disseminates certain promotional materials for the book clubs, as does Scholastic.

11.    Since at least January 2001, Defendants have marketed their direct-to-home book clubs through direct mail solicitations; through Internet advertising on their own websites, including <www.homeclubs.scholastic.com>; through various third-party Internet websites with which they have directly or indirectly contracted; and through an outbound telemarketing campaign, among other methods.

12.    Defendants' advertising in connection with direct-to-home book clubs offered two associated programs: (1) a base book club operated as a continuity program (*i.e.*, consumers receive periodic shipments of books without prior notification by Defendants before each shipment) and, (2) supplemental plans selling books and other merchandise operated as Prenotification Negative Option plans within the meaning of the Prenotification Negative Option Rule (*i.e.*, consumers periodically receive announcements which identify books or other merchandise that Defendants propose to send, and the consumers thereafter receive and are billed for the merchandise identified in each such announcement, unless they instruct Defendants not to send the identified merchandise) (hereinafter referred to as "supplemental plans" or "Prenotification Negative Option plans"). Consumers typically were required to purchase a minimum of four monthly continuity program shipments in order to fulfill base book club requirements. Merchandise consumers purchased as part of a supplemental plan did not count toward the base book club minimum purchase requirement. In addition, consumers had to cancel the base book club and supplemental plans separately.

13.    Defendants' direct mail solicitations, Internet advertising, and outbound telemarketing campaign advertised Defendants' base book clubs and supplemental plans by offering consumers a promotional "introduction" to a base book club. The advertising for the

Page 4 of 21

promotional introduction offered consumers (1) one or more free gifts – (typically books and/or book-related items such as book bags or cardboard book shelves), (2) a "preview" of one or more base book club "trial books" priced below typical club selections, and (3) a supplemental plan.

14.    Defendants' marketing materials disclosed the terms and conditions of base book clubs, including that consumers who are enrolled in a base book club would receive, each month, 2 books and other materials; that consumers would have 10 days to review the books and to decide whether to keep or return them; and that consumers could cancel after purchasing four regular monthly packages.

15.    After describing the base book club's terms and conditions, the Defendants' marketing materials referred to a supplemental plan. For example, many of Defendants' marketing materials, including, but not limited to, scripts and direct mail solicitations, stated:

> By joining, up to three times each year you will also receive, on approval, special
> . . . [club related] items as they are made available. You will be notified prior to
> shipment with details and the price; and you may cancel any annual shipment you
> do not wish to receive.

Defendants did not state that the supplemental plan is a Prenotification Negative Option plan; that consumers had to send back a form to Defendants to avoid shipments and the obligation to pay for or return them; that consumers' purchase of supplemental plan shipments did not count toward the minimum purchase requirements of Defendants' base book clubs; how consumers could cancel their enrollment in a supplemental plan; and that cancelling the base book club did not cancel enrollment in a supplemental plan, or that cancelling a supplemental plan did not cancel enrollment in a base book club.

16.    Introductory shipments of the base book club and the free gifts were accompanied by an invoice, typically for $8.98 (including shipping and handling). Attached to the invoice was a letter that described the introductory shipment; the terms of the base book club, including that consumers must purchase four monthly shipments to fulfill their minimum purchase requirement; and, using essentially the same language as in the initial advertising, the existence of a supplemental plan. The letter did not state that the supplemental plan is a Prenotification Negative Option plan; that consumers had to send back a form to Defendants to avoid shipments and the obligation to pay for or return them; that consumers' purchase of supplemental plan shipments did not count toward the minimum purchase requirements of Defendants' base book clubs; how consumers could cancel their enrollment in a supplemental plan; and that cancelling the base book club did not cancel enrollment in a supplemental plan, or that cancelling a supplemental plan did not cancel enrollment in a base book club.

17.    If consumers kept the invoiced trial book(s) beyond the preview period and/or paid the invoice in full or in part, Defendants enrolled them in the base book club. Defendants shipped to consumers enrolled in a base book club monthly, continuity program shipments "on approval," without prior notification of any individual shipment. Each base book club shipment was accompanied by an invoice, typically for $13.47. Consumers could return a base book club shipment they did not wish to purchase by paying to return the shipment and seeking reimbursement of their shipping costs from Defendants or by requesting a postage paid return label from the Defendants.

