UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

ALASKA LABORERS EMPLOYERS             :
RETIREMENT FUND, Individually and On  :
Behalf of All Others Similarly Situated,   :
                                       :
                          Plaintiff,   :          No. 07 Civ. 7402 (GBD)
                                       :
            -against-                  :
                                       :
SCHOLASTIC CORPORATION, RICHARD        :
ROBINSON and MARY WINSTON,             :
                                       :
                          Defendants.  :

---------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York  10017
Telephone: (212) 455-2000
Facsimile:  (212) 455-2502

*Attorneys for Scholastic Corporation,*
*Richard Robinson and Mary Winston*

## Table of Contents

Page

PRELIMINARY STATEMENT ......................................................................................1

SUMMARY OF THE ALLEGATIONS ..........................................................................2

    A.    Scholastic's Business ............................................................................2

    B.    The Statements at Issue .........................................................................4

    C.    Scholastic's Extensive Public Disclosures.............................................5

        1.    Challenges in the Continuities Business and the Company's New Business Strategy ..................................................5

        2.    Challenges in the U.K. Operations .............................................7

    D.    FTC Consent Decrees ............................................................................7

    E.    Cautionary Language .............................................................................8

    F.    The Alleged Corrective Disclosures ......................................................9

ARGUMENT .................................................................................................................10

I.    NONE OF THE CHALLENGED STATEMENTS WAS FALSE OR MISLEADING..................................................................................................10

    A.    Revenue Recognition ..........................................................................10

    B.    Reserves ..............................................................................................14

    C.    U.K. Operations...................................................................................15

    D.    Earnings Forecasts ..............................................................................15

    E.    Sarbanes-Oxley Certifications.............................................................16

II.    THE COMPLAINT FAILS TO ALLEGE THE REQUIRED ELEMENT OF LOSS CAUSATION ...............................................................................16

III.    NONE OF THE FACTS PLED IN THE COMPLAINT GIVES RISE TO AN INFERENCE OF SCIENTER—LET ALONE A "STRONG INFERENCE"................19

    A.    "Motive and Opportunity" .................................................................19

    B.    "Conscious Misbehavior or Recklessness".........................................22

CONCLUSION ................................................................................................................25

**Table of Authorities**

<u>Cases</u>

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ............................................................20

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ................................. 10, 15

*Caiafa v. Sea Containers Ltd.*, 2007 WL 2815633 (S.D.N.Y. 2007) .........................................23

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ...........................................................21, 23

*Coates v. Heartland Wireless Comm. Inc.*, 26 F. Supp. 910 (N.D. Tex.1998) .......................21

*Druskin v. AnswerThink, Inc.*, 299 F. Supp. 2d 1307 (S.D. Fla. 2004) ...........................11, 21, 24

*Dura Pharm., Inc. v. Bruodo*, 544 U.S. 336 (2005) .............................................................16, 17

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000)........................................................10

*Garfield v. NDC Health Corp.*, 466 F.3d 125 (11th Cir. 2006) ..................................................16

*Gavish v. Revlon, Inc.*, 2004 WL 2210269 (S.D.N.Y. 2004)................................................12, 24

*Gross v. Summa Four, Inc.*, 93 F.3d 987 (1st Cir. 1996) ...........................................................13

*Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753 (7th Cir. 2007)................................................23

*Hinerfeld v. United Auto Group*, 1998 WL 397852 (S.D.N.Y. 1998)....................................14, 25

*In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832 (N.D. Tex. 2005 ......................11, 22, 23, 24

*In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549 (S.D.N.Y. 2004)..........20, 23, 24, 25

*In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685 (S.D.N.Y. 2004 ...............................14, 25

*In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004) .....................................13

*In re FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031 (N.D. Cal. 2000)............................................20

*In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670 (D.N.J. 2006)..............................................16

*In re MCI WorldCom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778 (D. Miss. 2002) ............................21

*In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ...................................13

*In re Nokia OYJ (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364 (S.D.N.Y. 2006).... 14, 22, 23, 25

*In re Omnicom Group, Inc. Sec. Litig.*, 2008 WL 243788 (S.D.N.Y. Jan. 29, 2008) .................17

*In re Rhodia S.A. Sec. Litig.*, 2007 WL 2826651 (S.D.N.Y. Sept. 26, 2007) ........................17, 18

*In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254 (D.N.J. 2005)..........................................17, 18

*In re Trex Co. Sec. Litig.*, 212 F. Supp. 2d 596 (W.D. Va. 2002) ....................................11, 13, 24

*In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002)..........................................20, 21

*In re Winstar Communications*, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).............................17

*Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45 (2d Cir. 1998)......................25

*Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392 (S.D.N.Y. 2007)......................................................25

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001)...............................................................19, 22

*Kinsey v. Cendant Corp.*, 2005 WL 1907678 (S.D.N.Y. 2005).......................................................22

*Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832 (S.D. Tex. 2002) ........................24

*Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221 (S.D.N.Y. 2006).............................25

*Lentell v. Merrill Lynch & Co. Inc.*, 396 F.3d 161 (2d Cir. 2005) .................................................17

*Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117 (D. Conn. 2007) .............................20, 21, 23, 24

*Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250 (2d Cir. 2004) .................................................14

*Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96 (2d Cir. 2005) .................................................10

*Novak v. Kasaks*, 216 F.3d at 300 (2d Cir. 2000)..........................................................19, 22, 23

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004)..................................................................10, 16

*Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001) .........................................................................20

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) .........................................................................22

*Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977).................................................................13

*Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236 (2d Cir. 2002) .......................................10

*Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir. 1999).....................................................22

*Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162 (4th Cir. 2007) .................................................20, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007)....................................19, 23

iv

*United States v. Local 359, United Seafood Workers*, 55 F.3d 64 (2d Cir. 1995)........................13

## Statutes

15 U.S.C. § 78u-4(b)...............................................................................................10, 19

15 U.S.C. § 78u-4(b)(1) ...............................................................................................10

15 U.S.C. § 78u-5 ...............................................................................................16

18 U.S.C. § 1350...............................................................................................16

Scholastic Corporation, Richard Robinson and Mary Winston respectfully submit this memorandum of law, together with the affidavit of David Elbaum, in support of their motion to dismiss Plaintiff's Consolidated Amended Class Action Complaint pursuant to Federal Rules 9(b) and 12(b)(6), and the Private Securities Litigation Reform Act (the "PSLRA").

## PRELIMINARY STATEMENT

This is a securities fraud case in search of a fraud. Scholastic is the world's leading publisher and distributor of children's books. Richard Robinson is Scholastic's chairman, president and CEO, and Mary Winston is the former CFO of the Company. During its more than 85 years of operation, the Company has emphasized quality educational products and a dedication to learning and literacy. In March 2006, the Company reduced its earnings forecast for its 2006 fiscal year ending May 31, 2006. The Company's stock price dipped just over $3 per share (or about 11%), and has since fully recovered. The Plaintiff in this case, however, attempts to turn that routine earnings announcement into a federal class action lawsuit for securities fraud. The Complaint takes previously disclosed challenges facing certain business divisions of Scholastic, mixes them together to make it appear as though they were somehow related, and then simply announces—without setting out any facts to back up the claim—that fraud was afoot at Scholastic. This broad-brush, fraud-by-hindsight Complaint fails under well-settled Second Circuit case law for any one of three separate, independent reasons.

