UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ———————————————— x | |
| ALASKA LABORERS EMPLOYERS | : Civil Action No. 07-CIV-07402 (GBD) |
| RETIREMENT FUND, Individually and On | : **(Consolidated)** |
| Behalf of All Others Similarly Situated, | : |
| | : |
| | : CLASS ACTION |
| Plaintiff, | : |
| | : LEAD PLAINTIFF'S MEMORANDUM OF |
| vs. | : LAW IN OPPOSITION TO DEFENDANTS' |
| | : MOTION TO DISMISS |
| SCHOLASTIC CORP., et al., | : |
| | : |
| Defendants. | : |
| ———————————————— x | |

## TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ..........................................................................1

II.    STATEMENT OF FACTS ...............................................................................2

III.   ARGUMENT ...................................................................................................3

    A.     Legal Standard on a Motion to Dismiss..............................................3

    B.     The CAC Sufficiently Alleges Fraud with Particularity as Required by
        Rule 9(b) and the PSLRA ....................................................................4

        1.     Plaintiff Has Adequately Alleged the "Who, What, When, Where
            and How" ...................................................................................5

        2.     The CAC Adequately Particularizes the Reasons Why Defendants'
            Statements Were Materially False and Misleading When Made.................5

            a.     Improper Accounting Practices and Violations of GAAP..............5

            b.     The Material Misstatements or Omissions Concerning
                Scholastic's At Home Division and its U.K. Operations.................9

    C.     The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter ...............13

        1.     The CAC Adequately Alleges Conscious Misbehavior and
            Recklessness ...........................................................................14

        2.     Plaintiff Sufficiently Alleges Motive and Opportunity ...........................20

    D.     The CAC Sufficiently Alleges Loss Causation ...................................23

IV.    CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Aldridge v. A.T. Cross Corp.*,
   284 F.3d 72 (1st Cir. 2002)........................................................................................7

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (2007)..............................................................................................4

*Cent. Bank of Denver N.A. v. First Interstate Bank of Denver*,
   511 U.S. 164 (1994)................................................................................................13

*Druskin v. AnswerThink, Inc.*,
   299 F. Supp. 2d 1307 (S.D. Fla. 2004) ..................................................................21

*Dura Pharms. v. Bruodo*,
   544 U.S. 336 (2005)..........................................................................................23, 24

*Freedman v. Value Health, Inc.*,
   958 F. Supp. 745 (D. Conn. 1997)..........................................................................22

*Freeland v. Iridium World Commc'ns. Ltd.*,
   233 F.R.D. 40 (D.D.C. 2006)..................................................................................24

*Ganino v. Citizens Utils. Co.*,
   228 F.3d 170 (2d Cir. 2000)..............................................................................14, 20

*Gavish v. Revlon, Inc.*,
   No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. Lexis 19771
   (S.D.N.Y Sept. 30, 2004)......................................................................................8, 9

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007) ..................................................................................19

*In re Alamosa Holdings, Inc.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) .....................................................................9

*In re Am. Bank Note Holographics Sec. Litig.*,
   93 F. Supp. 2d 424 (S.D.N.Y. 2000).......................................................................16

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
   381 F. Supp. 2d 192 (S.D.N.Y. 2004).......................................................................9

**Page**

*In re APAC Teleservices, Inc. Sec. Litig.,*
No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
(S.D.N.Y. Nov. 19, 1999) ................................................................22

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
324 F. Supp. 2d 474 (S.D.N.Y. 2004)...........................................14, 15, 19, 21

*In re Bristol-Myers Squibb Sec. Litig.,*
No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448
(D.N.J. Aug. 17, 2005)...................................................................24

*In re Carter-Wallace Inc. Sec. Litig.,*
220 F.3d 36 (2d Cir. 2000).............................................................14

*In re eSpeed, Inc. Sec. Litig.,*
457 F. Supp. 2d 266 (S.D.N.Y. 2006).............................................15

*In re Gilat Satellite Networks, Ltd.,*
No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996
(E.D.N.Y. Sept. 19, 2005).............................................................16

*In re Health Mgmt. Inc. Sec. Litig.,*
970 F. Supp. 192 (E.D.N.Y. 1997) ................................................18

*In re Hollinger Int'l, Inc. Sec. Litig.,*
No. 04C-0834 (DHC), 2006 U.S. Dist. LEXIS 47173
(N.D. Ill. June 28, 2006) ...............................................................24

*In re IBM Corporate Sec. Litig.,*
163 F.3d 102 (2d Cir. 1998).............................................................9

*In re Initial Public Offering Sec. Litig.,*
241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................4, 22

*In re MicroStrategy, Inc. Sec. Litig.,*
115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................23

*In re Motorola Sec. Litig.,*
505 F. Supp. 2d 501 (N.D. Ill. 2007) ............................................23

*In re MTC Elec. Techs. S'holders Litig.,*
898 F. Supp. 974 (E.D.N.Y. 1995) ................................................22

- iii -

**Page**

*In re Nortel Networks Corp. Sec. Litig.,*
   238 F. Supp. 2d (S.D.N.Y. 2003)............................................................ *passim*

*In re Omnicom Group, Inc. Sec. Litig.,*
   No. 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272
   (S.D.N.Y. Mar. 30, 2005) ...........................................................................17

*In re Oxford Health Plans, Inc. Sec. Litig.,*
   187 F.R.D. 133 (S.D.N.Y. 1999) ..................................................21, 22, 23

*In re Par Pharm., Inc. Sec. Litig.,*
   733 F. Supp. 668 (S.D.N.Y. 1990).............................................................12

*In re Quintel Entm't. Inc. Secs. Litig.,*
   72 F. Supp. 2d 283 (S.D.N.Y. 1999).............................................................8

*In re Regeneron Pharms., Inc. Sec. Litig.,*
   No. 03 Civ. 3111, 2005 U.S. Dist. LEXIS 1350
   (S.D.N.Y. Feb. 3, 2005) ................................................................................4

*In re Scholastic Corp. Sec. Litig.,*
   252 F.3d 63 (2d Cir. 2001).................................................................. *passim*

*In re Sotheby's Holdings, Inc. Sec. Litig.,*
   No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
   (S.D.N.Y. Aug. 31, 2000).............................................................................12

*In re Tommy Hilfiger Sec. Litig.,*
   No. 04-civ-7678, 2007 U.S. Dist. LEXIS 55088
   (S.D.N.Y. July 20, 2007) ............................................................................16

*In re Top Tankers, Inc.,*
   No. 06 Civ. 13761 (CM), 2007 U.S. Dist. LEXIS 94259
   (S.D.N.Y., Dec. 18, 2007)............................................................................14

*In re Van Der Moolen Holding N.V. Sec. Litig.,*
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).........................................................19

*In re Veeco Instruments, Inc. Sec. Litig.,*
   235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................16, 18, 19

*In re Vivendi Universal, S.A. Sec. Litig.,*
   381 F. Supp. 2d 158 (S.D.N.Y. 2003)..................................................7, 8, 10

**Page**

*In re Winstar Commc'ns,*
    No. 01 CV 3014, 2006 U.S. Dist. LEXIS 7618
    (S.D.N.Y. Feb. 27, 2006) ..................................................................15, 17

*Irvine v. ImClone Sys., Inc.,*
    No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342
    (S.D.N.Y. June 3, 2003) ....................................................................10, 11

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    513 F.3d 702 (7th Cir. 2008) ..................................................................19

