UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

ALASKA LABORERS EMPLOYERS                          : Civil Action No. 07-CIV-07402(GBD)
RETIREMENT FUND, Individually and On Behalf : **(Consolidated)**
of All Others Similarly Situated,                          :
                                                                      : CLASS ACTION
                                          Plaintiff,            :
                                                                      :
                vs.                                                 : MEMORANDUM OF LAW IN OPPOSITION TO
                                                                      : DEFENDANTS' MOTION TO DISMISS THE
SCHOLASTIC CORP., et al.,                            : SECOND CONSOLIDATED AMENDED CLASS
                                                                      : ACTION COMPLAINT
                                          Defendants.      :
                                                                      :
—————————————————————— x

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................................. 1

II.   STATEMENT OF FACTS ...................................................................................... 3

III.  ARGUMENT........................................................................................................... 6

    A.   Legal Standard on a 12(b)(6) Motion to Dismiss ............................................ 6

    B.   The SCAC Sufficiently Alleges Fraud with Particularity.................................... 7

        1.   Defendants Have Admitted that Their Statements Concerning
            Scholastic's Continuities Business and U.K. Operations Were Materially
            False and that Scholastic's Continuities Business Was Materially
            Impaired........................................................................................................ 8

        2.   Defendants' Representations Regarding the Company's Accounting
            Practices and Financial Results Were False and Misleading When Made .......... 11

    C.   The SCAC Alleges Facts Giving Rise to a Strong Inference of Scienter ........................ 15

        1.   The SCAC Alleges Conscious Misbehavior and Recklessness........................... 16

        2.   The SCAC Alleges Motive and Opportunity....................................................... 19

    D.   The SCAC Sufficiently Alleges Loss Causation ............................................... 22

IV.   CONCLUSION....................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Bell Atl. Corp. v. Twombly,*
127 S. Ct. 1955 (2007) ........................................................................................ 7

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,*
497 F.3d 546 (5th Cir. 2007) ............................................................................ 22

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l,*
423 F. Supp. 2d 348 (S.D.N.Y. 2006) .............................................................. 17

*Cortec Ind., Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) ................................................................................ 25

*Crowell v. Ionics, Inc.,*
343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................. 13

*Druskin v. AnswerThink, Inc.,*
299 F. Supp. 2d 1307 (S.D. Fla. 2004) ............................................................ 22

*Dura Pharms., Inc. v. Broudo,*
544 U.S. 336 (2005) ............................................................................................ 22

*Freedman v. Value Health, Inc.,*
958 F. Supp. 745 (D. Conn. 1997) .................................................................... 21

*Freeland v. Iridium World Commc'ns Ltd.,*
233 F.R.D. 40 (D.D.C. 2006) ............................................................................ 23

*Ganino v. Citizens Utils. Co.,*
228 F.3d 154 (2d Cir. 2000) .............................................................................. 15

*Gavish v. Revlon, Inc.,*
No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. LEXIS 19771
(S.D.N.Y. Sept. 30, 2004) .................................................................................. 14

*Hall v. Children's Place Retail Stores, Inc.,*
No. 07 Civ. 8252 (SAS), 2008 U.S. Dist. LEXIS 54790
(S.D.N.Y. July 18, 2008) .................................................................................... 10

*Higginbotham v. Baxter Int'l, Inc.,*
495 F.3d 753 (7th Cir. 2007) ............................................................................ 18

*In re Am. Bank Note Holographics Sec. Litig.,*
93 F. Supp. 2d 424 (S.D.N.Y. 2000) ................................................................ 17

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
381 F. Supp. 2d 192 (S.D.N.Y. 2004) ................................................................ 8

Page

*In re APAC Teleservices, Inc. Sec. Litig.*,
    No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
    (S.D.N.Y. Nov. 19, 1999) ................................................................................ 21

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
    324 F. Supp. 2d 474 (S.D.N.Y. 2004) ......................................................... 10, 16, 18

*In re BISYS Sec. Litig.*,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................................... 12

*In re Bristol-Myers Squibb Sec. Litig.*,
    No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448
    (D.N.J. Aug. 17, 2005) .................................................................................. 23

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) ................................................................. 13

*In re Catalina Mktg. Corp. Sec. Litig.*,
    390 F. Supp. 2d 1110 (M.D. Fla. 2005) .......................................................... 10

*In re CINAR Corp. Sec. Litig.*,
    186 F. Supp. 2d 279 (E.D.N.Y. 2002) ............................................................ 19

*In re eSpeed, Inc. Sec. Litig.*,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ............................................................ 16

*In re Gilat Satellite Networks, Ltd.*,
    No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996
    (E.D.N.Y. Sept. 19, 2005) .............................................................................. 18

*In re IBM Corporate Sec. Litig.*,
    163 F.3d 102 (2d Cir. 1998) ............................................................................ 8

*In re Initial Pub. Offering Sec. Litig.*,
    241 F. Supp. 2d 281 (S.D.N.Y. 2003) ........................................................... 7, 21

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ............................................................ 21

*In re MTC Elec. Techs. S'holders Litig.*,
    898 F. Supp. 974 (E.D.N.Y. 1995) ................................................................ 21

*In re Nokia Corp. Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................ 19

*In re Nortel Networks Corp. Sec. Litig.*,
    238 F. Supp. 2d 613, 626 (S.D.N.Y. 2003) ............................................. 14, 15, 16

**Page**

*In re NYSE Specialists Sec. Litig.*,
    503 F.3d 89 (2d Cir. 2007) ................................................................................................... 6

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007) ................................................................................. 24

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ............................................................................. 11, 20, 21

*In re Parmalat Sec. Litig.*,
    375 F. Supp. 2d 278 (S.D.N.Y. 2005) ................................................................................. 24

*In re Qwest Commc'ns Int'l Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004) ............................................................................... 20

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    No. 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350
    (S.D.N.Y. Feb. 3, 2005) .......................................................................................................... 7

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) .......................................................................................... 7, 10, 20

*In re Scottish Re Group Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................................. 25

*In re Sotheby's Holding, Inc. Sec. Litig.*,
    No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504
    (S.D.N.Y. Aug. 31, 2000) .................................................................................................... 10

*In re Top Tankers, Inc. Sec. Litig.*,
    528 F. Supp. 2d 408 (S.D.N.Y. 2007) ................................................................................. 16

*In re Tower Auto. Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007) ................................................................................. 25

*In re Veeco Instruments, Inc. Sec. Litig.*,
    235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................................ 18

*In re Vivendi Universal, S.A. Sec. Litig.*,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................................................. 8, 11

*In re Winstar Commc'ns*,
    No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
    (S.D.N.Y. Feb. 27, 2006) ............................................................................................. 16, 23

**Page**

*In re Xethanol Corp. Sec. Litig.*,
    No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935
    (S.D.N.Y. Sept. 7, 2007) ....................................................................................... 25

*Irvine v. ImClone Sys.*,
    No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342
    (S.D.N.Y. June 4, 2003) ......................................................................................... 8

*Kinsey v. Cendant Corp.*,
    No. 04 Civ. 0582 (RWS), 2005 U.S. Dist. LEXIS 16397
    (S.D.N.Y. Aug. 11, 2005) ....................................................................................... 19

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) ..................................................................... 11

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005) ..................................................................................... 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ................................................................................... 18

*Montalvo v. Tripos, Inc.*,
    No. 4:03-CV-995 (SNL), 2005 U.S. Dist. LEXIS 22752
    (E.D. Mo. Sept. 30, 2005) ....................................................................................... 24

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ......................................................................... 7, 15, 18, 19

*Phelps v. Kapnolas*,
    308 F.3d 180 (2d Cir. 2002) ..................................................................................... 6

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) ................................................................. 23

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................................. 18, 20

*Ryan v. Flowserve Corp.*,
    444 F. Supp. 2d 718. (N.D. Tex. 2006) ................................................................. 23

*SEC v. Dunn*,
    No. 07 Civ. 2058 (LAP), 2008 U.S. Dist. LEXIS 77341
    (S.D.N.Y. Sept. 30, 2008) ....................................................................................... 18

*Sekuk Global Enters. v. KVH Indus., Inc.*,
    No. 04-306ML, 2005 U.S. Dist. LEXIS 16628
    (D.R.I. Aug. 11, 2005) ............................................................................................. 25

**Page**

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,*
    No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
    (S.D.N.Y. Sept. 6, 2005) ................................................................................................ 15, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007) ........................................................................................................ 15

**STATUTES, RULES AND REGULATIONS**

PSLRA ......................................................................................................................................... 7, 8

Federal Rules of Civil Procedure
    Rule 9(b) ................................................................................................................................ 7, 8
    Rule 12(b)(6) ......................................................................................................................... 6, 7