18.    Once base book club members purchased two base book club shipments, Defendants enrolled them into a supplemental Prenotification Negative Option plan. (Although

Defendants sometimes call the supplemental Prenotification Negative Option shipments "annual" shipments, the shipments occur up to three times per year and are thus not "annual supplements" excluded from coverage under the Prenotification Negative Option Rule.)

19.    After the Defendants enrolled consumers in a supplemental plan, they sent consumers "Announcement" letters notifying them in advance of each Prenotification Negative Option plan shipment. The letters instructed consumers that "[i]f you do not wish to examine [the featured product], tell us "no" by writing "cancel" on the bottom third of this letter and returning it to us within ten days." The letters did not include rejection forms and did not state that the supplemental plan was a Prenotification Negative Option plan; that consumers' purchase of supplemental plan shipments did not count toward the minimum purchase requirements of Defendants' base book clubs; or that cancelling the base book club did not cancel enrollment in a supplemental plan, or that cancelling a supplemental plan did not cancel enrollment in a base book club.

20.    If consumers did not send back the letter to cancel the shipment, the Defendants sent the Prenotification Negative Option plan shipment, accompanied by an invoice. The price of supplemental plan shipments varied depending on the books or other merchandise offered. For example, a shipment of two "giant-size" books cost $17.96, including shipping and handling; a shipment of three "full-color" books in another supplemental plan cost $13.74, including shipping and handling. Consumers who did not return the announcement letter to avoid the shipment and who did not wish to purchase the shipment could return it by paying to return the shipment and seeking reimbursement of their shipping costs from Defendants or by requesting a postage paid return label from the Defendants.

Page 7 of 21

21.     Defendants, in numerous instances: (1) received requests to cancel from consumers who believed that they had met Defendants' base book club minimum purchase requirements by making at least four purchases from Defendants' solicitations (including supplemental plan solicitations), (2) failed to cancel such consumers' accounts, on the basis that the consumers' purchase of supplemental plan shipments did not count toward Defendants' minimum purchase requirements, and (3) continued to send and invoice further monthly base book club and supplemental plan shipments to such consumers.

22.     Since at least January 2001, Defendants, in numerous instances, received requests to cancel from acknowledged contract-complete consumers (*i.e.*, consumers acknowledged by Defendants to have fulfilled minimum purchase requirements for the base book club). In numerous instances Defendants cancelled those consumers' enrollment in the base book club but continued to send and invoice further supplemental plan shipments to such consumers.

## PRIOR INJUNCTION AND DEFENDANTS' ACTUAL KNOWLEDGE

23.     On February 14, 1994, the U.S. District Court for the District of Connecticut entered a consent decree ("1994 consent decree") between the United States and Grolier (and its then-corporate parent Hachette Book Group USA, Inc.) requiring payment of a $200,000 civil penalty and enjoining Grolier and its successors and assigns from violating Sections 5(a)(1) and 5(m)(1)(B) of the FTC Act, 15 U.S.C. § § 45(a)(1) and 45(m)(1)(B), and the Unordered Merchandise Statute, 39 U.S.C. § 3009, by sending merchandise to consumers without their prior express consent. Unless Grolier obtains a consumer's express authorization to participate in a Prenotification Negative Option marketing plan, the consent decree further enjoins Grolier from representing that: (1) the consumer's failure to do something shall constitute a request that

Grolier send merchandise to the consumer, and (2) the consumer is obligated to pay for or return the merchandise.

24.  Attached as Appendix A to the 1994 consent decree was a copy of the Unordered Merchandise Statute, and the Synopsis of Federal Trade Commission Decisions Concerning Unordered Merchandise. The Commission determined in those decisions that shipping unordered merchandise and sending communications that seek to obtain payment for or return of merchandise shipped without the expressed consent of the recipient are unfair and deceptive acts or practices and are unlawful. (A copy of the 1994 consent decree, with its attached Appendix A, is attached herewith as Exhibit A.) On May 25, 2000, prior to Grolier's acquisition by Scholastic, the FTC served a copy of the 1994 consent decree and its attached Appendix A on Scholastic. The consent decree and Appendix A were also an exhibit to the Acquisition Agreement effecting the June 2000 acquisition. The FTC again served a copy of the 1994 consent decree and Appendix A on Scholastic on June 18, 2003.