*First*, the Complaint does not identify any misstatements. The public statements at issue are routine earnings announcements issued at the close of each quarter during the class period. None of the earnings statements has ever been revised, restated or modified. Scholastic's auditors stand by their clean audit opinions and the SEC has never taken issue with the reported results. Plaintiff's fanciful theory of fraud is based on mere generalities and cannot meet the particularity requirements of the PSLRA. And, the allegedly concealed factual

information was fully disclosed to investors, before and during the class period, in SEC filings.

*Second*, the Complaint fails to allege loss causation. Under the PSLRA and Supreme Court precedent, a plaintiff must allege that the claimed damage (here the drop in stock price) was caused by the public exposure of the alleged fraud. While Plaintiff points to two press releases (dated December 2005 and March 2006) as corrective disclosures, those disclosures did not correct anything or reveal any aspect of the fraud that Plaintiff alleges. This fact alone warrants dismissal of the Complaint.

*Third*, Plaintiff utterly fails to plead scienter. Not a single fact set out in the Complaint supports the notion that Scholastic or Mr. Robinson or Ms. Winston acted with an intent to defraud Scholastic's investors. The Complaint cannot show there was any "motive and opportunity" to commit fraud as a matter of law. As has been publicly disclosed, Mr. Robinson was required to sell 3% of his substantial holdings by his former spouse pursuant to a divorce agreement, but he did not retain any of the proceeds from the sales and he remained the Company's largest shareholder before, during, and after the class period. Ms. Winston did not sell any stock at all. Nor are there any facts alleged showing "recklessness." Plaintiff merely asserts a boilerplate allegation that Mr. Robinson and Ms. Winston had "access" to unidentified adverse information, which courts uniformly reject as insufficient. And the Complaint's vague, conclusory allegations from "confidential informants" do not come close to showing the required "strong inference" of fraudulent intent.

### SUMMARY OF THE ALLEGATIONS

**A.    Scholastic's Business**

To create the impression of misrepresentations, the Complaint either confuses or deliberately runs together Scholastic's different business units. The Company operates in four separate segments: Children's Book Publishing and Distribution; Educational Publishing; Media,

2

Licensing and Advertising; and International. *Id.* ¶ 31. The Children's Book unit distributes books through four businesses: school-based book clubs, school-based book fairs, direct-to-home continuity programs, and the trade channel. The Company reports on a June 1 to May 31 fiscal year and reports financial information separately for each of these different businesses.[1]

This case primarily concerns the Company's continuity and trade businesses. The continuity programs are operated by a subsidiary called Scholastic At Home, which Plaintiff refers to by the shorthand "At Home." *Id.* ¶ 34. This business was obtained through the Company's acquisition of Grolier Inc. in 2000. In continuity programs, families "place a single order and receive multiple shipments of books and other products over a period of time," directly to their homes. *Id.* ¶ 50. By contrast, the Trade division distributes books for the retail channels, through sales to wholesale distributors and retail outlets, such as Barnes & Noble.[2]

Scholastic's revenue recognition policies (which form the basis of Plaintiff's claims) are fully and completely disclosed in the Company's SEC filings. The Company's annual SEC reports informed investors that revenue from continuity programs and trade sales is generally "recognized at the time of shipment." Compl. ¶ 50 (quoting 2005 10-K). As it is customary for these businesses, books sold through these channels are sold with a right of return. Therefore, the Company establishes a reserve for estimated future returns at the time revenue is recognized. *Id.* "Actual returns are charged to the reserve as received. The calculation of the reserve for estimated returns is based on historical return rates and sales patterns." *Id.*

---

[1]    Only well-pleaded allegations of the Complaint are treated as true for the purposes of this motion. *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005); *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) ("conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice"). Scholastic denies that there is any merit to Plaintiff's allegations. On this motion, the Court may also consider documents publicly filed with the SEC. *See, e.g., Kramer v. Time Warner Inc.*; 937 F.2d 767 (2d Cir. 1991). In this brief, all citations and quotations are omitted and all emphasis is supplied.

[2]    A handful of paragraphs relate to Scholastic's U.K. operations. *Id.* ¶¶ 42, 93, 99, 104.

For sales through continuity programs, the Company also establishes a reserve for bad debts, or doubtful accounts. As stated in the 2005 10-K, "allowances for doubtful accounts are established through the evaluation of accounts receivable agings and prior collection experience to estimate the ultimate collectability of these receivables in the period such determination is made." Compl. ¶ 76. Thus, like the reserves for returns, reserves for bad debts are estimated using formulas that evaluate historical performance data.[3]

**B.    The Statements at Issue**

The Complaint identifies three specific press releases (and investor conference calls following the first two) as allegedly false and misleading:

- *March 17, 2005*: Scholastic announced financial results for the third fiscal quarter ended February 28, 2005, and confirmed previous earnings guidance for the full fiscal year ending May 31, 2005. Compl. ¶ 92–94. The press release provided no guidance regarding the upcoming fiscal year (starting June 1, 2005).

- *July 20, 2005*: The Company announced financial results for the fourth quarter and fiscal year ending May 31, 2005, and offered earnings guidance for the next fiscal year ending May 31, 2006. *Id*. ¶¶ 98–100.

- *September 22, 2005*: Scholastic announced financial results for the first fiscal quarter ended August 31, 2005, and "reaffirmed its outlook" for the fiscal year ending May 31, 2006. *Id*. ¶ 102.

The Complaint asserts that these statements materially overstated the Company's operating results because the Company improperly recognized revenues and understated its reserves in its Continuities (At Home) and Trade business units. Compl. ¶¶ 51, 64-65, 77.

---

[3]    The 2005 10-K further disclosed that the preparation of the financial statements "involves the use of estimates and assumptions by management," the Company "bases its estimates on historical experience, current business factors, and various other assumptions believed to be reasonable under the circumstances," and "on an on-going basis, the Company evaluates the adequacy of reserves and the estimates used in calculations, including but not limited to: collectibility of accounts receivable … [and] sales returns." Elbaum Aff. Ex. 6 at 16.

Plaintiff further claims that Scholastic hid "significant problems with its U.K. operations," *id.* ¶ 42, although the Complaint never says what those problems were. Plaintiff's "Class Period" is defined as March 18, 2005 through March 23, 2006. *Id.* ¶ 1. This purported class period straddles two separate fiscal years and bears no relationship to the Company's reporting cycle or any material developments in the Continuities, Trade or U.K. businesses.