*Miller v. Material Sciences Corp.,*
    9 F. Supp. 2d 925 (N.D. Ill. 1998) ..........................................................18

*Mills v. Polar Molecular Corp.,*
    12 F.3d 1170 (2d Cir. 1993) ......................................................................4

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ............................................................. *passim*

*Phelps v. Kapnolas,*
    308 F.3d 180 (2d Cir. 2002) ......................................................................3

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,*
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) ..................................................24

*Roeder v. Alpha Indus., Inc.,*
    814 F.2d 22 (1st Cir. 1987) ......................................................................12

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ................................................................20, 21

*Ryan v. Flowserve Corp.,*
    444 F. Supp. 2d 718 (N.D. Tex. 2006) ....................................................23

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ..............................................................................3, 20

*Stevelman v. Alias Research Inc.,*
    174 F.3d 79 (2d Cir. 1999) ......................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ............................................................................14

Page

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4. ...................................................................................................4
    §78u-4(b)(2) .........................................................................................13

Private Securities Litigation Reform Act of 1995. ........................................4, 7, 13

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................................4, 5
    Rule 10b-5...........................................................................................8, 9
    Rule 12(b)(6)..........................................................................................4

Lead Plaintiff, Alaska Laborers Employees Retirement Fund ("Lead Plaintiff" or "Plaintiff"), respectfully submits this memorandum of law in opposition to Defendants Scholastic Corporation ("Scholastic" or the "Company"), Richard Robinson and Mary Winston's motion to dismiss the Consolidated Amended Class Action Complaint (the "CAC").

## I.    PRELIMINARY STATEMENT

This is a federal securities class action lawsuit brought on behalf of purchasers of the common stock of Scholastic between March 18, 2005 and March 23, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

Defendant Scholastic and its subsidiaries engage in publishing and distributing children's books worldwide. During the Class Period, Scholastic's business was being negatively impacted by a host of adverse, undisclosed, negative factors which were causing its revenues to decline, expenses to rise and earnings to be negatively impacted. As a result, Scholastic was reporting financial results which were artificially inflated due to certain improper accounting practices which violated Generally Accepted Accounting Principles ("GAAP").

The CAC details the adverse factors impacting the Company's operations – sales practice issues at Scholastic's At Home Division, improper accounting practices (*e.g.,* improper overstatement of revenues and improper manipulation of accounting reserves) and declines in the Company's U.K. operations – and supports those allegations with the first-hand accounts of former high-level employees of Scholastic who worked at the Company during the Class Period. The CAC also details Defendants' false statements, the reasons why those statements were false when made and Defendants' knowledge or reckless disregard for the truth of their statements. Prior to the public disclosure of the true facts about Scholastic, Scholastic insiders collectively sold more than 632,000 shares of their personally-held common stock for proceeds of more than $23 million. Then, as the true facts about Scholastic's business became known to the market, the price of Scholastic common stock declined by more than $7 per share, or 21%.

Defendants' motion to dismiss asserts boilerplate dismissal arguments.  As set forth in detail herein, Defendants' arguments are not meritorious and it is respectfully submitted that Defendants' motion to dismiss should be denied and this case should proceed to discovery.

## II.    STATEMENT OF FACTS

Defendant Scholastic and its subsidiaries engage in publishing and distributing children's books worldwide. The Company operates through four segments: Children's Book Publishing and Distribution; Educational Publishing; Media, Licensing, and Advertising; and International. ¶31.[1] Scholastic describes itself as a leading operator of school-based book clubs and book fairs and continuity programs in the United States.  ¶32.

As detailed in the CAC, during the Class Period, Scholastic's business was being negatively impacted by a host of adverse, undisclosed, negative factors which were causing its revenues to decline, expenses to rise and earnings to be negatively impacted, as follows:

- **Problems at the At Home Division**: During the Class Period, Scholastic was experiencing significant problems with its Scholastic-at-Home division (the "At Home Division").  The At Home Division serves families with children from birth to 12 years of age with book programs for home reading and learning and is primarily the old book club business of Grolier Incorporated ("Grolier").  Scholastic acquired Grolier in 2000. ¶34. During the Class Period, the At Home Division was struggling to comply with the requirements of a Federal Trade Commission ("FTC") consent decree concerning its sales and consumer practices. As a result of the Scholastic FTC Consent Decree, the operations of the At Home Division were dramatically impacted. Stripped of the practices that had brought the problems with the FTC, the At Home Division's results began to dramatically suffer.[2]

- **Improper Accounting Practices**: Throughout the Class Period, Scholastic reported artificially inflated financial results, which were not indicative of the Company's true operating performance. As a result of these improper accounting practices, the Company's Class Period financial statements were not presented in conformity with GAAP and therefore were materially false and misleading when issued.

---

[1]    "¶___" refers to the paragraphs of the CAC.

[2]    The CAC extensively details the problems at the At Home Division as recounted by the former Vice President of the division.

- **Decline of U.K. Operations**: Throughout the Class Period, Scholastic was experiencing significant problems with its U.K. operations. According to CI 1, throughout the Class Period, the Company was unable to address the problems with its U.K. operations and it was continuing to experience problems with that division. ¶42.

During the Class Period, Defendants issued numerous statements which failed to disclose the adverse factors then impacting the Company's business and which materially overstated the Company's financial results through improper accounting practices.

The truth about the Company and its operational problems became known through two separate announcements. On December 16, 2005, Scholastic issued a press release announcing its financial results for the fiscal second quarter of 2006, the period ending November 30, 2005. The Company reported disappointing earnings and blamed, among other things, challenges with the Company's Continuities business (which includes the At Home Division) and "investments to restructure our business in the United Kingdom." In response to the disappointing earnings announcement, the price of Scholastic common stock declined from $33.10 per share to $29.30 per share, on heavy trading volume. Defendants, however, continued to conceal the scope of the problems at the Company and maintained earnings guidance that they knew could not be met. ¶¶104, 105.

Then, on March 23, 2006, Scholastic issued a press release announcing its financial results for the third quarter of 2006, the period ending February 28, 2006. The Company reported a net loss of $15.5 million, or ($0.37) per share, and dramatically reduced its earnings guidance citing a variety of factors. In response to the Company's announcement, the price of Scholastic common stock declined from $29.42 per share to $26.04 per share, on heavy trading volume. ¶¶106, 107.

## III.    ARGUMENT

### A.    Legal Standard on a Motion to Dismiss

On a motion to dismiss, a plaintiff's allegations are presumed to be true and are entitled to the benefit of every favorable inference that can be drawn from their allegations. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). At issue on a 12(b)(6) motion "is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Id.*; *Phelps v. Kapnolas,* 308

F.3d 180, 184-185 (2d Cir. 2002).  Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959 (2007) (citations omitted).  As detailed below, the CAC easily meets this standard.

### B.    The CAC Sufficiently Alleges Fraud with Particularity as Required by Rule 9(b) and the PSLRA

Securities fraud actions are subject to the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, et seq., and Rule 9(b), which require plaintiffs to identify "with particularity" the circumstances constituting the alleged fraud. Fed. R. Civ. P. 9(b).  "To satisfy Rule 9(b), the complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 U.S. Dist. LEXIS 1350, at *34-*35 (S.D.N.Y. Feb. 3, 2005) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In other words, the complaint must identify the "who, what, where, when and how" of the fraud.  *See In re Initial Public Offering Sec. Litig.,* 241 F. Supp. 2d 281, 358 (S.D.N.Y. 2003) ("*IPO*").  As the Second Circuit has confirmed, "[e]ven with the heightened pleading standard under Rule 9(b) and the Securities Reform Act we do not require the pleading of detailed evidentiary matter in securities litigation."  *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir. 2001).  Accordingly, "[the PSLRA] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based.  Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak v. Kasaks,* 216 F.3d 300, 313-14.