Lead Plaintiff, Alaska Laborers Employees Retirement Fund ("Lead Plaintiff" or "Plaintiff"), respectfully submits this memorandum of law in opposition to the motion to dismiss the Second Consolidated Amended Class Action Complaint (the "SCAC") filed by Defendants Scholastic Corporation ("Scholastic" or the "Company"), Richard Robinson ("Robinson") and Mary Winston ("Winston").[1]

## I.    PRELIMINARY STATEMENT

This is a federal securities class action lawsuit brought on behalf of purchasers of the common stock of Scholastic between March 18, 2005 and March 23, 2006, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

As Defendants point out, this is the second time that the parties are briefing Defendants' motion to dismiss. What Defendants fail to point out, however, is that the filing of the SCAC was the direct result of Defendants' belated admission that Scholastic had vastly overstated its Class Period financial results and that it would be restating its financial statements. Plaintiff's Consolidated Amended Complaint ("CAC"), which was filed on January 11, 2008, alleged that Scholastic had materially overstated its financial results and failed to disclose problems at Scholastic's direct-to-home continuities business (the "Continuities business"), which was operated by Scholastic's At Home Division (the "At Home Division").[2]   In their motion to dismiss the CAC, Defendants strenuously argued that the fact that Scholastic's accounting had never been questioned by the SEC and that the Company had never restated its financial statements rendered Plaintiff's claims insufficient as a matter of law.  After the hearing on Defendants' motion to dismiss the CAC, on July 31, 2008, Defendants advised the Court that, based on discussions with the SEC concerning its accounting disclosures, Scholastic would be restating its financial statements for fiscal years 2005, 2006 and 2007 (the "Restatement") and writing down the value of its Continuities business by $92.4 million.  The correspondence between Scholastic and the SEC reveals that the Company had been in discussions with the SEC regarding its accounting disclosures since February 2008.

---

[1]    Defendants Scholastic, Robinson and Winston will be referred to herein collectively as the "Defendants." Robinson and Winston will be referred to herein collectively as the "Individual Defendants."

[2]    For purposes of this memorandum, the At Home Division and the Continuities business are used interchangeably.

The Restatement erased the value of the Continuities business as Scholastic wrote down the value of that business by $92.4 million. Scholastic also admitted that its Class Period financial statements were materially false and misleading and had greatly overstated the Company's financial performance. For example, on July 20, 2005, Scholastic issued a press release announcing its financial results for the fourth fiscal quarter of 2005 and the full fiscal year, the period ending May 31, 2005. For the fiscal year, Scholastic reported net income of $64.3 million, or $1.58 per diluted share. As alleged in the SCAC, this figure vastly overstated the Company's financial results. As set forth in the Restatement, the Company's net income during fiscal 2005 was actually $3.3 million and not $64.3 million as originally reported – an overstatement of 21 times.

Given the breadth and scope of Defendants' admissions, which go directly to the issues in this case, Plaintiff's wrote the Court requesting permission to amend the CAC. The Court then denied Defendants' motion to dismiss as moot and Defendants consented to the filing of the SCAC. The SCAC was filed on October 20, 2008, and Defendants filed the instant motion to dismiss.

Not surprisingly, Defendants' motion to dismiss ignores the allegations of the SCAC. Defendants primarily argue that any problems with the Continuities business and Scholastic's revenue recognition practices were "fully disclosed." This is patently absurd. Scholastic has now admitted that, during the Class Period, its Continuities business was impaired and overvalued by $92.4 million on its financial statements, among other admissions. Defendants' citation to pre-Class Period "disclosures" which merely state that the Continuities business experienced lower than expected results does not advise investors that the Continuities business was impaired and overvalued by almost $100 million. Furthermore, none of the so-called disclosures identified by Defendants advised investors that: the Continuities business was negatively affected by the Scholastic FTC Consent Decree; the Continuities business was experiencing an increase in levels of bad debt and returns; Scholastic's method of recognizing revenue was improper and violated Generally Accepted Accounting Principles ("GAAP") because it recognized revenue upon shipment of products that the Company knew would not be paid for or would be returned; and Scholastic purposely targeted customers with poor credit histories in order to generate revenues. Instead, during the Class Period, Defendants told investors that the Continuities business was improving and on its way to increasing profitability.

A fair review of the SCAC makes clear that Plaintiff has sufficiently particularized its allegations of fraud and raised the requisite strong inference of scienter. The SCAC details: the problems at the Continuities business

and Defendants' knowledge of those facts or reckless disregard for them; Defendants' admitted GAAP violations; Defendants' insider trading; and their motive to conceal problems with the Continuities business in order to continue improper accounting practices at Scholastic. Finally, the SCAC adequately pleads loss causation by alleging that when the falsity of Defendants' false and misleading Class Period statements became known to the public, the price of Scholastic common stock declined by more than $7 per share, or 21%.

For the reasons set forth herein, it is respectfully submitted that Defendants' motion to dismiss should be denied in its entirety and this case should proceed to discovery.

## II.    STATEMENT OF FACTS

Defendant Scholastic is a children's publishing, education and media company. The Company operates through four segments: Children's Book Publishing and Distribution; Educational Publishing; Media, Licensing and Advertising; and International. ¶40.[3] During the Class Period, Scholastic's Continuities business, which was part of the Children's Book Publishing and Distribution segment, delivered multiple shipments of children's books and other products to customers over a period of time. ¶¶3, 44. The Continuities business was operated by the At Home Division, the old book club business of Grolier Incorporated ("Grolier"), which Scholastic acquired in 2000. ¶43.

As detailed in the SCAC, when Scholastic acquired Grolier it became subject to an FTC consent decree (the "Grolier FTC Consent Decree") that prevented Grolier, and later, the At Home Division, from sending merchandise to customers without their prior express consent. ¶45. During the Class Period, Scholastic violated the Grolier FTC Consent Decree and continued to ship unordered merchandise and sought payment for such merchandise, without making proper disclosures to customers. ¶46. On June 21, 2005, the FTC, alleging that Scholastic had continued the improper practices that were prohibited by the Grolier FTC Consent Decree, issued another consent decree (the "Scholastic FTC Consent Decree"), requiring Scholastic to pay a fine of $710,000 and to stop shipping and seeking payment for unordered merchandise without first making appropriate disclosures. ¶47.

While Scholastic experienced some problems with the Continuities business prior to the Class Period, the problems multiplied as a result of the Company's attempts to comply with the Scholastic FTC Consent Decree. ¶48.

---

[3]    "¶___" refers to the paragraphs of the SCAC.

For example, after the Scholastic FTC Consent Decree, the Company was required to provide an (800) customer service number, which led to an increase in returns and less sales. *Id.* The Scholastic FTC Consent Decree also caused the Continuities business to broaden its customer base, which, in turn, brought about the intentional targeting of customers who presented a risk of non-payment and the rise of bad debt levels. ¶49. These problems caused the Continuities business to be materially impaired. ¶50. Scholastic's U.K. operations were faring no better. Throughout the Class Period, the Company was unable to address the problems with its U.K. operations and it continued to experience problems with that division. ¶54.

As discussed in detail herein, during the Class Period, Defendants issued numerous positive statements about the Continuities business and Scholastic's U.K. operations, which failed to disclose the true facts about the business operations. ¶¶114-123. For example, despite their knowledge that the Continuities business was in trouble and that levels of bad debt were increasing due to targeting of non-creditworthy customers, Defendants made statements that the Company: "stabilized [the Continuities] business and improved results in international"; was starting to see "bad debt improvements"; "lowered bad debt and returns"; engaged in "better targeting of credit-worthy customers"; and was "on track to grow profitably in the future" with respect to the Continuities business. ¶¶116 and 122.

Moreover, in an attempt to conceal the problems with the Continuities business, Scholastic reported artificially inflated financial results by improperly recognizing revenue in its Continuities and Trade businesses and by manipulating its accounting reserves. ¶52. Scholastic's practice of recognizing revenue upon shipment of products was improper and violated GAAP because there was no true sale, as shipment of unordered products led to "big returns" and customers' failure to pay for the products. ¶¶66-67, 70, 73 and 76. In an attempt to increase revenue, Defendants purposely targeted customers that they knew were not creditworthy. ¶¶67 and 69. While Scholastic established reserves for product returns, such reserves were not reasonably estimable. ¶¶77-85. In addition, Scholastic's accounts receivable reserves were artificially low in light of the Company's levels of bad debt. ¶¶88-93. As a result of the accounting improprieties, Defendants' financial statements were false and misleading.