25.  Defendants therefore have had actual, ongoing knowledge that shipping unordered merchandise and sending communications that seek to obtain payment for or return of merchandise shipped without the expressed consent of the recipient are unfair and deceptive acts or practices and are unlawful. As set forth above, Defendants continued to ship unordered merchandise to consumers and continued to send communications that seek to obtain payment for it at least since January 2001.

## PRIOR COMMISSION DETERMINATIONS CONCERNING
## UNFAIR AND DECEPTIVE ACTS OR PRACTICES IN COMMERCE

In a proceeding under Section 5(b) of the FTC Act, 15 U.S.C. § 45(b), concerning *Sunshine Art Studios, Inc.*, FTC Docket No. 8825, 81 F.T.C. 836 (1972), *aff'd*, 481 F.2d 1171 (1st Cir. 1973), the Commission on November 30, 1972, determined that, in connection with the advertising, offering for sale, sale or distribution of any product in commerce, as "commerce" is defined in the FTC Act, certain acts or practices are unfair and deceptive and unlawful under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), and in that proceeding on that date with respect to such acts or practices the Commission issued a final order to Cease and Desist ("the Commission's Final Order").

26.    In *Sunshine Art Studios, Inc.* the Commission determined that:

i.    It is an unfair and deceptive act or practice to send any merchandise by any means without the expressed request or consent of the recipient unless such merchandise has attached to it a clear and conspicuous statement that the recipient may treat the merchandise as a gift and has the right to retain, use, discard, or dispose of it in any manner that the recipient sees fit without any obligation whatsoever to the sender;

ii.    It is an unfair and deceptive act or practice to send any communication that in any manner seeks to obtain payment for or return of merchandise shipped without the expressed consent of the recipient.

Page 10 of 21

### THE FTC ACT

27.    Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), provides that "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

28.    Misrepresentations or omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

### COUNT I

29.    In numerous instances since January 2001, in connection with the sale, offering for sale, or distribution of books and other merchandise through direct-to-home clubs, as described in Paragraphs 9-22, Defendants failed to disclose or to disclose adequately prior to automatic enrollment, which occurred once consumers paid for two base book club shipments, the terms and obligations of their Prenotification Negative Option plans including: (1) how consumers must act to avoid periodic supplemental plan shipments and the obligation to pay for or return them; (2) that the purchase of supplemental plan shipments did not count toward the minimum purchase requirements of Defendants' base book clubs; and (3) that the cancellation of a consumer's enrollment in a base book club did not cancel future supplemental plan shipments. These facts would have been material to consumers in their decisions to: (1) order and pay for introductory base book club shipments; (2) purchase supplemental plan shipments; and (3) cancel future supplemental plan shipments expressly.

30.    Defendants' failure to disclose or to disclose adequately these material facts is a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

Page 11 of 21

## COUNT II

31.     In numerous instances since January 2001, in connection with the sale, offering

for sale, or distribution of books and other merchandise through direct-to-home clubs, as

described in Paragraphs 9-22, Defendants:

    i.      Mailed or caused to be mailed shipments of books and other merchandise (1) to

           consumers who had already purchased four shipments from Defendants' book

           clubs (including supplemental plan shipments) but were refused cancellation of

           their enrollment by Defendants on the basis that their purchase of supplemental

           plan shipments did not count toward minimum purchase requirements; and (2) to

           acknowledged contract-complete consumers who cancelled their enrollments but

           were not informed that cancellation of a consumer's enrollment in Defendants'

           base book clubs did not cancel future supplemental plan shipments, without the

           prior expressed request or consent of the recipients, or without attaching to the

           shipments statements that the recipients may treat the shipments as a gift and have

           the right to retain, use, discard, or dispose of them in any manner the recipients

           see fit without any obligation to the Defendants; and, consequently

    ii.     Sent communications that seek to obtain payment for or return of books and other

           merchandise shipped without the expressed consent of the recipients.