**C.   Scholastic's Extensive Public Disclosures**

For every business challenge set out in the Complaint as a fact Scholastic was supposedly trying to hide, there is a clear disclosure to the investing public set out in Scholastic's public SEC filings. These documents show that Scholastic scrupulously disclosed the risks and opportunities of the children's book business.

**1.   Challenges in the Continuities Business and the Company's New Business Strategy**

In March 2004, a full year before the class period began, Scholastic reported that the federal "Do Not Call" legislation, which went into effect in October 2003, "resulted in lower than expected Direct-to-Home response rates and margins." Elbaum Aff. Ex. 1 at 1. To address these challenges, the Company announced changes in the Continuity group's senior management and a comprehensive review of the business "focusing on developing new models for acquiring customers and restoring profitable growth." *Id.* Thus, contrary to Plaintiff's claim, Compl. ¶ 40, the Company fully disclosed the negative impact of this legislation.

Based on this comprehensive review, the Company publicly reported in July 2004 that it would record a $25.4 million charge, in the fourth quarter ending May 31, 2004, related to write-downs of inventory and an increase in bad debt expenses and provisions for returns in the Continuities business. Elbaum Aff. Ex. 2 at 1. CEO Richard Robinson explained that the Company was adopting a new strategy for the Continuities business:

5

> We are adjusting our business model to strengthen our relationship with our most productive customers through product and service improvement. While we expect that reducing promotions to our less productive customers will temporarily reduce revenues, we believe these actions will improve customer retention, profitability and cash flow in this strategically important business.

*Id.* The new business strategy and the Company's expectations of lower revenues in the business were repeated in each of the succeeding quarterly and annual reports. *See, e.g.,* Elbaum Aff. Ex. 3 at 15 (August 2004 10-K disclosing that Scholastic expected "lower revenue and higher profit from the reorganized continuity business" in the upcoming fiscal year as it focused its marketing on fewer, but more productive, customers); *Id.,* Ex. 4 at 1 & 3 (September 2004 report of additional $3.6 million charge relating to the Continuity business). These actions and disclosures flatly contradict Plaintiff's claim that the Company "[doesn't] write off anything." Compl. ¶ 79.

As required, Scholastic also updated investors on its actual bad debt expenses and the amounts of its related reserves in its earnings reports and investor calls. For example, during the March 18, 2005 conference call with securities analysts, CFO Mary Winston explained that the Company's new business strategy had resulted in lower bad debts and fewer returns in the Continuities business. *Id.* ¶ 94. As a result, the Company reduced the percentage of sales that it used to establish the related reserves. *Id.* The Company did not change its reserve methodologies, but merely included the recent actual data in the formulas it uses to develop estimates, which is consistent with GAAP and its past practice. *Id.* The Company provided similar information to analysts during the July 21, 2005 conference call. *Id.* ¶ 100. Consistent with these conference calls, the Company's fiscal year 2005 Form 10-K reported a decline in bad debt expenses of 31%, or $28.1 million, compared to the prior fiscal year (including the write-off announced in July 2004), and also disclosed the amount of its reserves for bad debts and returns.

Elbaum Aff. Ex. 8 at 31, S-2.[4]

### 2.    Challenges in the U.K. Operations

Plaintiff alleges that Scholastic hid unspecified problems in its U.K. operations. Compl. ¶ 42. To the contrary, during the analyst conference call on July 21, 2005, Ms. Winston clearly reported that the Company had experienced "declines in the U.K. as we invest in restructuring that business." Elbaum Aff. Ex. 7 at 7. On the same conference call, Mr. Robinson further explained that "in the U.K., we've made significant changes throughout the organization to increase marketing effectiveness and rebuild our Trade business." *Id.* at 6. The Company repeated these disclosures in its next earnings release on September 22, 2005, reporting a quarterly loss in the International group "primarily due to lower results in the United Kingdom, where Scholastic is rebuilding its Trade and Continuities businesses." *Id.*, Ex. 9 at 1-2. These disclosures were also set out (almost verbatim) in press releases on December 16, 2005 and March 23, 2006. Elbaum Aff. Exs. 10, 11. The Company's full, frank and repeated acknowledgment of business challenges in the U.K. is fatal to Plaintiff's claim of concealment.

### D.    FTC Consent Decrees

Grolier was operating under a Federal Trade Commission consent decree when Scholastic bought the company in 2000. Compl. ¶ 35. The consent decree had been entered in 1994, over a decade before the start of the class period. *United States v. Hachette Book Group USA, Inc. and Grolier, Inc.*, No. 3:94 Civ. 116 (AVC) (D. Conn., decree entered Feb. 14, 1994). Eleven years after the Grolier consent decree, Scholastic entered into a separate consent decree

---

[4]    The 2005 10-K also reprinted the unqualified audit opinion letters of Ernst & Young, which certified that Scholastic's financial statements were reported "in conformity with U.S. generally accepted accounting principles" and that the Company maintained "effective internal control over financial reporting." Elbaum Aff. Ex. 8 at 60-61. E&Y has never retracted these opinions, and the SEC has never challenged them.

with the FTC. *United States v. Scholastic Inc.*, No. 1:05 Civ. 1216 (RWR) (D.D.C., decree entered Oct. 17, 2005). Plaintiff claims that the two consent decrees address similar conduct, and that Scholastic should have disclosed at the start of the class period that it was allegedly operating in violation of the 1994 consent decree. *See* Compl. ¶¶ 35–40, 45, 63, 85, 93.

Neither consent decree supports Plaintiff's claim of securities fraud. The first (in Connecticut federal court, in 1994) predates the class period by over a decade, and predates Scholastic's ownership of the At Home division by more than a half-decade. The second (in a different federal court, the District of Columbia, in 2005) contained no admission of wrongdoing (contrary to Compl. ¶ 45), resulted in a $710,000 fine that was not material (given Scholastic's size), and with which—by Plaintiff's own admission—Scholastic fully complied. *See* Compl. ¶¶ 38–39 (stating Scholastic ceased the allegedly improper conduct). Contrary to Plaintiff's unsupported supposition, the FTC itself never asserted that Scholastic violated the earlier decree. Elbaum Aff. Exs. 12, 13.

E.    **Cautionary Language**

Each of the press releases mentioned in the Complaint prominently cautions investors that the Company's estimates of future earnings are just that—estimates:

> This news release contains certain forward-looking statements. Such forward-looking statements are subject to various risks and uncertainties, including the conditions of the children's book and educational materials markets and acceptance of the Company's products within those markets, and other risks and factors identified from time to time in the Company's filings with the Securities and Exchange Commission. ***Actual results could differ materially from those currently anticipated.***

*See* Elbaum Aff., Ex. 5 at 2, Ex. 7 at 3 & Ex. 9 at 3. Among other factors, the Company's SEC filings highlighted the risks posed by the Do Not Call legislation and "the ability of the Company to successfully execute its plan with regard to its continuity business." *Id.*, Ex. 8 at 28-29.