As discussed below, the CAC easily satisfies the applicable pleading standard.

1.      **Plaintiff Has Adequately Alleged the "Who, What, When, Where and How"**

Plaintiff sufficiently alleges that Defendants made materially false and misleading statements and omitted material information concerning the Company's At Home Division, its financial results, and its U.K. operations.  As required by Rule 9(b), the CAC specifically identifies "what" statements are alleged to be false and misleading;[3] the individual(s) "who" made the statements (*i.e.*, Scholastic, Defendant Robinson and Defendant Winston); "when" they were made (*i.e.,* the specific date) and "where" they were made (*i.e.,* press releases, SEC filings and conference calls).  *See* ¶¶43, 50, 76, 88-90, 92, 94, 98, 100, 102.  The CAC also alleges "why" the representations were materially false and misleading by identifying specific facts that contradicted Defendants' statements.[4]  *See, e.g.,* ¶¶44, 91, 93, 95, 99, 101, 103.  Nonetheless, Defendants argue that the CAC fails to explain "why" their statements were false and misleading.  *See* Def. Mem. at 10-16.  As discussed below, Defendants' arguments are without merit.

2.      **The CAC Adequately Particularizes the Reasons Why Defendants' Statements Were Materially False and Misleading When Made**

a.      **Improper Accounting Practices and Violations of GAAP**

Throughout the Class Period, Scholastic misrepresented its financial results.  As set forth in the CAC, the representations Defendants made to investors through SEC filings and press releases regarding

---

[3]      Although Defendants contend that the CAC "fails to allege a single misstatement of fact" (*See* Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def. Mem."), filed February 27, 2008, at 10), Plaintiff unequivocally identifies almost a dozen SEC filings, press releases, and other statements released by Scholastic during the Class Period, which contain misrepresentations and material omissions. *See, e.g.,* ¶¶43, 50, 76, 88-90, 92, 94, 98, 100, 102.

[4]      For example, the CAC alleges, *inter alia,* that: (1) Defendant Robinson positively described certain trends in the Company's business, when the truth was that Scholastic's At Home Division and its U.K. operations were experiencing significant problems (¶¶93, 101, 103); (2) the Company's statements about its financial results were false because the Company was engaged in improper accounting practices that artificially inflated their financials results (¶¶44, 93, 99, 101, 103); (3) Defendant Winston's statements regarding improvements in bad debt reserve were materially false and misleading because the Company was improperly manipulating its bad debt reserve (¶¶44, 95); and (4) Scholastic's positive statements about its business performance and outlook were false because the Company was experiencing problems with its At Home Division and its U.K. operations and was engaged in improper accounting practices (¶¶99, 101, 103).

the Company's financial results were false and misleading because Scholastic was involved in numerous improper accounting practices which artificially inflated its financial performance and violated GAAP. ¶¶41, 43-91, 93, 95, 99, 101, 103.  The CAC does not simply allege these matters in a conclusory fashion, but provides detailed facts on how Defendants violated GAAP and Scholastic's accounting policies by improperly recognizing millions of dollars in revenue of shipments of unwanted products and by materially understating the amount of accounting reserves. ¶¶44, 46, 51. Such practices were improper because, as Defendants were aware, the unwanted shipment of products led to huge returns and problems collecting payments.[5]  ¶¶49-74.  In other words, Scholastic was recognizing revenue before it was realized in direct violation of GAAP because there was no true sale, the sales price was not fixed or determinable and the collectibility of the sales price was not reasonably assured at the time of revenue recognition. ¶¶51,64. In addition, Scholastic's recognition of revenue was materially false and misleading because Scholastic was unable to reasonably estimate product returns.[6]  ¶65.

The CAC provides the following particularized facts, among others, to support these allegations:

- It was common practice for Scholastic to ship unwanted products to customers and to send merchandise to customers that they knew had bad payment histories in order to generate revenue.  As a result, Scholastic experienced heavy returns of merchandise and problems collecting payment from customers (¶¶53, 54, 57, 60, 78);

---

[5]    Defendants' argument that they fully disclosed Scholastic's revenue recognition practices is misguided.  Def. Mem. at 10.  Defendants do not address what is truly at issue – *i.e.,* the fact that Scholastic's recognition of revenue was improper and a violation of GAAP because they were engaging in the practice of sending unwanted merchandise to consumers, which they knew would result in a large number of returns and problems collecting payments.

[6]    Notably, the CAC alleges exactly what Defendants claim is not alleged – *i.e.,* "why the Company's estimates were so consciously flawed as to constitute securities fraud."  Def. Mem. at 11.  Indeed, the CAC alleges that GAAP requires that future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of product return rights and specifies that Scholastic was unable to reasonably estimate product returns because customers were granted an unlimited amount of time to make returns, returns were not timely recorded and the amount of product in the Company's distribution channel was difficult to monitor.  ¶¶66-74.  Moreover, contrary to Defendants' contentions, the CAC specifies that Scholastic calculated "the reserve for estimated returns [] based on historical return rates and sales patterns." ¶50.

- Right before the end of each quarter, Scholastic was notorious for sales spikes and made deals that enabled the Company to meet its unlikely goals, but the deals would inevitably be followed by big returns in ensuing months (¶¶54, 58);

- Scholastic was motivated to book revenue upon shipment of products, without being concerned about returns or inability to collect on the revenues (¶¶54, 58);

- It was not uncommon to see customer sales forecasts established at an amount that was twice what the prior sales history reflected, even when the customers' recent sales history was declining (¶56);

- Scholastic could not reasonably estimate product returns because customers had an unlimited amount of time to return products, and returns from consumers and distributors were not formally processed or timely recorded in Scholastic's accounting records (¶¶67, 69-70, 72);

- Given the unpredictable amount of books that might eventually be returned to the Company, sales personnel did not receive commissions for the "sales" they reported during a particular quarter (¶69);

- Scholastic entered into "side-letter" arrangements with distributors, which altered the terms of documentation associated with various transactions (¶62); and

- In June 2005, Scholastic entered into a consent decree with the FTC, which settled charges brought by the FTC that Scholastic shipped unordered merchandise to consumers, and then sought payment for the merchandise (¶63).

These allegations sufficiently particularize Scholastic's improper accounting practices.[7]  *See In re Nortel Networks Corp. Sec. Litig.,* 238 F. Supp. 2d at 613, 626 (S.D.N.Y. 2003) (accounting allegations were adequately specific where complaint identified accounting practices that may have improperly inflated the company's reported revenues).

In addition, Plaintiff has identified numerous GAAP violations to show that Scholastic engaged in improper recognition of revenue and explains precisely how Defendants violated GAAP.  ¶¶47-49, 51, 66-68, 71, 73-75, 77, 81-85; *see In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 179-180

---

[7]      Contrary to Defendants' view, "the fact that financial statements . . . were not restated does not end [a] case when [plaintiff] has otherwise met the pleading requirements of the PSLRA." *Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir. 2002).  "To hold otherwise would shift to accountants the responsibility that belongs to the courts.  It would also allow officers and directors of corporations to exercise an unwarranted degree of control over whether they are sued, because they must agree to a restatement of the financial statements." *Id.*  Indeed, the fact that Scholastic has improperly failed to restate its misstated financial statements or to commence an internal investigation evidences Defendants' proclivity to mislead investors.