The truth about the Company and its operational problems began to emerge through two separate announcements. On December 16, 2005, Scholastic issued a press release announcing its financial results for the fiscal second quarter of 2006, the period ending November 30, 2005. The Company reported disappointing earnings

and blamed, among other things, challenges with the Company's Continuities business and "investments to restructure our business in the United Kingdom." In response to these announcements, the price of Scholastic common stock declined from $33.10 per share to $29.30 per share, on heavy trading volume. Defendants, however, continued to conceal the scope of the problems at the Company and maintained earnings guidance that they knew could not be met. ¶¶126 and 127.

Then, on March 23, 2006, Scholastic issued a press release announcing its financial results for the third quarter of 2006, the period ending February 28, 2006. The Company reported a net loss of $15.5 million, or ($0.37) per share, and dramatically reduced its earnings guidance citing a variety of factors. In response to the Company's announcement, the price of Scholastic common stock declined from $29.42 per share to $26.04 per share, on heavy trading volume. ¶¶128 and 129.

Following the Class Period, Scholastic continued to make additional disclosures about the true condition of its Continuities business. On December 20, 2007, Scholastic issued a press release announcing that the Company wished to sell the Continuities business and admitted that "in the last three years [the Continuities business] has lost profitability." ¶100. Then, on July 30, 2008, more than two years after the end of the Class Period, Scholastic filed its Form 10-K for fiscal 2008 ("2008 10-K"), which included an impairment charge for the discontinued Continuities business and the Restatement (which encompassed Scholastic's 2005, 2006 and 2007 financial statements). ¶101. The Restatement is an admission that Scholastic's Class Period financial statements were overstated by tens of millions of dollars. The Restatement further revealed that the entire value of goodwill attributable to Scholastic's Continuities business was impaired since May 31, 2005 and over-valued by $92.4 million. ¶51. As stated in the 2008 10-K, Scholastic "determined that all $92.4 [million] of goodwill ($61.0 [million] after recognition of deferred tax benefits) attributable to the [Continuities business] was impaired as of May 31, 2005." Accordingly, the Company restated its previously issued financial statements by recognizing a corresponding reduction to net income of $61.0 million in 2005. ¶101.

The information Scholastic has now disclosed in its 2008 10-K supports the allegations contained herein. ¶102. The 2008 10-K includes the Company's restated 2005, 2006 and 2007 operating results. Such restated financial data reveals that the Continuities business's bad debts between 2005 and 2007 averaged about 20 times more than the bad debts experienced by the rest of the Company. Scholastic has now admitted that the bad debt

expense of its Continuities business averaged approximately 20% of revenues from 2005 through 2007, while the bad debts at Scholastic's remaining businesses averaged less than 1% of revenues during the same period. The extraordinarily high level of bad debts at the Continuities business was a direct result of Defendants' improper practice of shipping unwanted product to customers, as alleged herein. ¶103.

The Restatement is tantamount to an admission that the Continuities business was not performing as it had modeled. In 2001, the Financial Accounting Standards Board radically changed the longstanding methods of accounting for business combinations with the issuance of Statement of Financial Accounting Standards ("SFAS") No. 141 and its companion standard, SFAS No. 142. This change resulted in the elimination of the pooling-of-interest method of accounting for business combinations and the amortization of goodwill. ¶104. Rather than require goodwill to be amortized, SFAS No. 142 requires that goodwill be tested for impairment at least annually at the "reporting unit" level. If the fair value of a reporting unit is less than its value reported in the entity's financial statements, the goodwill associated with the reporting unit is tested for impairment. ¶105.

Scholastic has now admitted that the value it attributed to its Continuities business was overstated by more than $92 million at May 31, 2005. The magnitude of this overstatement evidences the dire operating performance of the Continuities business prior to and during the Class Period. In fact, such amount represents more than 10% of the Company's total equity as of the end of fiscal 2005. ¶106.

## III.  ARGUMENT

### A.  Legal Standard on a 12(b)(6) Motion to Dismiss

The standard for review on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is well established. The Court must "accept all allegations in the complaint as true and draw all inferences in the light most favorable to the non-moving party[]." *In re NYSE Specialists Sec. Litig*., 503 F.3d 89, 95 (2d Cir. 2007).[4] At issue on a 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Phelps v. Kapnolas*, 308 F.3d 180, 184-185 (2d Cir. 2002). Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the

---

[4]  Citations and footnotes are omitted, unless otherwise noted.

grounds of entitlement to relief and raise a right to relief above the speculative level. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007).

As detailed below, it is respectfully submitted the SCAC satisfies this standard and should be upheld in its entirety.

**B.    The SCAC Sufficiently Alleges Fraud with Particularity**

Securities fraud actions are subject to the particularity pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4, *et seq.*, and Fed. R. Civ. P. 9(b), which require plaintiffs to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111(RWS), 2005 U.S. Dist. LEXIS 1350, at *34-*35 (S.D.N.Y. Feb. 3, 2005). In other words, the complaint must identify the "who, what, where, when and how" of the fraud. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 358 (S.D.N.Y. 2003). "Even with the heightened pleading standard under Rule 9(b) and the Securities Reform Act," the Second Circuit "do[es] not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Accordingly, "[the PSLRA] does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000).

Here, Plaintiff sufficiently alleges that Defendants made materially false and misleading statements and omitted material information concerning the Company's financial results, its accounting practices, its At Home Division (including the Continuities business) and its U.K. operations. As required by Rule 9(b), the SCAC specifically identifies "what" statements are alleged to be false and misleading; the individual(s) "who" made the statements (*i.e.*, Scholastic, Defendant Robinson and Defendant Winston); "when" they were made (*i.e.*, the specific date) and "where" they were made (*i.e.*, press releases, SEC filings and conference calls). *See, e.g.,* ¶¶55, 62, 89, 110-12, 114, 116, 120, 122 and 124. The SCAC also alleges "why" the representations were materially false and misleading, *i.e.*, Defendants failed to inform investors that: (i) the Company was experiencing significant problems with its Continuities business; (ii) the goodwill associated with the Continuities business was severely impaired and was therefore materially overstated by $92.4 million; (iii) the Company's U.K. operations were in significant decline

and the Company's efforts to correct the problems in the U.K. were not successful; (iv) Scholastic's reported

financial results were not a true and accurate representation of the Company's financial performance because the

Company was engaged in a host of improper accounting practices that artificially inflated its revenue and income;

and (v) the Company was improperly manipulating its bad debt reserve, thereby overstating the Company's financial

condition. *See, e.g.,* ¶¶56, 113, 115, 117, 121, 123 and 125.

Nonetheless, Defendants question whether the SCAC sufficiently alleges that the statements were false and

misleading when made. *See* Def. Mem. at 11-17.[5] As set forth below, the SCAC sufficiently alleges fraud with the

requisite particularity required by the PSLRA and Rule 9(b).

### 1. Defendants Have Admitted that Their Statements Concerning Scholastic's Continuities Business and U.K. Operations Were Materially False and that Scholastic's Continuities Business Was Materially Impaired

The SCAC alleges with specificity that Defendants made a series of misstatements and omissions regarding

Scholastic's Continuities business and its U.K. operations and failed to disclose that the Continuities business was

impaired and should have been written down by $92.4 million. As detailed in the SCAC, Defendants repeatedly

highlighted and mischaracterized the trends in Scholastic's business operations, including its Continuities business

and its U.K. operations, and made highly positive statements about the Company's future projections.[6] *See* ¶¶114,

116, 120 and 122. However, Defendants' failed to disclose that: Scholastic was experiencing significant problems

with its Continuities business as a result of attempts to comply with the Scholastic FTC Consent Decree (*see* ¶¶48-

50, 121 and 123); levels of bad debt in the Continuities business were increasing, as Defendants targeted customers

---

[5]    "Def. Mem. at __" refers to pages of the Memorandum of Law in Support of Defendants' Motion to Dismiss, filed October 31, 2008.

[6]    Contrary to Defendants' assertions, their statements regarding earnings forecasts are not protected by the PSLRA because the statements were knowingly false when made and any purported cautionary language was insufficient. *See In re IBM Corporate Sec. Litig.,* 163 F.3d 102, 107 (2d Cir. 1998) (holding that forward-looking statements are actionable where "the speaker does not genuinely or reasonably believe them"); *In re AOL Time Warner*, *Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 223 (S.D.N.Y. 2004) (holding that "no degree of cautionary language will protect material misrepresentations or omissions where defendants knew their statements were false when made"); *see also In re Vivendi Universal, S.A. Sec. Litig.,* 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) (holding that cautionary language must "render reliance on the misrepresentation unreasonable"). Here, the language that Defendants cite as "cautionary" constitutes mere boilerplate warnings that are insufficient to bring the statements within the protection safe harbor provision. *See Irvine v. ImClone Sys.*, No. 02 Civ. 109 (RO), 2003 U.S. Dist. LEXIS 9342, at *4 (S.D.N.Y. June 4, 2003) (holding that repeated general warnings did not constitute sufficient cautionary language).

with histories of non-payment (*see* ¶¶49-50, 67, 69 and 123); the goodwill associated with the Continuities business was severely impaired (*see* ¶¶6, 9, 50-52, 101-106, 121 and 123); and Scholastic was experiencing significant problems with the U.K. division (*see* ¶¶6, 54, 115 and 121).