32.     Defendants engaged in the acts and practices described in Paragraph 32 with

actual knowledge that such practices have been determined by the Commission to be unfair and

deceptive and are unlawful under Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1), as set

forth in Section 5(m)(1)(B) of the FTC Act 15 U.S.C. § 45(m)(1)(B). Defendants, therefore, violated Section 5(m)(1)(B) of the FTC Act.

### THE UNORDERED MERCHANDISE STATUTE

33.    The Unordered Merchandise Statute was enacted in 1970 and since that date has remained in full force and effect. It prohibits the shipping and billing for unordered merchandise that does not fall into narrow exceptions. The statute also prohibits sending dunning communications to recipients of unordered merchandise.

34.    Specifically, the Unordered Merchandise Statute, 39 U.S.C. § 3009, reads as follows:

Sec. 3009. Mailing of unordered merchandise

(a) Except for (1) free samples clearly and conspicuously marked as such, and (2) merchandise mailed by a charitable organization soliciting contributions, the mailing of unordered merchandise or of communications prohibited by subsection (c) of this section constitutes an unfair method of competition and an unfair trade practice in violation of section 45(a)(1) of title 15.

(b) Any merchandise mailed in violation of subsection (a) of this section, or within the exceptions contained therein, may be treated as a gift by the recipient, who shall have the right to retain, use, discard, or dispose of it in any manner he sees fit without any obligation whatsoever to the sender. . . .

(c) No mailer of any merchandise mailed in violation of subsection (a) of this section, or within the exceptions contained therein, shall mail to any recipient of such merchandise a bill for such merchandise or any dunning communications.

(d) For the purposes of this section, "unordered merchandise" means merchandise mailed without the prior expressed request or consent of the recipient.

35.    Pursuant to Section (a) of the Unordered Merchandise Statute, 39 U.S.C. § 3009(a), violations of the Unordered Merchandise Statute are unfair or deceptive acts or practices in violation of Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

### COUNT III

36.    In numerous instances since January 2001, in connection with the sale, offering for sale, or distribution of books and other merchandise through their direct-to-home clubs, as described in Paragraph 9-22, Defendants:

i.    Mailed books or other merchandise, without prior expressed request or consent (1) to consumers who had already purchased four shipments from Defendants' book clubs (including supplemental plan shipments) but were refused cancellation of their enrollment by Defendants on the basis that their purchase of supplemental plan shipments did not count toward minimum purchase requirements; and (2) to acknowledged contract-complete consumers who cancelled their enrollments but were not informed that cancellation of a consumer's enrollment in Defendants' base book clubs did not cancel future supplemental plan shipments; and, consequently,

ii.    Mailed bills and dunning communications to consumers to whom they mailed books or other merchandise without the prior expressed request or consent of the recipients.

Defendants thereby violated Sections (a) and (c) of the Unordered Merchandise Statute, 39 U.S.C. § 3009(a) and (c).

## THE PRENOTIFICATION NEGATIVE OPTION RULE

.37.    The Prenotification Negative Option Rule, promulgated by the Commission on February 15, 1973, became effective on June 7, 1974. The Rule was amended by the Commission in 1998 under Section 18 of the FTC Act, 15 U.S.C. § 57a. The amended Rule became effective on August 20, 1998, and has since that date remained in full force and effect.

38.    The Prenotification Negative Option Rule regulates sellers of merchandise that operate negative option plans. A negative option plan is defined by the Rule as "a contractual plan or arrangement under which a seller periodically sends to subscribers an announcement which identifies merchandise (other than annual supplements to previously acquired merchandise) it proposes to send to subscribers to such plan, and the subscribers thereafter receive and are billed for the merchandise identified in each such announcement, unless by a date or within a time specified by the seller with respect to each such announcement the subscribers, in conformity with the provisions of such plan, instruct the seller not to send the identified merchandise." 16 C.F.R. § 425.1(c)(1).

39.    The Prenotification Negative Option Rule requires a seller to disclose all material terms of membership in a negative option plan in any promotional material that contains a device, such as an order form, that a consumer can return to the seller to subscribe to the plan. 16 C.F.R. § 425.(a)(1).