**F.    The Alleged Corrective Disclosures**

By Plaintiff's telling, the Company's financial statements were somehow "revealed" to be "false" in two press releases issued in December 2005 and March 2006. Compl. ¶¶ 115-16. In the December 2005 press release, Mr. Robinson told investors about a number of challenges then facing the Company: "The impact of hurricanes on the Company, challenges in School Book Clubs and Continuities, and investments to restructure our business in the United Kingdom were all factors contributing to lower profits in the second quarter." Compl. ¶ 104. He reported, however, that due to a strong first quarter and steps taken to address these challenges, the Company expected earnings for the fiscal year to be "at the bottom end of the previously announced range." *Id.* These comments cannot constitute a corrective disclosure, as they do not "disclose" the supposed "fraud" about which Plaintiff complains. Indeed, the challenges facing the Continuities and U.K. businesses had been repeatedly disclosed long before December 2005.

The second supposed "revelation" was Scholastic's March 2006 press release, in which the Company reported poor results in the third quarter ended February 28, 2006, and reduced its earnings guidance for the fiscal year ending May 31, 2006. Mr. Robinson explained:

> Promotion expenses in School Book Clubs continued to be higher due to the volume of direct mailings as more customers than anticipated migrated to the core clubs in response to promotions. In School Book Fairs, staffing expenses increased during the quarter, in anticipation of fourth quarter fair bookings. Lastly, results in Educational Publishing were affected by lower educational technology revenues, reflecting greater seasonality in that business and a large district sale in the prior-year period.

*Id.* ¶ 106. Following this announcement (which Plaintiff selected as the close of the class period), Scholastic's share price declined from $29.42 to $26.04 per share. *Id.* ¶ 107. But none of the challenges mentioned in the press release have anything to do with the subject matter of the Complaint (Continuities, Trade and U.K.). Rather, they relate to completely separate

9

business units (Book Clubs, Book Fairs and Educational Publishing). And the Complaint never alleges that the reasons stated for the lower earnings were false.

**ARGUMENT**

A securities fraud complaint should be dismissed unless the plaintiff pleads particularized facts that show "the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). In attempting to state a claim, the plaintiff must satisfy the heightened pleading requirements of Federal Rule 9(b) and the PSLRA. *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). The Complaint in this case must be dismissed because it fails to allege a single misstatement of fact, *see* Point I, let alone a misstatement that caused any loss, *see* Point II, or that was made with intent to defraud, *see* Point III.

## I.     NONE OF THE CHALLENGED STATEMENTS WAS FALSE OR MISLEADING

"A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *accord* 15 U.S.C. § 78u-4(b)(1). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99. The Complaint falls far short of these basic, threshold requirements.

### A.     Revenue Recognition

Much of the Complaint is addressed to Scholastic's revenue recognition practices. But Scholastic fully disclosed its revenue recognition practices in its SEC filings, including the methodologies for establishing reserves using historical data to estimate how many shipped books will be returned and how many invoices will go unpaid. While the Complaint broadly

10

claims that "Scholastic falsely represented that it complied with" revenue recognition rules, Compl. ¶ 50, it does not allege any facts about how future returns are estimated or how reserves are calculated (either properly or otherwise), or explain why the Company's estimates were so consciously flawed as to constitute securities fraud. Critically, Scholastic has not restated any of its financial reports during the class period or recorded any charges for unanticipated bad debts or returns. And its auditors have not retracted their clean opinions. These facts are fatal to Plaintiff's claim. *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 854 (N.D. Tex. 2005); *Druskin v. AnswerThink, Inc.*, 299 F. Supp. 2d 1307, 1325-26 (S.D. Fla. 2004).

It is particularly telling that Plaintiff cannot point to a single transaction that should have been recorded differently. Instead, the Complaint defaults to generalized, conclusory allegations that the Company improperly recognized revenues because it engaged in "improper sales practices," shipped "unwanted merchandise," and had no "ability to reasonably estimate product returns." Compl. ¶¶ 52, 64-65. But even if these allegations were well based, courts require far more specificity, especially with allegations about revenue recognition and other technical accounting matters. *See, e.g., In re Trex Co. Sec. Litig.*, 212 F. Supp. 2d 596, 611 (W.D. Va. 2002) ("Courts require significant specificity when a plaintiff bases a claim on allegations of channel stuffing or other misleading revenue recognition."). For example, in *Alamosa*, the plaintiff alleged that the company improperly recognized revenue based on sales to "less creditworthy" customers. 382 F. Supp. 2d at 853. The court dismissed the complaint, holding that the "allegations must identify specific transactions in which there was improper revenue recognition and the materiality of such transactions and must identify any resulting restatements." *Id.* Similarly, Plaintiff here alleges that the At Home group shipped books to less creditworthy customers, Compl. ¶ 57, but the Complaint alleges no facts that specify these

11

supposed shipments or show how they impacted the financial statements in any way.

Judge Stein's opinion in *Gavish v. Revlon, Inc.*, 2004 WL 2210269 (S.D.N.Y. 2004), is similarly instructive. There, the plaintiff alleged that Revlon improperly recognized revenue based on many of the same sales practices alleged here—all of which the court rejected as "either unspecific, innocuous, or both." *Id.* at *18. Like the Complaint in this case, the complaint in *Gavish* alleged that (1) sales managers faced pressure to make sales (*compare* Compl. ¶¶ 55–56 relating to Continuities); (2) some sales managers were told to offer large discounts, return rights or other incentives to induce large orders (*compare* Compl. ¶ 58 relating to Trade); (3) some products were shipped that had not been ordered or were shipped at the end of a quarter and before the customer wanted them delivered (*compare* Compl. ¶¶ 54, 61–62 relating to Continuities and Trade); and (4) the company received high levels of returns resulting from overly large shipments (*compare* Compl. ¶¶ 58–59 relating to Trade). *Id.* Judge Stein ruled that these allegations failed in the absence of "a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements." *Id.* at *16.

As in *Gavish*, the Complaint does not contain any specific allegations of monetary consequence that show Scholastic's earnings statements were materially false when made. Indeed, the Complaint here is far weaker than the allegations in *Gavish* because of the unique nature of the At Home business. In Continuities, hundreds of thousands of small shipments are made directly to individual consumers, and the Company establishes reserves for returns and bad debts based on historical experience. Unlike Revlon, this business does not make large sales to wholesale or retail businesses. There is no way to "channel stuff" in the Continuities business.

Plaintiff's complaints about routine operational issues in the Trade business are

similarly innocuous.  For example, Plaintiff questions "side letter" agreements with distributors for price discounts (which are common in the industry), and Scholastic's speed in processing returned books.  Compl. ¶¶ 62, 70.  Even if these allegations were well pled, these are routine operational questions, and are subject to business judgment, beyond the purview of the federal securities laws.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).  And, in any event, the allegations are hopelessly vague.  Plaintiff offers no facts that explain the extent of these issues or how they render the Company's financial statements materially false.  *Gross v. Summa Four, Inc.*, 93 F.3d 987, 996 (1st Cir. 1996) (rejecting claim of revenue overstatement where no allegation of amount of the overstatement or the net effect on the company's earnings); *Trex*, 212 F. Supp. 2d at 611-12 (same, rejecting claim of channel stuffing).