(S.D.N.Y. 2003) ("opinions expressed by the various accounting sources incorporated by reference in the complaint suffice to show that the revenues [ ] were recognized prematurely"); *see also, In re Nortel Networks,* 238 F. Supp. 2d at 626 (a violation of GAAP may be the basis of a §10(b) claim when plead in combination with additional evidence of intent) (citing *In re Quintel Entm't. Inc. Secs. Litig.,* 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999)). Indeed, the CAC cites many of the same accounting sources that the court in *Vivendi* found were "enough to provide a reasonable basis to infer that [the company] [ ] materially overstated its revenue," including FASB Concepts Statement No. 5, ¶83, which mandates that "revenue should not be recognized until it is realized or realizable and earned." FASB Concepts Statement Nos. 2 and 5; Accounting Research Bulletin No. 43; and Accounting Principles Board Opinion No. 10. *See* ¶49; *see also In re Vivendi,* 381 F. Supp. 2d at 179-180. Throughout the Class Period, Scholastic falsely represented that it complied with these, and other, accounting rules. ¶50.

   The CAC also specifically alleges that throughout the Class Period, Scholastic improperly manipulated its accounting reserves in violation of GAAP and its own accounting policies. ¶¶75-86. The CAC provides in detail that Defendants were aware that Scholastic's book club business had experienced an increase in bad debt in the last eight to ten months of 2005 primarily due to problems collecting payment from customers. ¶78. Although Scholastic should have modified its bad debt assumptions, it failed to do so. *Id.* Instead, Scholastic reduced its accounts receivable reserves to an artificially low level. ¶80. As a result, Scholastic understated its sales returns and accounting reserves for its uncollectible receivables, thereby overstating its operating results.

   The authorities cited by Defendants are inapposite and do not support dismissal here. Defendants blatantly misrepresent the holding in *Gavish v. Revlon, Inc.,* No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. Lexis 19771 (S.D.N.Y Sept. 30, 2004), by making it appear, through a clever manipulation of the decision's text, that the case was dismissed because the allegations of improper revenue recognition were insufficient on their face to establish securities violations. Def. Mem. at 12 (listing plaintiffs' allegations and stating that the court ruled that "these allegations failed"). In fact, "the allegations" that warranted

dismissal in *Gavish* were not the allegations of improper revenue recognition, but conclusory allegations of materiality. *Gavish*, 2004 U.S. Dist. Lexis 19771, at *48-*49 ("plaintiffs' conclusory allegations of materiality cannot withstand a motion to dismiss"). The court in *Gavish* required plaintiffs to apprise defendants of "the approximate amount of overstatement involved." *Id.* at *48. Here, Plaintiff has satisfied this requirement by alleging that Scholastic "materially overstated the Company's operating results by recognizing millions of dollars in revenue on unwanted product."[8] ¶¶51, 65.[9]

> ### b. The Material Misstatements or Omissions Concerning Scholastic's At Home Division and its U.K. Operations

The CAC further alleges with specificity Defendants' misstatements and/or omissions regarding Scholastic's business operations. As detailed in the CAC, Defendants repeatedly highlighted and mischaracterized the trends in Scholastic's business, including its At Home Division and its U.K. Operations, and made positive statements about the Company's future projections.[10] Specifically,

---

[8]    *See In re Nortel Networks*, 238 F. Supp. 2d at 626 (accounting allegations were material where complaint alleged that the company "reported hundreds of millions, if not billions, of dollars in false revenues").

[9]    Defendants misconstrue the holding in *In re Alamosa Holdings, Inc.,* 382 F. Supp. 2d 832, 853 (N.D. Tex. 2005)*,* which is a Texas case, by insisting that the complaint in that case was dismissed because the allegation of improper recognition of revenue based on sales to a "less creditworthy" customer was insufficient on its face. Def. Mem. at 11. The *Alamosa* complaint was dismissed, however, because plaintiffs failed to allege that any of the "less creditworthy" customers were in fact less likely to make payments. 382 F. Supp 2d at 853. This is not at issue here because the CAC alleges that Scholastic itself maintained a huge customer database that indicated that certain customers were not acceptable club members based on their prior payment histories. ¶57; *see In re Nortel Networks,* 238 F. Supp. 2d at 626 (allegations that revenue was recognized on sales where such revenue was "known to be materially uncollectible" were sufficient to show fraud). Unlike *Alamosa*, the statements of confidential witnesses here amply support the allegation that Scholastic shipped products to customers who the company knew, based on its own records, were unlikely to pay.

[10]    Contrary to Defendants' assertions, Defendants' statements are not protected under the PSLRA's Safe Harbor Doctrine for forward-looking statements because their statements were knowingly false when made and their purported cautionary language was insufficient. *See In re IBM Corporate Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998) (holding that "[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of facts . . . or if the speaker does not genuinely or reasonably believe them") (citations omitted); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig*., 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (holding that "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their

Defendants' made numerous statements throughout the Class Period stating, *inter alia,* that Scholastic "achieved higher profitability in all operating segments;" experienced "improved results in International" and a "strengthening of [its] children's book business;" expected "[r]evenue and profit growth in Children's Book Publishing and Distribution" and "improvements in International" for fiscal 2006;" "implemented a revised strategy of focusing on [At Home's Division's] most productive customers;" "focus[ed] on better quality customers . . . who want to be engaged with [them];" and "focused on good customer service." *See, e.g.,* ¶¶93, 98, 100. These and other statements by Defendants regarding the Company's At Home Division and U.K. operations were materially false and misleading because Defendants failed to disclose that: 1) the Company was operating the At Home Division in violation of the Grolier FTC Consent Decree; 2) that they were experiencing problems with the At Home Division as a result of the Scholastic FTC Consent Decree; and 3) that the Company's U.K. operations were in significant decline and the Company's efforts to correct the problems in the U.K. were not successful. *See, e.g.,* ¶¶93, 99.

Ignoring the CAC's detailed allegations, Defendants erroneously contend that the CAC does not allege facts supporting the allegation that the At Home Division was operating in violation of the Grolier FTC Consent Decree.[11] However, as clearly expressed in the CAC, after discovering that Scholastic's At

---

statements were false when made") (citations omitted); *see also Irvine v. ImClone Sys., Inc.,* No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342, at *4 (S.D.N.Y. June 3, 2003) (holding that cautionary language was insufficient); *In re Vivendi,* 381 F. Supp. 2d at 183 (holding that cautionary language must "render reliance on the misrepresentation unreasonable"). Such language must "precisely address the substance of the specific statement or omission that is challenged." *See In re Nortel,* 238 F. Supp. 2d at 628. Here, the language that Defendants cite constitutes mere boilerplate warnings that are insufficient to bring the statements within the protection of the safe harbor provision. *See Irvine,* 2003 U.S. Dist. LEXIS 9342, at *4 (holding that repeated general warnings did not constitute sufficient cautionary language).