As alleged in the SCAC, Defendants' positive statements about the Continuities business were materially false and misleading because they failed to disclose, among other things, that the Continuities business was plagued with significant problems during the Class Period as a result of its attempts to comply with the Scholastic FTC Consent Decree. ¶¶48-52. For example, complying with the Scholastic FTC Consent Decree caused the At Home Division to experience declining financial results because it led to fewer sales, more returns and an increase in bad debt as Scholastic began to target customers who presented a heightened credit risk and risk of non-payment. ¶¶48-49. Indeed, while Defendants were making statements that the bad debts were improving as a result of "targeting of credit-worthy customers" and "a shift toward higher value customers" (¶122), the truth was that the Continuities business's level of ***bad debt increased*** throughout the Class Period and it was routine practice for Scholastic to ***target customers that Defendants knew had bad payment histories.*** ¶¶49, 67, 69 and 91. Scholastic's restated financials show that, during the Class Period, bad debts for the Continuities business were approximately 20 times greater than bad debts experienced by the rest of the Company. ¶102. Accordingly, by way of the Restatement, Scholastic admits that the Continuities business was not performing as it had stated. These allegations are more than sufficient to provide a basis for Plaintiff's allegations of falsity. *See In re Scholastic*, 252 F.3d at 72 ("Any information that shed light on whether class period statements were false or materially misleading is relevant").

Defendants do not dispute, nor can they, the SCAC's allegations that, as a result of the problems Scholastic was experiencing in its At Home Division, the goodwill in the Continuities business was impaired and should have been written down. ¶50. In fact, ***Scholastic has admitted that the entire value of goodwill attributable to the Continuities business was impaired since May 31, 2005.*** ¶51. Pursuant to SFAS 142, Scholastic was required to test its goodwill for impairment at least annually at the "reporting unit" level. ¶105. Scholastic admittedly failed to do so,[7] even though the Company knew that the Continuities business was doing poorly as a result of lower sales and

---

[7]    In the Restatement, Scholastic admitted that the Continuities business was incorrectly aggregated with the Children's Book Publishing and Distribution and that the Continuities business "should have been treated as a

an increase in bad debt.  ¶¶48-50.  Instead, Defendants made positive statements about the Continuities business throughout the Class Period and downplayed the problems the segment was experiencing.  ¶¶116 and 122.  Over a year later, when Scholastic decided to sell its Continuities business, the Company was finally forced to admit that the Continuities business had lost profitability during the Class Period.  ¶100.  As a result, Scholastic took an impairment charge for the goodwill attributable to the Continuities business, which was overvalued by $92.4 million, and restated the Company's 2005, 2006 and 2007 operating results.[8]  ¶¶51 and 101-102.

Moreover, by choosing to make positive statements about Scholastic's operations, earnings and levels of bad debt, Defendants created a duty to disclose the entire truth about the operations.  *Hall v. Children's Place Retail Stores, Inc*., No. 07 Civ. 8252 (SAS), 2008 U.S. Dist. LEXIS 54790, *17-*18 (S.D.N.Y. July 18, 2008) ("Once defendants choose to speak about their company, they undertake a duty to speak truthfully and to make such additional disclosures as . . . necessary to avoid rendering the statements misleading.").  "Thus, when a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."  *In re Sotheby's Holding, Inc. Sec. Litig.*, No. 00 Civ. 1041 (DLC), 2000 U.S. Dist. LEXIS 12504, at *12 (S.D.N.Y. Aug. 31, 2000).

Here, for example, Defendants made statements that the Continuities business was strengthening and "on track to grow profitably" (¶122), even though they knew that the Continuities business was experiencing significant problems, including an increase in levels of bad debt and returns, and that the goodwill in the Continuities business was materially impaired.  *See, e.g., In re Catalina Mktg. Corp. Sec. Litig.,* 390 F. Supp. 2d 1110, 1113 (M.D. Fla. 2005) (statements that "publicly touted new operations as a continuing source of rapid growth with knowledge that these operations would not yield revenue increases for some time, if ever" were actionable).  Accordingly, Defendants had no reasonable basis for their positive statements concerning the Continuities business.  *See In re*

---

reporting unit" and goodwill attributable to Continuities should have been assessed at the reporting unit level.  *See* Elbaum Ex. 28 at 53 (references to "Elbaum Ex. __" are to the exhibits of the Affidavit of David Elbaum, filed October 31, 2008).

[8]     Defendants misleadingly argue that "there can be no claim where the financial statements were accurate" (Def. Mem. at 15); however, because Scholastic restated its financials, there is no doubt that the Class Period financial statements were, in fact, inaccurate.  *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F. Supp. 2d 474, 486-487 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made").

*Vivendi,* 381 F. Supp. 2d at 182 (statements that a company was "financially solid" were actionable where defendants did not have a reasonable basis for them); *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (statements downplaying computer and internal control problems were actionable because they misled investors into believing that the problems were not as extensive or serious as they were); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (reasoning that even vague statements can be considered "statements that implied certainty when, in fact, Defendants purportedly had little reason to believe them").

Defendants assert that they "repeatedly disclosed" problems with the Continuities business and the U.K. operations. Def. Mem. at 15-16. This is simply not the case. Notwithstanding the fact that Defendants cite to Scholastic's 2004 Form 10-K, which was filed almost a year before the start of the Class Period and before the Scholastic FTC Consent Decree was even issued, Defendants' purported "disclosure" fails to say anything about the Continuities business's increase in levels of bad debt or that the Continuities business was negatively impacted as a result of its attempt to comply with the Scholastic FTC Consent Decree.[9] Def. Mem. at 15. Instead, throughout the Class Period, Defendants made positive statements about the Continuities business, its stabilization and projections of continued success.[10] ¶¶116, 120 and 122.

### 2. Defendants' Representations Regarding the Company's Accounting Practices and Financial Results Were False and Misleading When Made

The SCAC also sufficiently particularizes Scholastic's accounting improprieties and material overstatement of its financial results. In this regard, the SCAC details Defendants' numerous representations to investors in SEC

---

[9]     The only other document Defendants cite in support of their argument that they made disclosures regarding the Continuities business is Scholastic's 10-K for the period ended March 31, 2005, before the Scholastic FTC Consent Decree was issued, which did not make any disclosures concerning problems with the Continuities business as alleged in the SCAC.

[10]    Defendants do not dispute that they failed to disclose problems with Scholastic's U.K. operations and, instead, claim that they disclosed "restructuring efforts." Def. Mem. at 16. However, the purported disclosures demonstrate that Defendants were attempting to create the impression that Scholastic experienced declines in the U.K. as a result of trying to improve business. *See* Elbaum Ex. 7 at 5 and 7; Ex. 9 at 2. For example, Defendants' statement that Scholastic experienced "declines in the U.K. as [they] invest in restructuring that business" (Elbaum Ex. 7 at 7) fails to take into account the SCAC's allegations that Scholastic continu[ed] to experience problems with its U.K. operations, which it was unable to address. *See* ¶54. Accordingly, Defendants raise nothing more than an inappropriate factual dispute.

filings and press releases regarding the Company's financials and accounting practices.  *See,* ¶¶55, 62, 89, 114, 120 and 124.  These statements were materially false and misleading because Scholastic's results were made possible, in part, by the Company's practice of improperly recognizing revenue before it was actually earned and by materially understating the amount of its accounting reserves.  ¶¶4, 53, 55-113, 115, 117 and 121.

As Defendants have now admitted, Scholastic's 2005, 2006 and 2007 financial statements were false and overstated by tens of millions of dollars, resulting in a restatement of the Company's Class Period financial results.  ¶¶5 and 101-103.  The Company's financial statements were thus presumptively misleading and inaccurate.  The Restatement provides a "sufficient basis for pleading that th[e financial] statements were false and misleading."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 437 (S.D.N.Y. 2005).