40.    Specifically, the Prenotification Negative Option Rule contains the following provisions:

Sec. 425.1 The rule.

(a) . . . it is an unfair or deceptive act or practice, for a seller in connection with the use of any negative option plan to fail to comply with the following requirements:

> (1) Promotional material shall clearly and conspicuously disclose the material terms of the plan . . . .

41.   Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the Prenotification Negative Option Rule are unfair or deceptive acts or practices in violation of Section 5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

42.   Defendants are sellers that operate negative option plans within the meaning of the Commission's Prenotification Negative Option Rule, 16 C.F.R. §§ 425.1(c)(1).

## COUNT IV

43.   In numerous instances since January 2001, in connection with the sale, offering for sale, or distribution of books and other merchandise through their direct-to-home clubs, as described in Paragraphs 9-22, Defendants disseminated promotional material that failed to disclose clearly and conspicuously all of the material terms of Defendants' supplemental Prenotification Negative Option plans, including, without limitation, that the cancellation of a consumer's enrollment in a base book club did not cancel future supplemental Prenotification Negative Option shipments, thereby violating Section 425.1(a)(1) of the Prenotification Negative Option Rule.

## TELEMARKETING SALES RULE

44.   Pursuant to the Telemarketing Act, on August 16, 1995, the FTC promulgated the Telemarketing Sales Rule, 16 C.F.R. Part 310, with a Statement of Basis and Purpose, 60 Fed.

Page 16 of 21

Reg. 43842 (Aug. 23, 1995). The Rule became effective on December 31, 1995, and was

amended by the Commission in 2003. The amended Rule became effective on March 31, 2003

(except for specific provisions not at issue in this case), and since that date has remained in full

force and effect.

45.    The Telemarketing Sales Rule prohibits deceptive and abusive telemarketing acts

or practices. Specifically, the Telemarketing Sales Rule contains the following provision:

Sec. 310.3  Deceptive telemarketing acts or practices.

(a) *Prohibited deceptive telemarketing acts or practices.* It is a deceptive telemarketing

act or practice and a violation of this Rule for any seller or telemarketer to engage in the

following conduct:

> (1) Before a customer pays for goods or services offered, failing to disclose
>
> truthfully, in a clear and conspicuous manner, the following material information:

* * *

> > (vii) If the offer includes a negative option feature, all material terms and
> >
> > conditions of the negative option feature . . . .

* * *

46.    Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and

Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), violations of the Telemarketing Sales

Rule are unfair or deceptive acts or practices in or affecting commerce, in violation of Section

5(a)(1) of the FTC Act, 15 U.S.C. § 45(a)(1).

47.    Defendants are sellers engaged in telemarketing within the meaning of the

Telemarketing Sales Rule, 16 C.F.R. §§ 310.2(r) and (u). Defendants' book clubs include

negative option features within the meaning of the Telemarketing Sales Rule, 16 C.F.R. § 310.2(t).

**COUNT V**

48.    In numerous instances since March 31, 2003, in connection with the telemarketing of their direct-to-home clubs, as described in Paragraphs 9-22, Defendants failed to disclose truthfully, in a clear and conspicuous manner, before the customer paid for goods that resulted in enrollment in a supplemental plan, all material terms and conditions of the supplemental plan's negative option features, including, but not limited to: (1) how consumers must act to avoid periodic supplemental plan shipments and the obligation to pay for or return them; and (2) that the cancellation of a consumer's enrollment in a base book club did not cancel future supplemental plan shipments, thereby violating Section 310.3(a)(1)(vii) of the Telemarketing Sales Rule.

**CONSUMER INJURY**

49.    Consumers throughout the United States have suffered substantial monetary loss as a result of Defendants' unlawful acts or practices. In addition, Defendants have been unjustly enriched as a result of their unlawful practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## COURT'S POWER TO AWARD
## CIVIL PENALTIES, INJUNCTIVE AND OTHER RELIEF

50.    Defendants violated the Prenotification Negative Option Rule and the

Telemarketing Sales Rule as described above with knowledge as set forth in Section 5(m)(1)(A)

of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

51.    Each advertisement, piece of promotional material, or telemarketing call

disseminated or made by the Defendants since January 1, 2001, that failed to comply with the

Prenotification Negative Option Rule, and each telemarketing call made by Defendants since

March 31, 2003, that failed to comply with the Telemarketing Sales Rule in one or more of the

ways described above constituted a separate violation for which plaintiff seeks monetary civil

penalties.