Finally, Plaintiff's reliance on the FTC Consent Decree is misplaced.  Scholastic did not admit any wrongdoing in the settlement, and the Complaint alleges no facts demonstrating that the Company failed to account for any impact of the Consent Decree on its business.  Plaintiff offers no facts even suggesting that the 1994 decree had been violated.  Nor could it, as the FTC never alleged Scholastic violated the 1994 Grolier decree.[5]  There also is no merit in Plaintiff's suggestion that the Company was obligated to report that it was in violation of a preexisting Consent Decree, entered in 1994, even if it had been.  Compl. ¶ 93.  "The federal securities laws do not require a company to accuse itself of wrongdoing," *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), or to disclose internal operational issues, *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000) ("disclosure of

---

[5]  The notion that entry of the 2005 consent decree means that Scholastic violated the 1994 consent decree is also nonsensical.  The 1994 consent decree was entered in Connecticut.  If Scholastic had violated that decree, the FTC would presumably have moved for enforcement in Connecticut.  *Cf. United States v. Local 359, United Seafood Workers*, 55 F.3d 64, 69 (2d Cir. 1995) (district court retains jurisdiction to enforce a consent decree).

internal management and engineering problems falls outside the securities laws").

**B.    Reserves**

Plaintiff claims that the Company misstated its reserves, Compl. ¶ 77, but never alleges any facts to show that the amounts of the reported reserves were different from the amounts actually recorded on the Company's accounting books. And, of course, "accurate statements are self-evidently not actionable under the securities laws." *Nadoff v. Duane Reade, Inc.*, 107 Fed. Appx. 250, 252 (2d Cir. 2004); *In re Nokia OYJ (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 395 (S.D.N.Y. 2006).

Rather than show any misstatements were made, Plaintiff appears to take issue with the assumptions used in the Company's reserve estimates. However, Scholastic was not required under GAAP to establish reserves at any specific percentage of sales, and the Complaint concedes that substantial reserves were established. Compl. ¶ 80. Mere disagreement with the business judgments of Scholastic and its accounting professionals is not actionable under the securities laws. *See, e.g.*, *In re CIT Group, Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 689 (S.D.N.Y. 2004) ("a failure on the part of defendants to correctly gauge the adequacy of the loan loss reserves" is not "actionable under the securities laws"); *Hinerfeld v. United Auto Group*, 1998 WL 397852, at *7 (S.D.N.Y. 1998) (same). The sole, dispositive fact is that investors were fully informed of the amount of the Company's reserves, including its decision in 2005 to reduce the percentage of sales that it used to establish its reserves. Elbaum Aff. Exs. 5 at 1, Ex. 8 at S-2.

Plaintiff's "confidential informant" allegations do not change this analysis, as they are too conclusory and ambiguous to satisfy the stringent requirements imposed by Rule 9(b) and the PSLRA. For example, Plaintiff alleges that "heading into [calendar] 2006," the Company needed to modify its "bad debt assumptions" because there had been an "upswing in bad debts and no-pays." Compl. ¶78 (citing Confidential Informant ("CI") No. 2). But this does

14

not even suggest that the Company's bad debt reserves or expenses were misstated, let alone provide any particularized facts about the supposed "upswing." General allegations about early 2006 also have no bearing on the challenged statements in March, July and September 2005. And the Company disclosed that its reserve formulas took into account historic data in estimating future bad debts. Compl. ¶ 76. Elbaum Aff. Ex. 6 at 16. Similarly, Plaintiff claims that Scholastic "absolutely had problems" collecting from some customers, *id.* (citing CI No. 3), but never explains the extent of these "problems" or how they rendered the financial statements materially false. Finally, Plaintiff asserts that management did not "like write-offs" and the Company had "huge receivables" more than two years past due. *Id.* ¶ 79 (citing CI No. 9). CI No. 9, however, is alleged to have "left the Company in 2004," *id.* ¶ 30, long before the class period even began, and so has no personal knowledge of the challenged statements. CI No. 9's claim is also demonstrably false, as Scholastic recorded a charge of $25.4 million in July 2004 relating to the Continuities business. Elbaum Aff. Ex. 2 at 1.

### C.    U.K. Operations

Plaintiff alleges that "Scholastic was experiencing significant problems with its U.K. operations" but never identifies a single such problem. Vague, generalized claims of "significant problems" are not sufficient. *ATSI*, 493 F.3d at 99. And, in any event, Plaintiff's claims about U.K. problems fail because Scholastic repeatedly disclosed its U.K. restructuring efforts in public filings and on conference calls. *See, e.g.,* Elbaum Aff. Ex. 5 at 6 & 7; Ex. 6 at 2.

### D.    Earnings Forecasts

In addition to the Company's historic results, the Complaint also challenges the Company's earnings forecasts. Compl. ¶¶ 92, 98, 102. Such forecasts are by definition "forward looking statements," and thus are absolutely protected under the PSLRA so long as they are accompanied by meaningful cautionary language and were not knowingly false when made. 15

15

U.S.C. § 78u-5; *Nokia*, 423 F. Supp. 2d at 400. Here, each of the press releases cited in the Complaint contains cautionary language and refers to the Company's SEC filings for additional risk factors. And Plaintiff has not alleged a single fact that might show Mr. Robinson or Ms. Winston made any earnings forecasts with knowledge that the forecasts were untrue.[6]

### E.    Sarbanes-Oxley Certifications

Finally, while the Complaint is less than clear, it appears that Plaintiff may attempt to state a claim based on certifications signed pursuant to Section 906 of the Sarbanes-Oxley Act, 18 U.S.C. § 1350. *See* Compl. ¶¶ 87–91. But Congress did not create a private right of action to enforce this section. *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 707 (D.N.J. 2006). Nor can Plaintiff use the certifications as an end-run around the PSLRA, as "[t]he plain language of Sarbanes-Oxley evidences no congressional intent to alter the pleading requirements set forth in the PSLRA." *Garfield v. NDC Health Corp.*, 466 F.3d 125, 1266 (11th Cir. 2006). And the Complaint alleges absolutely no facts at all about the Company's internal controls.

## II.    THE COMPLAINT FAILS TO ALLEGE THE REQUIRED ELEMENT OF LOSS CAUSATION

Beyond Plaintiff's inability to identify any misstatements, the Complaint also fails to allege the essential element of loss causation. Plaintiff must allege facts showing "a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Bruodo*, 544 U.S. 336, 342 (2005). Loss causation is generally pled by pointing to a "corrective disclosure" that reveals the falsity of the prior statements and is followed by a decline in the stock price. *Lentell v. Merrill Lynch & Co. Inc.,* 396 F.3d 161, 173 (2d Cir. 2005).