[11]    Defendants claim that the FTC did not allege that Scholastic violated the Grolier FTC Consent Decree. Not only is this a question of fact inappropriate for consideration on a motion to dismiss, but the FTC complaint against Scholastic clearly alleges that the FTC served a copy of the Grolier FTC Consent Decree to Scholastic on two separate occasions and Scholastic "therefore [ ] had actual, ongoing knowledge that shipping unordered merchandise and sending communications that seek to obtain payment for or return of merchandise shipped without the expressed consent of the recipient are unfair and deceptive acts or practices and are unlawful. . . Defendants ***continued*** to ship unordered merchandise to consumers and continued to

Home Division was operating in violation of the Grolier FTC Consent Decree, the FTC alleged that Scholastic continued Grolier's improper practices of shipping unordered merchandise to customers and failed to make numerous important disclosures with knowledge that the FTC had previously prohibited such deceptive practices. ¶37, 63. Scholastic then entered into its own consent decree with the FTC and stipulated that it shipped unordered merchandise to consumers. ¶45. As part of the Scholastic FTC Consent Decree, the Company was required to pay a civil fine of $710,000 and agreed to stop shipping and seeking payment for unordered merchandise. ¶37. Numerous former Scholastic employees have confirmed the improper shipping practices at the At Home Division. *See, e.g.,* ¶¶53, 54.

The CAC also provides sufficient facts to support Plaintiff's other allegations. To support Plaintiff's allegation of problems at the At Home Division, the CAC cites information from a former Vice President of the At Home Division that complying with the Scholastic FTC Consent Decree caused the At Home Division to experience declining financial results because it led to fewer sales and more returns. ¶38. After entering into the consent decree, Scholastic was also forced to increase its promotional activity in order to broaden its customer base. ¶39. According to a former Marketing Director at the At Home Division, the increased scope of mailings caused the At Home Division to look for potential customers who presented a heightened credit risk. *Id.* According to another Scholastic employee, near the end of each quarter, it was routine practice for Scholastic to ship unwanted merchandise to customers who Scholastic knew had bad payment histories. ¶57. With regard to the U.K. operations, a former Scholastic employee confirmed that throughout the Class Period, Scholastic was continuing to experience problems with that division. These allegations are more than sufficient to provide a basis for Plaintiff's allegations of falsity. *See In re Scholastic*, 252 F.3d at 72 ("Any information that sheds light on whether class period statements were false or materially misleading is relevant").

---

send communications that seek to obtain payment for it . . ." (*See U.S. v. Scholastic, et al.*, No. 05-cv-1216 (D.D.C.), filed June 21, 2005, ¶¶24-25) (emphasis added).

Defendants make a feeble attempt to discharge their duty to disclose information regarding the At Home Division's failure to comply with the Grolier FTC Consent Decree. Def. Mem. at 13. By choosing to make positive statements about Scholastic's operations and earnings, however, Defendants created a duty to disclose the entire truth about the operations.[12] *See In re Par Pharm., Inc. Sec. Litig.,* 733 F. Supp. 668, 675 (S.D.N.Y. 1990) (holding that "once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading") (citations omitted). "Thus, when a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *In re Sotheby's Holdings, Inc. Sec. Litig.,* No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *12 (S.D.N.Y. Aug. 31, 2000) (quoting *Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir. 1987)). Here, Defendants made statements that Scholastic was experiencing "higher profitability in all operating segments"(¶92) and made specific projections of continued success, even though they were aware that much of the profitability was due to shipping unwanted merchandise to consumers in violation of the Grolier FTC Consent Decree.

Moreover, Defendants claim that they made "extensive public disclosures" regarding the problems at the At Home Division and the U.K. operations. This is simply not the case. Relying on a press release that Scholastic issued a year before the start of the Class Period and before the Scholastic FTC Consent Decree was issued, Defendants claim that they "fully disclosed" the negative impact of the "Do Not Call" legislation. Def. Mem. at 5. Plaintiff, however, does not argue that Defendants failed to make disclosures regarding the negative impact of the "Do Not Call" legislation on the At Home

---

[12]    Notably, in neither of the cases Defendants cite as support for their assertion that they were under no duty to disclose the problems at the At Home Division did the plaintiffs allege that defendants made positive statements that created a duty to disclose the alleged undisclosed facts.

Division.[13]  Rather, Plaintiff clearly alleges that Defendants did not disclose that the operations of the At Home Division were negatively impacted as a result of the Scholastic FTC Consent Decree.  *See* ¶¶38-40.  Tellingly, Defendants do not dispute that they failed to make any disclosures regarding problems that Scholastic experienced as a result of trying to comply with the Scholastic FTC Consent Decree.[14]

Defendants also claim that they disclosed Scholastic's "business challenges" in the U.K.  Def. Mem. at 7.  However, the purported disclosures regarding declines in the U.K. were, at most, only half truths.[15]  The "fundamental purpose" of the federal securities laws is to implement a "philosophy of full disclosure."  *Cent. Bank of Denver N.A. v. First Interstate Bank of Denver,* 511 U.S. 164, 171 (1994) (citations and quotations omitted).  In fact, a fair reading of the statements demonstrates that Defendants were attempting to create the impression that Scholastic experienced declines in the U.K. as a result of trying to improve the business.  *See* Def. Mem. at 7.  Despite the problems Scholastic was admittedly experiencing with its U.K. operations, Defendants continued to make misleadingly optimistic future predictions about Scholastic's International segment.  *See Novak,* 216 F.3d at 315.

## C.    The CAC Alleges Facts Giving Rise to a Strong Inference of Scienter

Under the PSLRA, a complaint alleging violations of Section 10(b) of the Exchange Act must state "facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  In the Second Circuit, a "strong inference" of scienter may be satisfied in one of

---

[13]    Plaintiff makes note of the fact that the Federal "Do Not Call" legislation negatively impacted the At Home Division only to support the contention that the At Home Division was experiencing problems acquiring customers *after* the Scholastic FTC Consent Decree was imposed.  As a result, the At Home Division was forced to increase promotional activity via mailings which, in turn, created an increase in expenses and a heightened credit risk.  *See* ¶¶39-40.

[14]    Instead, Defendants argue that seven months prior to the Class Period, Scholastic disclosed that they were "reducing promotions to [their] less productive customers," which is the exact opposite of what the CAC alleges.

[15]    Defendants' statements that Scholastic experienced "declines in the U.K. as [they] invest in restructuring that business" fails to take into account the CAC's allegations that Scholastic was continu[ed] to experience problems with its U.K. operations, which it was unable to address.  *See* ¶42.

two ways: (1) by alleging facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness"; or (2) by alleging facts which demonstrate that defendants had both a "motive and opportunity to commit fraud." *Ganino v. Citizens Utils. Co.*, 228 F.3d 170, 168-169 (2d Cir. 2000). As Defendants admit (Def. Mem. at 19), the inference of scienter need only be "as compelling as" – not more compelling than – "any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2504-05 (2007). In other words, under the Supreme Court's standard, a tie between facts that give rise to an inference of scienter and plausible opposing inferences is sufficient to avoid dismissal. *In re Top Tankers, Inc.*, No. 06 Civ. 13761 (CM), 2007 U.S. Dist. LEXIS 94259, at *17 (S.D.N.Y., Dec. 18, 2007). Applying the standard to this case, the inference of scienter is at least as strong as any opposing inference advanced by Defendants.