Pursuant to GAAP, revenue should not be recognized until it is realized or realizable and earned.  *See* ¶61.  As alleged in the SCAC, throughout the Class Period, Defendants engaged in the practice of shipping unordered books to consumers and recognized revenue upon shipment of these products.  ¶¶62-63 and 65.  Although Defendants knew that the practice of shipping unwanted books led to heavy returns and problems collecting payments from customers, Scholastic continued to recognize revenue before it was actually earned, in direct violation of GAAP.  ¶¶63-87.  Indeed, Scholastic purposely targeted customers that they knew had bad payment histories and were not likely to pay for the shipped merchandise in order to generate revenue.  ¶¶67 and 69.  Such practices were improper and violated GAAP because while Scholastic booked revenue upon the shipment of products, there was no true sale and the collectibility of the sales price was not reasonably assured at the time of revenue recognition.[11]  ¶76.

While Scholastic established reserves for estimated returns, Scholastic's estimates of future product returns were inherently unreliable and impossible to estimate because: 1) customers were granted an unlimited amount of time to make returns; 2) returns were not formally processed or timely recorded in Scholastic's accounting records;

---

[11]    Defendants' contention that "Scholastic fully disclosed" its revenue recognition practices is misleading.  *See* Def. Mem. at 11.  While Defendants may have disclosed Scholastic's practice of recognizing revenue upon shipment of merchandise, they did not disclose what is truly at issue here – that the Company's recognition of revenue was improper and a violation of GAAP because Defendants knew the unwanted merchandise they sent to consumers resulted in a large number of returns and problems collecting payments.

and 3) the amount of product in the Company's distribution channel was difficult to monitor.[12] ¶¶79-82 and 84; *see In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 593 (D.N.J. 2001) (allegations of improper revenue recognition were sufficiently particular where plaintiffs alleged that future returns could not be reasonably estimated). Given Scholastic's inability to predict the amount of books that might eventually be returned to the Company, sales personnel did not receive commissions for the "sales" they reported during a particular quarter. ¶81. However, these same sales were recorded as revenue upon shipment. Accordingly, while Scholastic's financial statements were misleadingly represented to have been presented in conformity with GAAP, the truth was that Scholastic's reported sales and earnings were artificially inflated as a result of Defendants' practices of recognizing revenue upon shipment of books that Defendants knew would either go unpaid for or would later be returned. Indeed, Scholastic has since admitted that although the Company reported earnings of $1.61 during the Class Period, its actual earnings were only $0.08.[13] ¶87.

Furthermore, as alleged in the SCAC, Scholastic improperly manipulated its accounting reserves in violation of GAAP and the Company's own accounting policies. ¶¶88-93. As alleged in the SCAC, Scholastic was required to estimate the collectibility of its receivables in order to record accounting reserves. ¶89. Although Defendants were aware that Scholastic's Continuities business had experienced an increase in bad debt in the last eight to ten months of 2005 – primarily due to problems collecting payments from customers – Defendants failed to modify Scholastic's bad debt assumptions. ¶91. Instead, Scholastic reduced its accounts receivable reserves to an

---

[12]     Notably, the SCAC alleges exactly what Defendants claim is not alleged – *i.e.*, "how future returns were estimated" and "why the Company's estimates were so consciously flawed as to constitute fraud." *See* ¶¶62, 79 and 89.

[13]     Defendants attempt to downplay the importance of the Restatement of the Company's Class Period financials by repeatedly arguing that Scholastic has not revised its revenues or recorded any charges due to returns or bad debt. Def. Mem. at 11. However, Defendants ignore the SCAC's allegations that Scholastic restated its financials statements as a result of the SEC's review of Scholastic's accounting statements. ¶87. Whether or not the Restatement was related to Scholastic's improper revenue recognition is a factual matter that is not appropriate at this juncture. Moreover, as one court has noted, "[t]he focus on revenue, an old chestnut that securities fraud defendants frequently try on judges and juries, is entirely specious. What matters most to investors is income, not revenues." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 18 (D. Mass. 2004). Here, as Scholastic later admitted, the Company's net income during fiscal 2005 was $3.3 million, as opposed to $64.3 million as originally reported. ¶121.

artificially low level and made false statements that its bad debt was improving.[14] ¶¶93 and 116. As a result, the Company's financial statements materially understated its sales returns and accounting reserves for its uncollectible receivables, thereby overstating its operating results.[15] ¶90. Scholastic has now admitted that bad debts in the Continuities business between 2005 and 2007 averaged almost 20 times more than bad debts experienced by the rest of the Company. ¶¶102-103.

Defendants do not dispute that Scholastic shipped unwanted merchandise to its customers, thereby recognizing revenue before such revenue was actually earned. Instead, Defendants argue that "Plaintiff's claims . . . are not supported by any factual allegations." *See* Def. Mem. at 11. Contrary to Defendants assertions, the SCAC's allegations of improper accounting practices are sufficiently specific, as they identify the accounting practices, such as premature revenue recognition and manipulation of accounting reserves, that may have improperly inflated the Company's reported revenues.[16] *See In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 626 (S.D.N.Y. 2003) (allegations of improper revenue recognition were adequately specific, where, among other things, plaintiffs

---

[14]    Defendants assert that Scholastic was not required "to establish reserves at any specific percentage of sales" (Def. Mem. at 13); however, the absence of a specific mandate regarding the recording of reserves does not give Defendants the freedom to manipulate accounting estimates to artificially inflate revenue. The Company was required to record reserves based on reasonable estimates and on a consistent basis and failed in this respect by decreasing accounting reserves throughout the Class Period while levels of bad debt were increasing. ¶¶90 and 91.

[15]    Defendants' circular reasoning that "the Company's reserves were sufficient" and therefore, "bad debts could not have led to a misstatement revenues" (Def. Mem. at 13, n.7) ignores the facts alleged in the SCAC. For purposes of this motion, the allegations of the SCAC must be accepted as true, and the SCAC specifically alleges that Scholastic's bad debt reserves were insufficient due to problems collecting payments from customers. ¶¶90-93.

[16]    Defendants reliance on *Gavish v. Revlon, Inc.*, No. 00 Civ. 7291 (SHS), 2004 U.S. Dist. LEXIS 19771 (S.D.N.Y. Sept. 30, 2004) does not support dismissal. The court in *Gavish* dismissed plaintiffs' complaint because the alleged accounting abuses were "not alleged with a degree of detail sufficient to support a reasonable belief that [the company] actually engaged in them during the Class Period." *Id.* at *40. The court noted that "[i]f the foregoing series of improper accounting allegations were accompanied by other, more particularized and less inferentially attenuated allegations of material fraudulent conduct, they would perhaps suffice to raise a sufficient inference of wrongdoing." *Id.* at *45. As Defendants acknowledge, none of the allegations in *Gavish* "contain[ed] a specific allegation of monetary consequence at all, let alone one large enough to have been reflected in Revlon's financial statements." *Id.* at *49. Here, however, the SCAC explicitly states that Defendants "materially overstated the Company's operating results by recognizing millions of dollars in revenue on unwanted product" and that Scholastic's "Class Period financial statements were overstated by tens of millions of dollars." ¶¶5, 63 and 77; *see In re Nortel Networks,* 238 F. Supp. 2d at 626 (accounting allegations were specific where complaint alleged that the company "reported hundreds of millions, if not billions, of dollars in false revenues"). The SCAC also specifies that, during the Class Period, while the Company reported earnings of $1.61, its actual earnings were only $0.08 and the Company's net income during fiscal 2005 was actually $3.3 million and not $64.3 million as originally reported. ¶¶87 and 121.

alleged that defendants "improperly reported revenue on sales . . . with the knowledge that [ ] customers could not pay for the products").

Plaintiff's allegations are parallel to those of plaintiffs in *In re Nortel Networks*. In *Nortel Networks*, plaintiffs sued defendants alleging that Nortel's financial statements were materially misstated because of "accounting irregularities perpetrated at Nortel." *Id.* at 625. Plaintiffs in *Nortel Networks* alleged a number of accounting violations, including "improper recognition of revenue from sales . . ., failure properly to reflect (through reserves or charges against income) the risk of 'noncollectibility' of unsecured loans extended to uncreditworthy customers, . . . and failure to recognize 'billions of dollars' in impairment losses on long-term assets obtained through the Company's acquisitions." *Id.* at 626. Plaintiffs further alleged that the company improperly reported revenue on sales that they knew were materially uncollectible. The court held that such allegations were sufficiently particular and provided a "detailed account of 'why, in plaintiff's view the [challenged statements] were fraudulent." *Id.* Similarly, here, the SCAC specifically alleges that Scholastic improperly recognized revenues on sales of books that Defendants knew were materially uncollectible because the products were either returned or were sent to uncreditworthy customers that failed to pay for the books. ¶¶61-87. The SCAC also specifically alleges that Scholastic failed to properly reflect the risk of noncollectibility because its accounting reserves were materially understated. ¶¶88-93.