52.    Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), authorizes the

Court to award monetary civil penalties of not more than $10,000 for each such violation of the

Prenotification Negative Option Rule and the Telemarketing Sales Rule.  Section 4 of the Federal

Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, as amended by the Debt

Collection Improvement Act of 1996, Pub.L. 104-134, 110 Stat. 1321-373 § 31001, and Federal

Trade Commission Rule 1.98(d), 16 C.F.R. § 1.98(d), 61 Fed. Reg. 54549 (Oct. 21, 1996),

authorizes the Court to award monetary civil penalties of not more than $11,000 for each such

violation of the Prenotification Negative Option Rule and the Telemarketing Sales Rule.

53.    Section 5(m)(1)(B) of the FTC Act, 15 U.S.C. § 45(m)(1)(B), Section 4 of the

Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note, as amended by

the Debt Collection Improvement Act of 1996, Pub.L. 104-134, and Federal Trade Commission

Rule 1.98(e), 16 C.F.R. § 1.98(e), 61 Fed. Reg. 54548 (Oct. 21, 1996), authorize the Court to

award monetary civil penalties of not more than $11,000 for each violation of previous Commission determinations concerning unfair and deceptive acts or practices in commerce.

54. Each shipment of unordered merchandise made by Defendants since January 1, 2001, constituted a separate violation for which Plaintiff seeks monetary civil penalties.

55. Section 19 of the FTC Act, 15 U.S.C. § 57b, authorizes this Court to award such relief as is necessary to redress the injury to consumers or others resulting from defendant's violation of the Prenotification Negative Option Rule and the Telemarketing Sales Rule.

56. Under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), this Court is authorized to enjoin the defendant from violating the Prenotification Negative Option Rule, the Telemarketing Sales Rule, the Unordered Merchandise Statute, and the FTC Act, as well as to grant plaintiff ancillary equitable relief.

## PRAYER FOR INJUNCTIVE AND MONETARY RELIEF

WHEREFORE, Plaintiff requests that this Court, pursuant to 15 U.S.C. §§ 45(a), 45(m)(1)(A) and (B), 53b, 57b, and the Court's own equity powers:

(1) Enter judgment against Defendants and in favor of Plaintiff for each violation alleged in this Complaint;

(2) Enjoin Defendants from violating the Prenotification Negative Option Rule, the Telemarketing Sales Rule, the Unordered Merchandise Statute, and the FTC Act;

(3) Award Plaintiff monetary civil penalties from Defendants for each violation of Commission determinations concerning unfair and deceptive acts or practices in commerce; and for each violation of the Prenotification Negative Option Rule and the Telemarketing Sales Rule alleged in this Complaint; and

(4)    Award Plaintiff such other and additional equitable relief as the Court may deem

just and proper.

DATED:

Of Counsel:

JAMES REILLY DOLAN
Assistant Director for Enforcement
Bureau of Consumer Protection
Federal Trade Commission

EDWIN RODRIGUEZ
Attorney
Division of Enforcement
Federal Trade Commission
600 Pennsylvania Ave., NW
Washington, DC 20580
(202) 326-3147

FOR THE UNITED STATES OF AMERICA:

PETER D. KEISLER
Assistant Attorney General
Civil Division
U.S. Department of Justice

KENNETH L. WAINSTEIN
United States Attorney
District of Columbia

*Laurie Weinstein / WMW*

LAURIE WEINSTEIN, D.C. BAR 389511
Assistant United States Attorney
555 4th St., NW
Washington, D.C. 20001
(202)

EUGENE M. THIROLF
Director
Office of Consumer Litigation

*Elizabeth Stein*

ELIZABETH STEIN
Attorney
Office of Consumer Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001
(202) 307-0486
(202) 514-8742 Facsimile