---

[6]    In addition, the statements of corporate optimism cited in the Complaint are not actionable under the securities laws. *See Rombach*, 355 F.3d at 174 ("expressions of puffery and corporate optimism do not give rise to securities violations"); *Nokia*, 423 F. Supp. 2d at 397 (statements that, in retrospect, proved too optimistic are not actionable).

The Supreme Court recognized in *Dura* that a decline in stock price may reflect a number of factors other than the alleged misrepresentations, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343. "Establishing loss causation is critical because Section 10(b) is not meant to 'provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause.'" *In re Rhodia S.A. Sec. Litig.*, 2007 WL 2826651, at *15 (S.D.N.Y. Sept. 26, 2007) (quoting *Dura*, 544 U.S. at 345).

"The loss causation requirement is satisfied only if the public disclosure causing injury addressed the specific fact allegedly concealed." *Rhodia*, 2007 WL 2826651, at *16. As this Court held in *In re Winstar Communications*, "it is the exposure of the falsity of the fraudulent representation that is the critical component of loss causation." 2006 WL 473885, at *14 (S.D.N.Y. Feb. 27, 2006) (Daniels, J.). Accordingly, "where a disclosure does not reveal the falsity of the alleged misstatements, it does not qualify as 'corrective.'" *In re Omnicom Group, Inc. Sec. Litig.*, 2008 WL 243788, at *6 (S.D.N.Y. Jan. 29, 2008); *accord Lentell*, 396 F.3d at 175 n.4 ("Plaintiff's allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations."); *In re Tellium, Inc. Sec. Litig.*, 2005 WL 2090254, at *4 (D.N.J. 2005) ("*Dura* itself makes clear that loss causation is not pled upon allegations of drops in stock price following an announcement of bad news that does not disclose the fraud.").

Here, Plaintiff relies on two press releases (issued in December 2005 and March 2006) as corrective disclosures. *See* Compl. ¶¶ 115–16. Yet neither press release "discloses" anything new about the Company's revenue recognition, reserves, U.K. operations, or any other

17

matter challenged in the Complaint. The December 16, 2005 press release reported a decline in net income compared to the same period in the prior year, based on a variety of factors: "The impact of hurricanes on the Company [including Katrina], challenges in School Book Clubs and Continuities, and investments to restructure our business in the United Kingdom were all factors contributing to lower profits in the second quarter." Compl. ¶ 104. The Company first disclosed challenges facing its Continuities business in March 2004, nearly two years earlier, and also disclosed the U.K. turn-around efforts starting in July 2005. Elbaum Aff., Ex. 1 at 1, Ex. 6(A) at 2, Ex. 7 at 1. There was nothing new relating to these business units in the December 2005 press release.

Similarly, the Company's March 23, 2006 press release reported poor results based on increased expenses and decreased revenues, but in the entirely separate business units of School Book Clubs, School Book Fairs and Educational Publishing. Compl. ¶ 106. In explaining the Company's results and revised earnings guidance, this release did not mention any of the subjects referred to in the Complaint (Continuities, Trade and the U.K. businesses).

Critically, the Company has *never* restated the challenged financial statements, recorded any charges for unanticipated returns or bad debts (other than prior to the class period), or modified the challenged accounting practices. Nor has there been any disclosure of material weaknesses in the Company's internal controls, or any doubts from Ernst & Young. Instead, the only new information in the December 2005 and March 2006 press releases pertains to market-wide factors (such as Hurricane Katrina) and company-specific factors (such as challenges in separate business units). This is insufficient as a matter of law. *See, e.g., Rhodia*, 2007 WL 2826651, at *16; *Tellium*, 2005 WL 2090254, at *4.

### III.   NONE OF THE FACTS PLED IN THE COMPLAINT GIVES RISE TO AN INFERENCE OF SCIENTER—LET ALONE A "STRONG INFERENCE"

Even if the Complaint identified a misstatement (it does not), and even if the Plaintiff could allege loss causation (it cannot), dismissal of this lawsuit would nonetheless be required.  Under the PSLRA, a complaint fails to state a claim unless the plaintiff alleges "with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  For Section 10(b) claims, the required state of mind is "scienter, a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007).  In the Second Circuit, a plaintiff "can establish this intent either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  In either scenario, the inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 127 S. Ct. at 2504–05.  This entails an "inherently comparative" inquiry taking into account "plausible nonculpable explanations for the defendant's conduct.  *Id.* at 2510.

### A.   "Motive and Opportunity"

Allegations of "motive and opportunity" will only suffice if they reveal that defendants "benefited in some concrete and personal way from the purported fraud."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).  Here, the Complaint asserts that Scholastic, Mr. Robinson and Ms. Winston were motivated to inflate Scholastic's stock price to profit from insider sales.  Compl. ¶¶ 14, 74.  But "executive stock sales, standing alone, are insufficient to support a strong inference of fraudulent intent."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F.

Supp. 2d 549, 561 (S.D.N.Y. 2004). Courts recognize that insiders may sell stock for many

reasons other than fraud, such as "to fund major family expenses." *Ronconi v. Larkin*, 253 F.3d

423, 435 (9th Cir. 2001). Accordingly, only stock sales that are "unusual" in amount and timing

are probative of fraudulent intent. *See, e.g., Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 183

(4th Cir. 2007); *Malin v. XL Capital Ltd.*, 499 F. Supp. 2d 117, 150 (D. Conn. 2007).

Here, Ms. Winston *sold no stock at all* during the class period. The only other

individual defendant, Mr. Robinson, sold just 3% of his substantial personal stake in the

Company, and that was only because those sales were directed by his ex-spouse under their

divorce agreement. Compl. ¶ 118; Elbaum Aff. Ex. 12 at 14. As a matter of law, no nefarious

inference can be drawn as to either individual. In *Acito v. IMCERA Group, Inc.*, for example, the

Second Circuit held that no negative inference could be drawn from the former CEO's sale of

only 11% of his holdings—especially when "the complaint failed to allege that any other

defendant sold any shares . . . during this period." 47 F.3d 47, 54 (2d Cir. 1995); *see also In re*

*FVC.com Sec. Litig.*, 136 F. Supp. 2d 1031, 1040 (N.D. Cal. 2000) (nothing suspicious about

defendants' sale of 13% of their holdings); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092–

94 (9th Cir. 2002) (same, as to 13%); *Ronconi*, 253 F.3d at 435–36 (same, as to sales of 10% and

17%); *Malin*, 499 F. Supp. 2d at 153 (same, as to sales of 14.42% and 30.84%).