### 1. The CAC Adequately Alleges Conscious Misbehavior and Recklessness

Courts have generally held that conscious misbehavior constitutes conduct "which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Nortel Networks*, 238 F. Supp. 2d at 631 (quoting *In re Carter-Wallace Inc. Sec. Litig.,* 220 F.3d 36, 39 (2d Cir. 2000)). Further, "securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged Defendants' knowledge of facts or access to information that contradicted their public statements. *Novak,* 216 F.3d at 308 (holding that a complaint pleads recklessness where it alleges that "defendants knew, or more importantly, should have known that they were misrepresenting material facts related to the corporation.").

Accordingly, where a corporation's "high-level executive officer" makes public statements that are contradicted by facts that are available when the statements are made, an inference arises that the officer "had intimate knowledge of those facts or should have known them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004). In fact, this Court has previously recognized that, even in the absence of specific information contradicting their public statements,

- 14 -

"knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Commc'ns,* No. 01 CV 3014, 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006) (citing *In re Atlas Air,* 324 F. Supp. 2d at 489; *see also, In re eSpeed, Inc. Sec. Litig.,* 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006). High level corporate officers, such as the Defendants, who signed SEC filings containing the Company's financial statements have a duty to familiarize themselves with the facts relevant to the core operations of the Company and the financial reporting of those operations. *In re Winstar Commc'ns,* 2006 U.S. Dist. LEXIS 7618, at *22-*23.

The CAC alleges facts that adequately support a strong inference that Defendants were aware, or at the very least, by the nature of their positions, should have been aware, of the falsity of statements made in press releases and SEC filings throughout the Class Period. Defendants, as CEO and CFO of Scholastic, may be presumed to have knowledge about the Company's improper accounting practices and, therefore, were reckless in repeatedly issuing statements during the Class Period that misrepresented Scholastic's business and financial results by failing to disclose the impact of that conduct on the Company.[16] *See id.* at *23 ("Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties may be imputed to the company's officers and directors who are involved in the day-to-day operations of the company.").

---

[16]    Defendants' refusal to acknowledge that these facts give rise to a strong inference of scienter runs contrary to a wealth of authority in this Circuit. *See, e.g., In re eSpeed,* 457 F. Supp. 2d at 293-294 (holding that "even in the absence of specific information contradicting their public statements," knowledge of contradictory information may be imputed to executives where the statements concern matters that are "sufficiently significant" to the company); *In re Winstar Commc'ns,* 2006 U.S. Dist. LEXIS 7618, at *22 (imputing scienter to key officers who filed false financial statements); *In re Atlas Air,* 324 F. Supp. 2d at 489 (holding that where a "high-level officer" makes public statements that are contradicted by available facts, an inference arises that the officer "had intimate knowledge of those facts or should have known them.").

As described in the CAC, Defendants Robinson and Winston were both high-level executives who were intimately involved in important issues affecting the Company's business and had access to undisclosed information regarding Scholastic's business and improper accounting practices. ¶¶9-14. Their positions allowed them to directly control the revenue recognition practices of Scholastic. *See In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to CFO where because of his position, he was "uniquely situated" to control the revenue recognition procedures of the company).

Adding to the inference to be drawn from the fact that the improper accounting practices occurred at the core of Scholastic's operations, the CAC further alleges that Defendants had knowledge of or recklessly ignored a series of accounting improprieties, each of which violated GAAP and Scholastic's own internal policies. *In re Veeco Instruments, Inc. Sec. Litig.,* 235 F.R.D. 220, 231 (S.D.N.Y. 2006) ("such alleged actions, which are contrary to expressed policy and prior practice, form the basis for proof of recklessness.") (citations omitted); *see also In re Scholastic Corp. Sec. Litig.,* 252 F.3d at 77 (holding that allegations that the defendants accounting practices were contrary to their stated policy and prior practice, and that the defendants closely monitored the accounts in question was sufficient). Allegations of GAAP violations can support a securities fraud claim when coupled with evidence of corresponding fraudulent intent. *In re Tommy Hilfiger Sec. Litig.*, No. 04-civ-7678, 2007 U.S. Dist. LEXIS 55088, at *11 (S.D.N.Y. July 20, 2007). Moreover, "[c]ourts have recognized that accounting manipulations involving premature revenue recognition . . . are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently', but instead 'suggest a conscious decision to improperly recognize revenue.'" *In re Veeco Instruments,* 235 F.R.D. at 231-232 (citing *In re Gilat Satellite Networks, Ltd.,* No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996 (E.D.N.Y. Sept. 19, 2005).

The allegations in the CAC detail specific and repeated violations of GAAP made by Defendants while in possession of information directly contradicting Scholastic's reported financial performance.

- 16 -

*See In re Winstar Commc'ns,* 2006 U.S. Dist. LEXIS 7618, at *26 (recklessness established when complaint alleged that defendants made misrepresentations despite knowledge of facts and access to information contrary to their public statements). The CAC "does not focus on the alleged GAAP and rules violations themselves, but ties these allegations to reasons for the violations." *See In re Omnicom Group, Inc. Sec. Litig.*, No. 02 Civ. 4483 (RCC), 2005 U.S. Dist. LEXIS 5272, at *42 (S.D.N.Y. Mar. 30, 2005). For example, the CAC alleges that although Defendants were aware that Scholastic had problems with large volumes of returns which were not being timely processed or recorded, they continued to recognize revenue upon shipment of unwanted products in furtherance of their deliberate attempt to realize a large amount of revenue. ¶¶72, 74; *see Novak*, 216 F.3d at 311-12 (allegations that defendants deliberately failed to mark down inventory in order to artificially inflate financial results was sufficient to show scienter).

As the CAC alleges, there can be no doubt that Defendants knew or recklessly ignored that Scholastic's policy of recognizing revenue upon shipment of product was improper. ¶¶52, 68. Pursuant to GAAP, revenue is not to be recognized until it is realized or earned – a transfer of risk has to occur in order to affect an "exchange" for purposes of revenue recognition. ¶49. Nevertheless, according to numerous former Scholastic employees, Defendants caused Scholastic employees to "ship unwanted product to customers" and engaged in a practice of "ship first and ask questions later."[17] ¶¶53-54. Then, at the end of each quarter, Scholastic was notorious for sales spikes and made deals that enabled the Company to meet its unlikely goals. ¶¶54, 58. Moreover, Defendants knew, or should have known, that their shipping practices led to massive returns and inability to collect on payments. ¶¶68, 78. In fact, according to a former Marketing Director in Scholastic's At Home Division, the unrealistic revenue targets imposed by Defendants caused At Home Division employees to pursue customers that were not

---

[17]    Defendants were aware that such conduct was improper because it was prohibited by the Grolier FTC Consent Decree, to which they were subject.

likely to pay. ¶58.  In addition, Defendants' revenue recognition practices were in violation of GAAP's requirement that "the amount of future returns must be reasonably estimable in order for revenue to be recognized prior to the expiration of the product return rights." ¶66.  As Defendants knew or should have known, Scholastic estimates of product returns were unreliable because Scholastic granted customers and distributors an unlimited amount of time to return products and returns were not formally processed or timely accounted for.  ¶¶67, 69.  Indeed, meetings were held to discuss the large volumes of returns from distributors, which had not been timely processed or recorded in the Company's accounting systems. ¶72.  The CAC also alleges that Defendants had knowledge of or recklessly ignored an increase in bad debt and inability to collect on payments; yet, nevertheless, materially understated its sales returns and accounting reserves for uncollectible receivables in violation of GAAP and Scholastic's own accounting principles.  ¶77-78.