In sum, the SCAC's allegations of Defendants' false and misleading statements support a reasonable belief as to the misleading nature of each statement or omission, and nothing more is required at the pleading stage. *Novak,* 216 F.3d 300.

### C.    The SCAC Alleges Facts Giving Rise to a Strong Inference of Scienter

In the Second Circuit, a "strong inference" of scienter is established by facts that constitute evidence of conscious misbehavior or recklessness, or which show that defendants had motive and opportunity to commit fraud. *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir. 2000). Even in light of this standard, great specificity is not required. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *29 (S.D.N.Y. Sept. 6, 2005). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2509

(2007) (emphasis in original). The inference must merely be "*at least as likely* as any plausible opposing inference." *Id.* at 2513 (emphasis in original). In other words, a tie between facts that give rise to an inference of scienter and plausible opposing inferences is sufficient to avoid dismissal. *In re Top Tankers, Inc. Sec. Litig.,* 528 F. Supp. 2d 408, 414 (S.D.N.Y. 2007). As discussed below, Plaintiff easily meets these pleading requirements.

### 1.    The SCAC Alleges Conscious Misbehavior and Recklessness

To plead scienter based on conscious misbehavior or recklessness, a plaintiff must allege facts showing that defendants' conduct "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *In re Nortel Networks,* 238 F. Supp. 2d at 631. Moreover, where a complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, an inference arises that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak,* 216 F.3d at 308. As this Court has acknowledged, even in the absence of specific information contradicting their public statements, "knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Commc'ns,* No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006).

Here, Defendants' statements regarding Scholastic's financials and its Continuities business were contradicted by available facts, giving rise to an inference that Defendants "had intimate knowledge of those facts or should have known them."[17] *In re Atlas Air,* 324 F. Supp. 2d at 489. Specifically, the SCAC alleges that the Individual Defendants, as CEO and CFO of Scholastic, were intimately involved in important issues affecting the Company's business, including its Continuities business, and had access to undisclosed information. ¶¶18-23. Their positions also allowed them to directly control the revenue recognition and other accounting practices.[18] *See In re*

---

[17]    "[E]ven in the absence of specific information contradicting their public statements," knowledge of contradictory information may be imputed to individual defendants where the statements concern matters that are "sufficiently significant" to the company. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006).

[18]    Indeed, as alleged in the SCAC, the accounts receivable reserves were determined by Defendant Winston. ¶93, n.8.

*Am. Bank Note Holographics Sec. Litig.,* 93 F. Supp. 2d 424, 448 (S.D.N.Y. 2000) (finding scienter allegation sufficient as to CFO where, because of his position, he was "uniquely situated" to control the revenue recognition procedures of the company).  Accordingly, the Individual Defendants knew, or at the very least, by the nature of their positions, should have known, that the adverse facts pleaded in the SCAC (and discussed herein) had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and misleading.[19]

The Individual Defendants knew, or should have known, the following, among other things:

- the fact that Scholastic's Continuities business was experiencing significant problems as a result of the Scholastic FTC Consent Decree, including a decrease in financial results, increased returns and an increase in levels of bad debt (¶¶48-50);

- that the Company intentionally targeted customers who presented a risk of non-payment, which caused the Continuities business's level of bad debt to rise (¶¶49 and 67);

- that Scholastic's U.K. operations suffered from significant problems that the Company was unable to address (¶54); and

- that Scholastic's accounts receivable reserves were reduced to an artificially low level, given the increase in levels of bad debt (¶¶88-93).

Similarly, due to the pervasiveness and significance of problems with the Continuities business and the accounting improprieties, Defendants knew, or were reckless in not knowing , that Scholastic's financial statements were overstated, including the massive overstatement of goodwill attributable to the Continuities business and the overstatement of revenue.  Scholastic has now admitted that the entire $92.4 million value of goodwill in the Continuities business was impaired as of May 31, 2005, and has since restated its financial statements.  ¶¶101 and 140.  The magnitude of this write-down, "coupled with evidence of 'corresponding fraudulent intent,'" may support a finding of scienter.[20] *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l,* 423 F. Supp. 2d 348, 362

---

[19]    As alleged in the SCAC, the Individual Defendants signed SEC filings and Sarbanes-Oxley Certificates (¶¶110-112), which gave rise to a duty to familiarize themselves with Scholastic's core business operations. *See Teamsters Local 445 Freight Div. Pension Fund,* 2005 U.S. Dist. LEXIS 19506, at *63.

[20]    Although Defendants now argue that "a restatement of earnings does not support a strong, or even a weak, inference of scienter," (Def. Mem. at 23), in their prior memorandum in support of their motion to dismiss, dated February 27, 2008 ("Def. Mem. II"), Defendants placed great weight on the fact that Scholastic did not restate its earnings and argued that the Company's failure to restate was "fatal" to Lead Plaintiff's case. *See* Def. Mem. II at 11.

(S.D.N.Y. 2006) (citing *Novak*, 216 F.3d at 309); *see also Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (holding that a large write-down supports a finding of recklessness); *In re Atlas Air*, 324 F. Supp. 2d at 489 (court held that "the mere fact that the company had to make a large correction is some evidence of scienter").

Further contributing to a strong inference of scienter are Scholastic's GAAP violations.  Defendants knew, or should have known, that Scholastic's policy of recognizing revenue upon shipment of product was improper and violated GAAP because there was no true sale.  ¶¶64, 76 and 80.  *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006) ("accounting manipulations involving premature revenue recognition . . .are especially indicative of conscious misbehavior since such violations 'do not commonly occur inadvertently', but instead 'suggest a conscious decision to improperly recognize revenue'"); *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS), 2005 U.S. Dist. LEXIS 41996, at *64 (E.D.N.Y. Sept. 19, 2005) (acknowledging that "GAAP violations that involve the premature recognition of revenue have been said to 'suggest a conscious choice to recognize revenue in a manner improper, and may therefore support a stronger inference of scienter'"); *see also SEC v. Dunn*, No. 07 Civ. 2058 (LAP), 2008 U.S. Dist. LEXIS 77341, at *50 (S.D.N.Y. Sept. 30, 2008) (holding that "[t]o adopt an accounting policy without any regard for what is required under relevant accounting principles amounts to an egregious refusal to the obvious" while "to do so with the intention of conveying an appearance of success despite knowledge of the contrary is the quintessence of an intent to deceive, manipulate, or defraud").  As alleged in the SCAC, numerous former Scholastic employees confirmed that Defendants caused Scholastic employees to "ship unwanted product to customers," which led to massive returns and inability to collect on payments.[21]  ¶¶65-67.  Indeed, Scholastic *intentionally* pursued customers that they knew were unlikely to pay in

---

[21]    Defendants' reliance on *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007), to argue that the Court should steeply discount allegations based on confidential informants is misplaced.  Not only is *Higginbotham* a Seventh Circuit case, but in that case, "[t]here was no basis other than the confidential sources, described merely as three ex-employees of Baxter and two consultants, for a strong inference that the subsidiary had failed to conceal the fraud from its parent and thus that the management of the parent had been aware of the fraud during the period covered by the complaint."  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 712 (7th Cir. 2008).  Unlike *Higginbotham*, here, the confidential informants are identified with sufficient particularity to support the allegations relating to Defendants' awareness of problems with the At Home Division and Scholastic's accounting improprieties.  ¶¶30-39.  Each confidential informant provided the type of information that someone in their position would likely know.  *See In re Veeco Instruments*, 235 F.R.D. at 230 (acknowledging that allegations were adequately sourced when it was "likely that these [ ] employees would have been knowledgeable about [Veeco's alleged accounting improprieties and defendants' alleged fraudulent intent]").  In fact, six of the nine informants

order to generate revenue.  ¶¶67 and 69.  Defendants knew that these customers were not credit-worthy because the At Home Division maintained a database of customer information that contained five to six years of customer purchasing and payment histories.[22]  ¶69.  In addition, as Defendants knew or recklessly disregarded, Scholastic's estimates of product returns were unreliable because Scholastic granted customers an unlimited amount of time to return products and returns were not formally processed or timely accounted for.  ¶¶79-84.  According to a former Vice President of Finance for the At Home Division, the Individual Defendants were "very well informed" about Scholastic's financial and accounting matters and, in fact, Defendant Winston attended quarterly meetings during which finances for the At Home Division were reviewed.  ¶86.