Three other facts about Plaintiff's stock sale allegations are particularly

significant to the scienter inquiry:

- *First*, Mr. Robinson remained Scholastic's largest (and, with his family, controlling) shareholder throughout the class period, which is wholly inconsistent with Plaintiff's claim that he was somehow motivated to "pump and dump" Company stock;

- *Second*, starting before the class period and continuing after it, Mr. Robinson has received annual incentive grants totaling 1,249,000 options, further cementing his long-term stake in the success of the

20

Company (Elbaum Aff., Ex. 15); and

- *Third*, as has been publicly disclosed in the Company's proxy statements, Mr. Robinson's stock sales were made solely pursuant to his ex-spouse's direction under their divorce agreement. He did not make the investment decisions or retain any of the proceeds. Elbaum Aff., Ex. 14 at 10, Ex. 16. There can be no inference of scienter where the sales were forced, rather than voluntary. *See Druskin*, 299 F. Supp. 2d at 1337; *In re MCI WorldCom, Inc. Sec. Litig.*, 191 F. Supp. 2d 778, 792-93 (D. Miss. 2002).

The Complaint also alleges that eight other individuals sold shares during the 53-week class period. But none of these individuals is named as a defendant, nor are they mentioned in the Complaint as having been involved in any supposed "fraud." Indeed, they are not mentioned in the Complaint at all, except to note that they sold stock. And, almost all of these individuals were either employees who were leaving the Company, or who exercised options that were about to expire, or outside directors who were not involved in day-to-day management. As such, their sales are not "unusual" or "suspicious" at all. *See* Appendix A.[7]

In the context of a Section 10(b) claim, an individual only has an "opportunity" to commit fraud where he or she has the ability and likely prospect of achieving the alleged benefits through misstatements. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 n.4 (2d Cir. 1996). Where individuals did not make any statements, the Court cannot draw an inference of scienter. *See*

---

[7]    Plaintiff's claim that "more than $22 million" in stock was sold (including Mr. Robinson's trades), Compl. ¶ 14, is vastly inflated. Almost all of the sales involved the cashless exercise of options, so the relevant number is the net proceeds of $7.18 million. Plaintiff's allegations also relate to an exceedingly long class period of 53 weeks, crossing different fiscal years and bearing no relationship to the Company's reporting cycles or business cycles. *See Vantive*, 283 F.3d at 1093 (class period of 63 weeks is "unusually long"). By extending the class period, Plaintiff impermissibly seeks "to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period." *Vantive*, 283 F.3d at 1092. Here, more than 60% of the shares were sold in the first 7 weeks of the class period. Compl. ¶ 118. This naked ploy "weakens any inference of scienter that could be drawn from the timing" of the trades, and "strengthens a competing inference that the plaintiffs filed their complaint simply to embark on a fishing expedition with the hope of catching a valid claim." *Teachers' Ret.*, 477 F.3d at 185; *see also Malin*, 499 F. Supp. 2d at 151.

*Alamosa*, 382 F. Supp. 2d at 860 (without allegations linking sellers to the misrepresentations, the sales are not probative of scienter). Accordingly, these sales are not probative of anything.[8]

**B.    "Conscious Misbehavior or Recklessness"**

Attempting to demonstrate fraudulent intent via "strong circumstantial evidence of conscious misconduct or recklessness," *Kalnit*, 264 F.3d at 138, is exceedingly difficult in the Second Circuit. Negligence is insufficient, and the caliber of the reckless behavior must be "highly unreasonable," representing "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000). This standard is all the more steep where, as here, a plaintiff has made no showing of "motive and opportunity." *Kalnit*, 264 F.3d at 142.

Plaintiff's claims are based on the conclusory and discredited allegation that "because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information." Compl. ¶ 9; *see also id.* ¶¶ 10, 12. Courts uniformly reject bare "access to information" allegations, finding them "insufficient, as a matter of law, to establish scienter." *Nokia*, 423 F. Supp. 2d at 406; *Kinsey v. Cendant Corp.*, 2005 WL 1907678, at *5 (S.D.N.Y. 2005). Indeed, the Second Circuit requires that "where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309; *see Caiafa v. Sea Containers Ltd.*, 2007 WL 2815633, at *10 (S.D.N.Y. 2007). Plaintiff does not identify a single report received by Mr.

---

[8]    The Second Circuit's decision in *Stevelman v. Alias Research Inc.*, 174 F.3d 79 (2d Cir. 1999), does not help Plaintiff. In that case, the CEO, a named defendant, sold 40% of his holdings during the class period. The court found that the CEO's sales were suspicious and that sales by other insiders supported the inference that the CEO acted with scienter. *Id.* at 85. When, as here, a plaintiff has failed to identify any suspicious trades by the named defendants, *Stevelman* does not permit a plaintiff to use allegations about non-defendants as a substitute.

Robinson or Ms. Winston. There are no allegations even hinting that these two professionals recklessly ignored adverse financial data or other information pertaining to revenue recognition, reserves or operations in the United Kingdom.[9]

Nor can any "red flags" from "confidential informants" save the Complaint. An informant must have personal knowledge for the allegations to be credited, *see Malin*, 499 F. Supp. 2d at 141; *Alamosa*, 382 F. Supp. 2d at 851–52, and there is nothing to indicate these "informants" have anything of the kind. It is not even clear that some of these people worked at Scholastic. CI No. 5, for example, claims to have worked in the "Games Division," Compl. ¶ 26, but Scholastic has never had a "Games Division." In conducting the comparative inquiry under *Tellabs*, the Court should apply a "steep" discount to claims made by anonymous sources. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007).

While Plaintiff purports to recite allegations from nine anonymous sources, only one of them is claimed to have any expertise in accounting or the setting of reserves. Tellingly, this individual, CI No. 1, is alleged to be the former vice president of finance with the At Home division and provides absolutely no support for Plaintiff's claim of fraud. Compl. ¶ 22.[10] Plaintiff also never alleges that these "informants" reported their supposed concerns to Scholastic. Their secret thoughts cannot, as a matter of law, support a strong inference the Defendants acted with scienter. *See, e.g., Novak*, 216 F.3d at 309.

The anonymous allegations are also far too general and vague. Plaintiff merely

---

[9]    Plaintiff's sweeping, but unsupported, allegations of GAAP violations are also insufficient to state a claim. "Allegations concerning GAAP violations, absent sufficient allegations of fraudulent intent, are not sufficient to properly allege scienter." *Nokia*, 423 F. Supp. 2d at 408; *see also Chill*, 101 F.3d at 270–71; *Bristol-Myers*, 312 F. Supp. 2d at 549.

[10]    Similarly, CI No. 9 is described broadly as a "financial analyst," Compl. ¶ 30, but no details are provided as to CI No. 9's role in the preparation of the challenged financial reports. CI No. 9 also left the Company in 2004, before the class period started. *Id.*

relies on the same conclusory allegations that fail to show the challenged statements were false, much less made with fraudulent intent. For example, Plaintiff alleges that there had been a "tremendous amount of turnover" in key finance positions, Compl. ¶ 85(c), but does not give any statistical information or even identify a single former employee or explain why he or she left the Company. "There are many reasons not related to fraud why people resign" and far more detailed allegations are required to create an inference of fraud. *Kurtzman v. Compaq Computer Corp.*, 2002 WL 32442832, at *10 (S.D. Tex. 2002); *Malin*, 499 F. Supp. 2d at 161–62. Resignations by non-defendants also cannot show the Defendants acted with scienter. *Id.* at 162.