        The CAC further alleges that Defendants recklessly ignored "red flags" regarding Scholastic's financial reporting improprieties.  ¶84.  Specific factual allegations that a defendant ignored red flags or warning signs that would have revealed the falsity of their statements support a strong inference that a defendant acted intentionally or recklessly.  *See In re Health Mgmt. Inc. Sec. Litig.,* 970 F. Supp. 192, 203 (E.D.N.Y. 1997) (citations omitted); *Miller v. Material Sciences Corp.,* 9 F. Supp. 2d 925, 928 (N.D. Ill. 1998) ("Deliberately ignoring 'red flags' . . . can constitute the sort of recklessness necessary to support §10(b) liability."); *see also, In re Veeco Instruments,*  235 F.R.D. at 232 (court considered plaintiffs' allegations that defendants ignored red flags in determining that scienter was sufficiently plead).

        Here, the CAC specifically identifies five red flags that that Defendants knew or recklessly ignored, including, *inter alia*: (1) significant "sale spikes" were recorded at the end of each quarter; (2) the existence of "side agreements" with distributors; (3) Scholastic's "sales" were not based on actual orders from customers; (4) Scholastic's sales forecasts were unrealistically high; and (5) Scholastic was put on notice that its practices of shipping unwanted goods were not permitted by the Grolier FTC

Consent Decree.  ¶¶84-85; *see In re Van Der Moolen Holding N.V. Sec. Litig.,* 405 F. Supp. 2d 388, 405 (S.D.N.Y. 2005) (an examination report by the NYSE was a red flag that should have put the company on  notice that its subsidiary's revenue violated NYSE rules).  These red flags should have prompted Defendants to review their accounting practices, which they apparently did not do.

Contrary to Defendants' assertions, the "Second Circuit has held that a plaintiff may rely on confidential sources to plead facts giving rise to a strong inference of scienter."[18]  *In re Atlas Air*, 324 F. Supp. 2d at 493.  Here, the confidential informants are identified with sufficient particularity to support the allegations relating to Defendants' awareness of the accounting improprieties.  *See* ¶¶21-30.  It is irrelevant that some of the sources were not directly involved in Scholastic's accounting operations.  *See* Def. Mem. at 23.  The sources provided the type of information that someone in their position would likely know.  *See In re Veeco Instruments,* 235 F.R.D. at 230 (acknowledging that allegations were adequately sourced when it was "likely that these [ ] employees would have been knowledgeable about [Veeco's alleged accounting improprieties and defendants' alleged fraudulent intent]") (citations omitted); *see also, In re Atlas Air,* 324 F. Supp. 2d at 493.  For example, according to CI 2, a former Marketing Director of the At Home Division, unrealistic revenue targets imposed by Defendants caused At Home's employees to pursue customers that were unlikely to make payments (¶55); CI 4, who was tasked with rectifying the issues of the At Home Division, stated that the At Home Division experienced "tremendous" customer service issues because of its common practice to ship unwanted product to customers (¶53); CI 7, the director of Wholesale Sales, said one of Scholastic's sales goals was the "sell-

---

[18]    Defendants' reliance on *Higginbotham v. Baxter Int'l, Inc.,* 495 F.3d 753 (7th Cir. 2007), is misplaced.  Not only is *Higginbotham* a Seventh Circuit case, but in that case, "[t]here was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus that the management of the parent had been aware of the fraud during the period covered by the complaint." *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 513 F.3d 702, 712 (7th Cir. 2008). As shown above, this is clearly not the case here.

in" of books to distributors and the "sell-through" of these books by the distributors to end-user customers.[19]

### 2.    Plaintiff Sufficiently Alleges Motive and Opportunity

Since Plaintiff has established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege motive and opportunity. *Ganino,* 228 F.3d at 170.  Nonetheless, allegations of motive and opportunity can serve to further strengthen an inference of scienter. *See Rothman v. Gregor,* 220 F.3d 81, 93-94 (2d Cir. 2000) (alleged motive may serve to establish scienter or reinforce other scienter allegations).  In order to support a "strong inference" of fraudulent intent, Plaintiffs' allegations of motive must "entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak*, 216 F.3d at 301 (citations omitted).  The Second Circuit has held that the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit." *In re Scholastic,* 252 F.3d at 74.

There can be no dispute that Defendants, both high-ranking corporate officers, had the opportunity to commit the fraudulent acts alleged in the CAC. *Id.*  (summarily noting that corporate officers "ha[ve] access to insider information and thus ha[ve] an opportunity to commit fraudulent acts.").[20]  In addition, the CAC more than adequately pleads Defendants' motive to commit the fraud.  Specifically, it describes in great detail their plan to artificially inflate Scholastic's stock price in order to

---

[19]    Defendants contention that some of the confidential sources may not have worked at Scholastic is irrelevant and wholly inappropriate at this juncture because, on a motion to dismiss, a plaintiff's allegations are accepted as true. *See Scheuer v. Rhodes,* 416 U.S. at 236.

[20]    In a desperate attempt to argue that there was no scienter, Defendants claim that they had no opportunity to commit fraud because Defendants "did not make any statements." Def. Mem. at 21.  However, not only is this argument inappropriate on a motion to dismiss, it also fails to take into account the numerous SEC filings, press releases, and other statements during the Class Period that identify the exact misrepresentations and material omissions that Defendants made. *See, e.g.,* ¶¶43, 50, 76, 88-90, 92, 94, 98, 100, 102.

enable Defendant Robinson and other high-level insiders to sell-off approximately $23 million of their personal holdings in the Company.

Stock sales by insiders generally imply a strong inference of scienter when those sales are "unusual." *In re Scholastic,* 252 F.3d at 74; *see also In re Atlas Air*, 324 F. Supp. at 488 ("Typically, the pleading of motive and opportunity is sufficient when a plaintiff alleges that corporate insiders made materially misleading statements while selling large amounts of stock at artificially high prices."). A court will generally consider several factors to determine whether insider trading activity is unusual, including "the amount of profit from the sales, the portion of the stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic,* 252 F.3d at 74-75 (citing *Rothman*, 220 F.3d at 94. A court will also consider the timing of the sales. *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (holding that "[t]rades made a short time before a negative public announcement are suspiciously timed").[21]

Here, the Company's highest-level executives collectively sold approximately $23 million worth of their personal holdings in the Company at suspicious times. It is noteworthy that Defendant Robinson alone sold over $6 million worth of stock at two critical points: first, right before Scholastic and the FTC agreed to settle allegations that Scholastic violated laws enforced by the FTC in marketing their negative option book clubs; and later, within days after announcing that Scholastic made "impressive gains" and that he was "confident" that Scholastic would grow revenues in fiscal 2006.[22] *See* ¶¶97, 98, 118.

---

[21]    Moreover, as this Court recognized in *Oxford*, "[a]lthough plaintiffs generally use evidence of unusual or suspicious insider trades to provide evidence of motive, it is also relevant as evidence of conscious or reckless behavior." 187 F.R.D. at 140, n.1.

[22]    Defendants cite *Druskin v. AnswerThink, Inc.*, 299 F. Supp. 2d 1307, 1337 (S.D. Fla. 2004), for the proposition that there can be no inference of scienter where the sales were forced; however, as *Druskin* makes clear, this is only true if the defendant has no control over the timing or circumstances of the sale. *Id.* Here, the nature of how Defendant Robinson used the proceeds of his stock sale is irrelevant to the issue of scienter. Presumably, Defendant Robinson had control over the method of fulfilling his financial obligations under his divorce agreement. Def. Mem. at 20. There is no evidence in the Affidavit of David Elbaum, filed on

Moreover, other insiders sold millions of dollars of their holdings throughout the Class Period – over $16 million in total, excluding Defendant Robinson's sales.[23]  ¶118.