Nevertheless, Defendants contend that the SCAC fails to adequately allege recklessness because, according to Defendants, allegations of a defendant's position in a company are "insufficient, as a matter of law, to establish scienter."  Def. Mem. at 22.  Here, however, Plaintiff does not simply allege that the Individual Defendants' positions with the Company support an inference of scienter; rather, Plaintiffs allege that the roles of the Individual Defendants, along with Scholastic's Restatement and information that was reasonably available to the Individual Defendants regarding large returns and levels of bad debt, are what support the strong inference of scienter.  *See In re CINAR Corp. Sec. Litig.,* 186 F. Supp. 2d 279, 316 (E.D.N.Y. 2002) ("'subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate knowledge of company affairs' is [sic] enough to adequately infer scienter").  Indeed, that is precisely what was missing from *In re Nokia Corp. Sec. Litig.*, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) and *Kinsey v. Cendant Corp.,* No. 04 Civ. 0582 (RWS), 2005 U.S. Dist. LEXIS 16397, at *13 (S.D.N.Y. Aug. 11, 2005), which Defendants cite to support their argument.

## 2.    The SCAC Alleges Motive and Opportunity

Although Plaintiff has established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, allegations of motive and opportunity serve to further strengthen the inference of

---

worked in either the At Home Division, Trade or as a financial analyst and, because of their positions, had direct information about the allegations in the SCAC.

[22]    This internal data directly contradicted the positive statements Defendants were making regarding improvements in Scholastic's level of bad debt and is classic evidence of scienter.  *See Novak*, 216 F. 3d at 311 (holding that an inference of scienter may arise where a complaint alleges that defendants "knew facts or had access to information suggesting that their public statements were not accurate").

scienter.[23]  *See Rothman,* 220 F. 3d at 93-94.  In the Second Circuit, the "motive and opportunity element is generally met when corporate insiders misrepresent material facts to keep the price of stock high while selling their own shares at a profit."  *In re Scholastic*, 252 F.3d at 74.  Stock sales by insiders usually imply a strong inference of scienter when those sales are "unusual."  *Id.* at 74.  Sales may be unusual because of the size of the sales, the timing of the sales, the portion of holdings sold or the number of insiders selling.  *Id.* at 74-75; *In re Oxford Health Plans*, 187 F.R.D. at 139 (holding that "[t]rades made a short time before a negative public announcement are suspiciously timed").

Here, the Company's highest-level executives collectively sold approximately $23 million worth of their personal holdings in the Company at suspicious times.  Defendant Robinson alone sold over $6 million worth of stock at two critical points: 1) right before Scholastic paid $710,000 to settle allegations by the FTC that the Company violated laws enforced by the FTC in marketing their negative option book clubs; and 2) within days after announcing that Scholastic made "impressive gains" and that he was "confident" that Scholastic would grow revenues in fiscal 2006.  *See* ¶¶119-120 and 142.  Other insiders sold millions of dollars of their holdings throughout the Class Period – over $16 million in total, excluding Defendant Robinson's sales.  ¶142.  Moreover, most of the insider sales by these Company executives were executed near the highs for the stock during the Class Period, which adds further support to a strong inference of scienter.[24]  *Id.*; *In re Qwest Commc'ns Int'l Sec. Litig.*, 396 F. Supp. 2d 1178, 1196 (D. Colo. 2004) (insider sales made near class period high are probative of scienter).

Contrary to Defendants' assertions, there is no minimum level of sales at which insider trading becomes unusual *per se*; rather, each case must be decided on its own facts.  *In re Scholastic*, 252 F.3d at 74.  In fact, cases alleging far less egregious insider selling than what is alleged here have been held to satisfy the motive and opportunity elements of scienter.  *See, e.g., In re Oxford Health Plans,* 187 F.R.D. at 140 (holding that stock sales

---

[23]  Defendants do not contest that they had the "opportunity" to commit fraud, which is generally presumed for high-level corporate executives.  *See, e.g., In re Scholastic,* 252 F.3d at 74.

[24]  Defendants argue that stock sales by other insiders who are not named as Defendants are irrelevant to the scienter inquiry.  Def. Mem. at 21.  This argument ignores the realities of a corporate issuer.  When a large group of insiders sell stock in suspicious amounts it raises an inference that those inside the Company knew something that others do not.  That adds to the strong inference that those running the Company were aware of the problems at the Company.

were suspicious where certain insiders separately sold between $621,000 and $5.4 million worth of stock); *In re Initial Pub. Offering*, 241 F. Supp. 2d at 365-66 ("Where corporate insiders engaged in 'unusual insider trading activity', *i.e.,* sold hundreds of thousands of dollars worth of inflated stock, the motive prong is plainly satisfied."); *In re MTC Elec. Techs. S'holders Litig.*, 898 F. Supp. 974, 980 (E.D.N.Y. 1995) (holding that stock sales by one defendant of approximately 8,000 shares for profits of $173,993 raised a strong inference of fraudulent intent). Here, the sheer volume of insider sales – 632,586 shares for $22.9 million in gross proceeds – clearly gives rise to a strong inference of scienter.[25]

Defendants contend that Plaintiff has not properly alleged scienter because Defendant Robinson sold only 3% of his shares, pursuant to a divorce agreement. Def. Mem. at 20-21. However, the mere fact that Defendants profited from the sale of some of their stock, as opposed to all of it, still means that they obtained a concrete benefit from the artificially inflated stock price. *See In re Oxford Health Plans*, 187 F.R.D. at 140 (holding that the retention of a large position after realizing profit from stock sales does not vitiate insider trading liability); *see also In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 647 (E.D. Va. 2000) (refusing to hold that insider sales did not create an inference of scienter simply because defendants sold less than 5% of their shares). Moreover, the nature of how Defendant Robinson used the proceeds of his stock sale is irrelevant to the issue of scienter. Defendants contend that "Mr. Robinson's stock sales were made solely at his ex-spouse's direction" (Def. Mem. at 21), but do not cite any documents to support this assertion. Indeed, the exhibits Defendants attach merely state that the transactions were "made in accordance with the instructions of Mr. Robinson's former spouse pursuant to a matrimonial settlement agreement" (Elbaum Ex. 14 at 10, Ex. 16) and says nothing about whether Defendant Robinson had any control over the method of fulfilling his financial obligations under the divorce agreement or

---

[25]    The fact that Defendant Winston did not trade Scholastic stock during the Class Period (*see* Def. Mem. at 20) does not diminish the force of Plaintiff's scienter allegations. The scienter requirement may be satisfied even if some insiders sell little or none of their holdings. *See In re APAC Teleservices, Inc. Sec. Litig.,* No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter"); *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 755 (D. Conn. 1997) (holding that sales by only three of nine named defendants was sufficient to plead scienter).

whether Defendant Robinson was forced to sell his shares at a particular time.[26] Courts have rejected arguments, such as Defendants', that there can be no inference of scienter when a defendant sells stock pursuant to a divorce agreement. *See, e.g., Cent. Laborers' Pension Fund v. Integrated Elec. Servs.,* 497 F.3d 546, 554 (5th Cir. 2007) (rejecting argument that "financial obligations created by a divorce decree . . . provide a non-suspicious explanation for the stock sales").

As alleged in the SCAC, Defendants were motivated in not taking a timely impairment charge on the value of goodwill of the Continuities business because they wanted to conceal their accounting improprieties, including improper recognition of revenue and manipulation of accounting reserves, in the Continuities business.  ¶141. Indeed, Scholastic has now recorded the goodwill impairment charge only because the SEC began questioning the Company's accounting treatment of the goodwill related to the Continuities business.  *Id.*  Scholastic's failure to write-down the impairment in goodwill, coupled with Defendants' insider trading, provides a sufficient motive to commit securities fraud because Defendants had a financial incentive to conceal the problems with the Continuities business in order to avoid a decline in stock price.

Accordingly, Plaintiff's allegations, taken collectively and accepted as true, raise a strong inference of scienter.

### D.    The SCAC Sufficiently Alleges Loss Causation

"[L]oss causation is the causal connection between the material misrepresentation or omission and the economic loss suffered by the plaintiffs." *In re Winstar Commc'ns,* 2006 U.S. Dist. LEXIS 7618, at *41 (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 125 (2005)).  To establish loss causation, a plaintiff need only "establish that the loss was foreseeable and was caused by the materialization of the concealed risk." *In re Winstar Commc'ns,* 2006 U.S. Dist. LEXIS 7618, at *43-*44 (citing *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir. 2005).  The Supreme Court has acknowledged that a "short and plain statement" will suffice. *Dura Pharms.*, 544 U.S. at 346.  Defendants attempt to heighten this standard by attacking loss causation on the purported

---

[26]    Defendants cite *Druskin v. AnswerThink, Inc.,* 299 F. Supp. 2d 1307, 1337 (S.D. Fla. 2004), for the proposition that there can be no inference of scienter where the sales were forced; however, as *Druskin* makes clear, this is only true if the defendant has no control over the timing or circumstances of the sale. *Id.*

basis that Defendants never announced anything "new" about the Company's accounting or its business units.  Def. Mem. at 18.