Plaintiff next alleges that Scholastic was "notorious for sales spikes" at the end of quarters and that returned products were not properly monitored or accounted for by the Company. Compl. ¶ 85(f)-(g). Even if there were any merit to these claims, they are much too vague. *See Gavish*, 2004 WL 2210269, at *19 ("The complaint's totally conclusory allegations regarding defendants' omniscient awareness of traffic into and out of the channel are insufficiently particularized to support a strong inference of scienter.").[11] Similarly, the generalized claim that "sales forecasts were unrealistically high" is too conclusory and subjective to be credited. Compl. ¶ 85(h). And, in any event, courts routinely reject claims that aggressive sales goals support an inference of scienter. *See Gavish*, 2004 WL 2210269, at *19; *Alamosa Holdings*, 382 F. Supp. 2d at 851–52; *Bristol-Myers*, 312 F. Supp. 2d at 566–68. So, too, with Plaintiff's allegations of "side letter" agreements with Company distributors (which are common in the industry). Compl. ¶ 85(d). These allegations do not suggest that Defendants were

---

[11]    *See Trex*, 212 F. Supp. 2d at 608–09 ("Allegations of channel stuffing, standing alone, are insufficient to sustain the state of mind requirements in a securities fraud claim because there may be a number of legitimate reasons for attempting to achieve sales earlier than in the normal course."); *Druskin*, 299 F. Supp. 2d at 1333 (allegation that it was "generally known" that accounts were uncollectible was not sufficient to show strong inference of scienter).

informed that revenues had been improperly recognized. *See, e.g.*, *Bristol-Myers*, 312 F. Supp. 2d at 566–68.

Finally, the Complaint does not allege any facts suggesting that the Defendants knew the Company's reserves were improperly reduced or did not actually believe they were adequate. While Plaintiff claims that reserves should have been recorded at some unspecified higher amount, even if well-pled, these allegations are at most a claim of corporate mismanagement, not actionable securities fraud. *See, e.g.*, *CIT Group*, 349 F. Supp. 2d at 689; *Hinerfeld*, 1998 WL 397852, at *6–*7.[12]

## CONCLUSION

For these reasons, Defendants respectfully request that the Court enter an order dismissing the Complaint in its entirety and with prejudice.[13]

Dated: February 27, 2008
  New York, New York

Respectfully submitted,
SIMPSON THACHER & BARTLETT LLP

By: _____
  Michael J. Chepiga (mchepiga@stblaw.com)
  David Elbaum (delbaum@stblaw.com)
  425 Lexington Avenue
  New York, New York 10017
  Telephone: (212) 455-2000
  Facsimile: (212) 455-2502

  *Attorneys for Scholastic Corporation,*
  *Richard Robinson and Mary Winston*

---

[12] Plaintiff's claim under Section 20(a) for "controlling person" liability should also be dismissed because the Complaint has not stated a claim of a primary violation, *Nokia,* 423 F. Supp. 2d at 410–11, or alleged particularized facts showing the controlling person's "culpable participation" in the fraud. *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406-07 (S.D.N.Y. 2007); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 246 (S.D.N.Y. 2006).

[13] The Complaint has already been amended once and should be dismissed without further leave to amend. In addition, the defects (no misstatements, no loss causation, no scienter) cannot be remedied. *See Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1998) ("district court may properly deny leave when amendment would be futile").

**APPENDIX A**

| Name | Explanation | Authority |
|---|---|---|
| **Charles Deull**, former General Counsel | Deull left the Company in the January of 2006 and exercised options in October 2005 in connection with his departure. Elbaum Aff., Ex. 17. | *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) ("It is not unusual for individuals leaving a company ... to sell shares. Indeed they often have a limited period of time to exercise their company stock options."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 594 (S.D. Tex. 2003) ("Readily available, plausible explanations for a sale, such as that the insider is leaving the company or retiring in a few months might make a sale nonsuspicious."). |
| **Beth Ford**, Senior Vice President of Global Operations | On September 28 and October 4, 2005, Ford exercised options in connection with her purchase of a home. Elbaum Aff., Ex. 18. | *See Ronconi*, 253 F.3d at 435 (recognizing insiders may sell stock "to fund major family expenses"); *see also Silicon Graphics*, 183 F.3d 970, 987 (sales not suspicious where individual had small holdings and sales were small percentage of total sales alleged in complaint). |
| **Deborah Forte**, Executive Vice President of the Media, Licensing and Entertainment Division | Between March 22 and May 2, 2005, Forte exercised options that were scheduled to expire in July 2005. The May 2 trade was also made pursuant to a pre-established Rule 10b-5(1) plan, and that alone completely destroying any possible inference of scienter. Aff., Ex. 19. | 17 C.F.R. § 240.10b5-1(c); *SEC v. Healthsouth Corp.*, 261 F. Supp. 2d 1298, 13222-23 (N.D. Ala. 2003). |

| Name | Explanation | Authority |
|---|---|---|
| **Charles Harris,** Independent, Outside Director | Harris had no day-to-day responsibilities with the Company. He exercised options on July 29 and August 1. Elbaum Aff., Ex. 20. | *See Silicon Graphics*, 183 F.3d at 987 |
| **Larry Holland,** former Senior Vice President of Human Resources | Holland voluntarily terminated his employment in the spring of 2005 and was required to exercise his shares before leaving the Company or they would expire. His sales were made between March 22 and April 19, 2005, at the start of the class period. Elbaum Aff., Ex. 21. | *See Greebel*, 194 F.3d at 206; *Enron*, 258 F. Supp. 2d at 594. |
| **Mae Jemison,** Independent, Outside Director | Jemison had no day-to-day responsibilities with the Company. She exercised options in connection with her purchase of a home.<br><br>Jemison's trade was also made at a relatively low point in the stock price during the class period. Jemison sold on April 19 at $34.73 per share, Compl. ¶ 118, while the stock traded at $38.62 on March 18 and reached a high of $39.50 on July 5. Elbaum Aff., Ex. 22. | *See Ronconi*, 253 F.3d at 435 (no inference of scienter where individual "misses the boat" by not selling at high point); *see also Silicon Graphics*, 183 F.3d at 987. |
| **Karen Maloney,** Senior Vice President of Finance | Maloney exercised options on March 22, at the start of the 53-week class period. Elbaum Aff., Ex. 23. | *See Silicon Graphics*, 183 F.3d at 987. |
| **Barbara Marcus,** President of the Children's Book Publishing and Distribution Division | Marcus exercised options between March 22 and April 15, 2005 because they were scheduled to expire in July 2005. Elbaum Aff., Ex. 24. | *See Silicon Graphics*, 183 F.3d at 987. |