Cases alleging far less egregious insider selling than what is alleged here have been held to satisfy the motive and opportunity elements of scienter.  *See In re Oxford Health Plans,* 187 F.R.D. at 140 (holding that stock sales were suspicious where certain insiders separately sold between $621,000 and $5.4 million worth of stock); *IPO,* 241 F.Supp. 2d at 365-66 ("Where corporate insiders engaged in 'unusual insider trading activity', *i.e.,* sold hundreds of thousands of dollars worth of inflated stock, the motive prong is plainly satisfied.") (citations omitted); *In re MTC Elec. Techs. S'holders Litig.,* 898 F. Supp. 974, 980 (E.D.N.Y. 1995) (holding that stock sales by one defendant of approximately 8,000 shares for profits of $173,993 raised a strong inference of fraudulent intent).  Here, the sheer volume of insider sales – 632,586 shares for $22.9 million in gross proceeds – clearly gives rise to a strong inference of scienter.[24]

Defendants contend that Plaintiff has not properly alleged scienter because Defendant Robinson sold only 3% of his shares, was still a major shareholder of the Company and received annual stock option grants.  Def. Mem. at 20-21.  However, the mere fact that Defendants profited from the sale of some of their stock, as opposed to all of it, still means that they obtained a concrete benefit from the

---

February 27, 2008 in support of Def. Mem., that Defendant Robinson was forced to sell the particular stock at a particular time.

[23]    Defendants argue that stock sales by other insiders who are not named as Defendants are irrelevant to the scienter inquiry.  *See* Def. Mem. at 21.  Although not probative of scienter alone, these insiders derived proceeds of over $16 million.  Therefore, the inclusion of their trades is surely relevant and establishes further evidence of Defendants' scienter.

[24]    The fact that Defendant Winston did not trade Scholastic stock during the Class Period (*see* Def. Mem. at 20) does not diminish the force of Plaintiff's scienter allegations.  The scienter requirement may be satisfied even if some insiders sell little or none of their holdings.  *See In re APAC Teleservices, Inc. Sec. Litig.,* No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter"); *Freedman v. Value Health, Inc.,* 958 F. Supp. 745, 755 (D. Conn. 1997) (holding that sales by only three of nine named defendants was sufficient to plead scienter).

- 22 -

artificially inflated stock price. *See In re Oxford Health Plans,* 187 F.R.D. at 140 (holding that the retention of a large position after realizing profit from stock sales does not vitiate insider trading liability); *see also In re MicroStrategy, Inc. Sec. Litig.,* 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (refusing to hold that insider sales did not create an inference of scienter simply because defendants sold less than 5% of their shares); *cf. Stevelman v. Alias Research Inc.,* 174 F.3d 79, 82, 85-86 (2d Cir. 1999) (holding that insider sales were sufficient to establish motive even in absence of allegations as to percentage of shares retained). There simply is no *per se* rule concerning the percentage of stock that must be sold for trading to be unusual. *In re Scholastic,* 252 F.3d at 74. Moreover, Defendants' claim that the total amount of insider sales alleged in the CAC is "vastly inflated" (Def. Mem. at 21, n.7) is inappropriate at this stage. *See In re Scholastic,* 252 F.3d at 75 (cautioning that on a motion to dismiss, courts should not engage in fact finding to resolve disputed issues concerning the percentage of shares sold by defendants).

**D.    The CAC Sufficiently Alleges Loss Causation**

Defendants argue that the CAC fails to sufficiently allege loss causation because they contend they never announced anything "new" about the Company's accounting or its business units. Def. Mem. at 18. As an initial matter, Defendants ignore that the disclosures at the end of the Class Period specifically mention problems in the Continuities business and problems in the U.K.

In any event, contrary to Defendants' contentions, "a corrective disclosure [need not], on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges." *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 546 (N.D. Ill. 2007). Defendants' insistence that Plaintiff must allege a corrective disclosure that specifically admits and corrects each of the subjects of the earlier misstatements and omissions alleged in the CAC is not supported by *Dura Pharms. v. Bruodo*, 544 U.S. 336 (2005). *See Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 728-29 (N.D. Tex. 2006) (surveying cases on loss causation and rejecting argument that *Dura* requires "fact-for-fact pleading" in order to sufficiently allege loss causation noting that were that the

- 23 -

rule it would "discourage candor and inhibit the flow of precise, accurate information between corporations and shareholders."); *Freeland v. Iridium World Commc'ns. Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures. Several District Courts have, therefore, read *Dura* narrowly, and this Court finds their reasoning persuasive"); *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J. Aug. 17, 2005) (rejecting proposition "that an alleged corrective disclosure must be the linguistic mirror image of the alleged fraud"); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, 411 F. Supp. 2d 1172, 1177 (N.D. Cal. 2005) (rejecting defendants' argument that "*Dura* requires the corrective disclosure to directly relate to the putative misstatement.").

Here, the CAC alleges that Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Scholastic's stock price and operated as a fraud or deceit on Class Period purchasers of Scholastic stock by misrepresenting the Company's past and future business prospects. ¶112. Defendants achieved this façade of success, growth and strong future business prospects by making misrepresentations about the Company's business and financial results. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, Scholastic's stock fell precipitously as the prior artificial inflation came out of Scholastic's stock price. *Id.* This sufficiently alleges loss causation. *See In re Hollinger Int'l, Inc. Sec. Litig.*, No. 04C-0834 (DHC), 2006 U.S. Dist. LEXIS 47173, at *42 (N.D. Ill. June 28, 2006) (plaintiffs satisfied loss causation by pleading misrepresentations, corrective disclosure and loss; whether disclosures were "truly" corrective could not be derived on pleadings and plaintiffs were given all inferences that disclosure was corrective).[25]

---

[25]    Defendants contend that the CAC fails to state a claim under Section 20(a) of the Exchange Act because it fails to allege a primary violation. This argument fails because the CAC states a claim for violations of the Exchange Act.

## IV.     CONCLUSION

For the reasons stated herein, we respectfully submit that Defendants' motion to dismiss be denied in its entirety and this case proceed to discovery.  In the event that the Court grants Defendants' motion, however, Plaintiff respectfully requests the Court to grant leave to amend the CAC.

DATED:  April 18, 2008                    COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          DAVID A. ROSENFELD
                                          MARIO ALBA JR.


                                                 /s/ Samuel H. Rudman
                                          SAMUEL H. RUDMAN


                                          58 South Service Road, Suite 200
                                          Melville, NY  11747
                                          Telephone:  631/367-7100
                                          631/367-1173 (fax)


                                          Lead Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I, Samuel H. Rudman, hereby certify that, on April 18, 2008, I caused a true and correct copy of the attached:

Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss

to be served: (i) electronically on all counsel registered for electronic service for this case; and (ii) by first-class mail to any additional counsel.

_/s/ Samuel H. Rudman_
Samuel H. Rudman

SCHOLASTIC 07
Service List – 4/18/08   (07-0182)
Page 1 of 1

**Counsel for Defendant(s)**

Michael J. Chepiga
David Elbaum
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
  212/455-2000
  212/455-2502 (Fax)


**Counsel for Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)