Contrary to Defendants contentions, a corrective disclosure need not reveal "the precise loss attributable to [the] fraud" or the precise manner in which the fraud occurred.  *Lentell*, 396 F.3d at 177; *see also In re Winstar Commc'ns*, 2006 U.S. Dist. LEXIS 7618, at *45 (acknowledging that there is no "requirement that the disclosure take a particular form or be of a particular quality").  A corrective disclosure need not be the "linguistic mirror image" of the alleged fraud.  *In re Bristol-Myers Squibb Sec. Litig.*, No. 00-1990 (SRC), 2005 U.S. Dist. LEXIS 18448, at *57 (D.N.J. Aug. 17, 2005).

Defendants' insistence that Plaintiff must allege a corrective disclosure that specifically admits and corrects each of the subjects of the earlier misstatements and omissions alleged in the SCAC is not supported by *Dura*.  *See Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 728-29. (N.D. Tex. 2006) (surveying cases on loss causation and rejecting argument that *Dura* requires "fact-for-fact pleading" in order to sufficiently allege loss causation and noting that if that were the rule, it would "discourage candor and inhibit the flow of precise, accurate information between corporations and shareholders."); *Freeland v. Iridium World Commc'ns Ltd.*, 233 F.R.D. 40, 47 (D.D.C. 2006) ("Indeed, reading *Dura* to require proof of a complete, corrective disclosure would allow wrongdoers to immunize themselves with a protracted series of partial disclosures.  Several District Courts have, therefore, read *Dura* narrowly, and this Court finds their reasoning persuasive"); *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.,* 411 F. Supp. 2d 1172, 1177 (N.D. Cal. 2005) (rejecting defendants' argument that "*Dura* requires the corrective disclosure to directly relate to the putative misstatement.").  As this Court has previously held, "[a]llegations that the market reacted negatively to an opinion or speculation which in fact exposes the falsity of defendants' representations can be sufficient to plead loss causation."  *In re Winstar Commc'ns*, 2006 U.S. Dist. LEXIS 7618, at *47.[27]

_____

[27]    Curiously, Defendants state that Plaintiff "has studiously avoided this Court's loss causation analysis in *Winstar*."  Def. Mem. at 18.  Perhaps Defendants failed to read the decision in *Winstar*, because if they had, they would have known that this Court ruled **in favor** of the plaintiffs on the issue of loss causation and rejected defendants' argument that the company "never issued a restatement or other corrective disclosure concerning the alleged accounting improprieties."  *In re Winstar Commc'ns*, 2006 U.S. Dist. LEXIS 7618, at *47.

Defendants ignore that the disclosures at the end of the Class Period specifically mention problems in the Continuities business and problems in the U.K. As the SCAC alleges, the truth regarding Scholastic's false financial results and problems with its Continuities business and U.K. operations first began leaking out to the market on December 16, 2005, when the Company disclosed that "challenges in . . . Continuities, and investments to restructure our business in the United Kingdom" caused "lower profits in the second quarter."[28] ¶126. In response to this news, the stock price dropped by $3.80 per share. ¶127. Another drop occurred on March 23, 2006, after the Company reported a net loss of $15.5 million and reduced its outlook for fiscal 2006. ¶128. At that time, the stock price declined $3.38. ¶129. Thus, damages of *at least* $7.00 per share are attributable to removal of artificial inflation from the stock price resulting from the fraud, although other drops may also be linked to it. *See In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 252 (S.D.N.Y. 2007) (finding loss causation where stock drops were tied to announcements).

Although the March 23, 2006 press release did not *specifically* mention the Company's Continuities business and U.K. segments, it is clear from the context of the statements made during the Class Period, and the Company's December 16, 2005 announcement, where Scholastic attributed lower profits in the second quarter to "challenges in School Book Clubs and Continuities" and the "restructur[ing] [of] business in the United Kingdom," (¶126) that the lowering of Scholastic's outlook was indeed linked to problems with the Continuities business and the U.K operations. ¶128. At the very least, the March 23, 2006 announcement put investors on notice that Defendants' positive statements during the Class Period and its financial statements were false and unreliable. *See In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (loss causation adequately pled where announcements that the company could not repay bonds as they became due were alleged to disclose defendants' accounting improprieties, even though "the true extent of the fraud was not revealed to the public until [after the class period]"); *Montalvo v. Tripos, Inc.*, No. 4:03-CV-995 (SNL), 2005 U.S. Dist. LEXIS 22752, at *26 (E.D. Mo.

---

[28]    Defendants argue that the December 16, 2005 release did not announce new information about Scholastic's business units because the Company disclosed problems with the Continuities business and U.K. operations; however, throughout the Class Period, Defendants were making statements that these segments were "improv[ing]," "strengthening," experiencing "revenue and profit growth"; "stabiliz[ing]"; and "on track to grow profitably." ¶¶120 and 122. Therefore, the December 2005 disclosure provided new information to investors that Scholastic's Continuities business and U.K. operations were not doing as well as Defendants had suggested.

Sept. 30, 2005) (rejecting defendants' argument that plaintiffs failed to plead loss causation because the financial statements were restated until after the class period, court held that loss causation was sufficiently alleged where plaintiffs pled facts showing that the company's announcement that defendants had missed a "major milestone" caused their company's stock price to drop and was causally connected to allegations of GAAP violations); *Sekuk Global Enters. v. KVH Indus., Inc.,* No. 04-306ML, 2005 U.S. Dist. LEXIS 16628, at *47-*51 (D.R.I. Aug. 11, 2005) (holding that loss causation was sufficiently pled where end of class period announcement was about an earnings miss and did not mention the alleged non-disclosures concerning a particular product because, "taken in the light most favorable to Plaintiffs, [the announcement] can be plausibly understood to announce that disappointing A5 sales figures caused a decline in both KVH's satellite product revenue and its overall revenue"). Nevertheless, ultimately, whether the December 2005 and March 2006 statements constituted "corrective" disclosures are issues of fact that are not appropriate for resolution on a motion to dismiss. *In re Xethanol Corp. Sec. Litig.*, No. 06 Civ. 10234 (HB), 2007 U.S. Dist. LEXIS 65935, at *8, n.2 (S.D.N.Y. Sept. 7, 2007).[29]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.[30]

DATED:  December 12, 2008                COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         SAMUEL H. RUDMAN
                                         DAVID A. ROSENFELD


                                            */s/ Samuel H. Rudman*
                                           SAMUEL H. RUDMAN

---

[29]     Defendants contend that the SCAC fails to state a claim under Section 20(a) of the Exchange Act because it fails to allege a primary violation. This argument fails because the SCAC states a claim for violations of the Exchange Act. Moreover, the SCAC alleges that the Individual Defendants had direct involvement in the day-to-day management of the Company and were responsible for its statements to the public – which is all that it must do. *See, e.g., In re Scottish Re Group Sec. Litig.,* 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007). Further, to the extent that it must, the SCAC alleges that the Individual Defendants were "culpable participants" in the fraud with facts supporting an inference that they not only exerted control over Scholastic, but also participated in the alleged improprieties with scienter. *See In re Tower Auto. Sec. Litig.,* 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007).

[30]     In the event that the Court grants dismissal with respect to the primary or control person claim, Plaintiff respectfully requests an opportunity to amend the SCAC. *See Cortec Ind., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead.").

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

*Lead Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Samuel H. Rudman, hereby certify that, on December 12, 2008, I caused a true

and correct copy of the attached:

Memorandum of Law in Opposition to Defendants' Motion to Dismiss the
Second Consolidated Amended Class Action Complaint

to be served: (i) electronically on all counsel registered for electronic service for this

case; and (ii) by first-class mail to any additional counsel.


              */s/ Samuel H. Rudman*
              Samuel H. Rudman

SCHOLASTIC 07
Service List – 4/18/08   (07-0182)
Page 1 of 1

**Counsel for Defendant(s)**

Michael J. Chepiga
David Elbaum
Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, NY 10017
  212/455-2000
  212/455-2502 (Fax)


**Counsel for Plaintiff(s)**

Samuel H. Rudman
David A. Rosenfeld
Mario Alba Jr.
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747
  631/367-7100
  631/367-1173 (Fax)